# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| VIRGINIA A. D'ADDARIO and § <br> BRENT A. PLATT, TRUSTEE, as § <br> Trustee for the Virginia D'Addario § <br> Spray Trust #1, the Virginia D'Addario § <br> Spray Trust #2, and the Virginia § <br> D'Addario Accumulation Trust, § <br> § <br>      Plaintiffs, § <br> § <br> vs. § <br> § <br> DAVID D'ADDARIO; MARY LOU § <br> D'ADDARIO KENNEDY; GREGORY § <br> S. GARVEY; RED KNOT § <br> ACQUISITIONS, LLC; SILVER KNOT, § <br> LLC; and NICHOLAS VITTI, § <br> § <br>      Defendants. | No. 3:16-cv-00099-JBA <br><br> February 9, 2016 |

## RICO CASE STATEMENT

ARMSTRONG LAW FIRM, P.C
F. Dean Armstrong
Ct. Fed. Bar #ct22447
1324 Dartmouth Road
Flossmoor, IL  60422
708/798-1599
Fax: 708/798-1599
armstronglaw@sbcglobal.net

SABIA TAIMAN, LLC
Edward C. Taiman, Jr.
Ct. Fed. Bar #ct01319
450 Church Street
Hartford, CT 06103
860/541-2077
Fax: 860/713-8644
etaiman@sabialaw.com

Attorneys for Plaintiffs
Virginia A. D'Addario and
Brent Platt, Trustee

**TABLE OF CONTENTS**

Page

Summary Of The Suit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

1. Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

    A. Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

    B. Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

2. Alleged Wrongful Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

    A. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

    B. The Overall Fraudulent Scheme . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

    C. The Honeyspot Road Scheme . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    D. The Frenchtown Road Scheme . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

    E. The Red Knot Forbearance Agreement Scheme . . . . . . . . . . . . . . . . . . . .16

        (1) The Bank Group Offers To Discount The Amount Owed . . . . . . . . 19

        (2) The Red Knot Forbearance Agreement Was A Sham . . . . . . . . . . . 20

        (3) The Red Knot Forbearance Agreement
            Was A Fraud On The Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    F. The Wrongful Use And Transfer Of The Estate's Residential
       Properties For The Benefit Of David D'Addario, Lawrence
       D'Addario And Mary Lou D'Addario . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    G. The Silver Knot/Wise Metals Scheme . . . . . . . . . . . . . . . . . . . . . . . . . . .28

    H. Red Knot/David D'Addario Settlement Scheme . . . . . . . . . . . . . . . . . . . . 30

    I. For Virginia D'Addario, Any Remedy In
       The Probate Court Is Futile . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

    J. The Probate Estate Is Now Hopelessly Insolvent . . . . . . . . . . . . . . . . . . . .40

# TABLE OF CONTENTS

Page

K.    The Defendants Are Jointly And Severally Liable For The
      Conduct Of David D'Addario And The Other Co-Conspirators . . . . . . . . . .42

3.    Other Wrongdoers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

4.    Victims/Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

5.    Pattern Of Racketeering Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

      A.    Predicate Acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

            (1)    Mail Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45

            (2)    Wire Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

            (3)    Money Laundering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

            (4)    Monetary Transactions With Unlawful Proceeds . . . . . . . . . . . . . . .52

            (5)    Interstate Racketeering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

            (6)    Interstate Transport Of Misappropriated Funds. . . . . . . . . . . . . . . 54

      B.    Dates Of The Predicate Acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

      C.    Circumstances Constituting Mail Fraud And Wire Fraud . . . . . . . . . . . . . 54

      D.    Criminal Conviction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

      E.    Civil Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  54

      F.    Pattern Of Racketeering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  54

      G.    Relatedness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

6.    Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

      A.    Entities Which Constitute The Enterprise . . . . . . . . . . . . . . . . . . . . . . . 56

      B.    Structure, Purpose, Function And Course Of Conduct
            Of The Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

## TABLE OF CONTENTS

Page

C.     Employees, Officers, Or Directors Of The Enterprise . . . . . . . . . . . . . . . . . . 57

D.     Association Of The Defendants With The Enterprise . . . . . . . . . . . . . . . . . . .57

E.     Relation Of The Defendants To The Enterprise . . . . . . . . . . . . . . . . . . . . . . 58

F.     Perpetrators And Victims Of The Racketeering Activity . . . . . . . . . . . . . . .58

7.     Separateness Of The Pattern Of Racketeering Activity And The Enterprise . . . . . 58

8.     The Relationship Between The Activities Of The Enterprise And The Pattern Of Racketeering Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

9.     Benefits To The Enterprise. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .58

10.    Effect Of The Enterprise On Interstate Commerce . . . . . . . . . . . . . . . . . . . . . . . . . 59

11.    N/A

12.    Acquisition Of Interest In And Control Over The Affairs Of The Enterprise Under 18 U.S.C. §1962(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

13.    Association Of The Defendants With The Enterprise Under 18 U.S.C. §1962(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

14.    Description Of The Conspiracy Pursuant To 18 U.S.C. §1962(d) . . . . . . . . . . . . . . 59

15.    Injury To Business Or Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

16.    Causal Relationship Between The Injury And The RICO Violations . . . . . . . . . . .60

17.    Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

18.    Other Federal Causes Of Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

19.    State Law Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .61

20.    Additional Information Helpful To The Court In Processing The RICO Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .62

iv

## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **VIRGINIA A. D'ADDARIO and** | § | |
| **BRENT A. PLATT, TRUSTEE, as** | | |
| **Trustee for the Virginia D'Addario** | § | |
| **Spray Trust #1, the Virginia D'Addario** | | |
| **Spray Trust #2, and the Virginia** | § | |
| **D'Addario Accumulation Trust,** | | |
| | § | |
| Plaintiffs, | | |
| | § | |
| vs. | | **No. 3:16-cv-00099-JBA** |
| | § | |
| **DAVID D'ADDARIO; MARY LOU** | | **February 9, 2016** |
| **D'ADDARIO KENNEDY; GREGORY** | § | |
| **S. GARVEY; RED KNOT** | | |
| **ACQUISITIONS, LLC; SILVER KNOT,** | § | |
| **LLC; and NICHOLAS VITTI,** | | |
| | § | |
| Defendants. | | |

## RICO CASE STATEMENT

Pursuant to this Court's Standing Order in Civil RICO Cases, Plaintiffs submit the following RICO Case Statement.

### Summary Of The Suit

This lawsuit involves the long-term plan of Defendant David D'Addario to plunder, pillage and loot the over $160,000,000 in assets of his deceased father's probate estate, all for his personal financial benefit, and all to the detriment of David's unfavored estate creditors, including David's unfavored older sister, Plaintiff Virginia A. D'Addario.

Rather than honor his charge as executor to administer and settle the affairs of his deceased father's probate estate (the "Estate") in a prompt and efficient manner, David ran the Estate as his own personal fiefdom, deliberately keeping the Estate open until now, some 30 years later, all of the Estate's major assets have been transferred for David's personal financial

benefit, and, in his wake, the Estate is left hopelessly insolvent. And as a result of David's denuding of the Estate, his older sister, Virginia D'Addario, is left with no realistic chance for any recovery on her acknowledged, but unpaid, multi-million dollar creditor claim against the Estate, and no realistic chance for any distribution on her 12.5% beneficial interest in the Estate's $120,000,000 net worth, as was her deceased father's express desire in his Last Will and Testament.

Through this suit, Virginia D'Addario -- as both an aggrieved creditor of the Estate, as well as a defrauded beneficiary of the Estate -- seeks to hold David D'Addario, and those who conspired with him, accountable for the systematic looting of her deceased father's Estate. Because the Defendants' long-term pattern of related wrongful conduct involves the violation of numerous federal statutes, Plaintiffs bring suit against the Defendants pursuant to the civil damage provisions of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1961 *et seq.* ("RICO"). *See Bingham v. Zolt*, 66 F.3d 553 (2d Cir. 1995); *Bankers Trust Company v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988); *Cadle Company v. Flanagan*, 2006 WL 860063 (D. Conn. March 31, 2006) (Covello, J.); and *Gunther v. Dinger*, 547 F.Supp. 25 (S.D.N.Y. 1982). Further, Plaintiffs assert Connecticut state law claims against the Defendants for breach of fiduciary duties, conspiracy to breach fiduciary duties, and aiding and abetting breach of fiduciary duties (*see Beal Bank v. Galef*, 2010 WL 1332461 (D.Conn. March 31, 2010) (Hall, J.); and *Chapman Lumber, Inc. v. Tager*, 288 Conn. 69, 87-88 & 89 (2008)), which claims are redressable herein pursuant to this Court's diversity jurisdiction. *See Beal Bank*, 2010 WL 1332461 at *1 & 4-5.

This suit is timely because the Estate became insolvent within four years of the filing of this suit, thus making Plaintiffs' RICO claims now ripe for prosecution (*see Bankers Trust*, 859

F.2d at 1101-07; *Bingham*, 66 F.3d at 559-61; and *Cruden v. Bank of New York*, 957 F.2d 961, 977-78 (2d Cir. 1992)), and because the Defendants engaged in a continuing course of conduct to breach fiduciary duties owed to the Plaintiffs. *See Giulietti v. Giulietti*, 65 Conn. App. 813, 833-36 (2001); and *Estate of Axelrod v. Flannery*, 476 F.Supp. 2d 188, 203-04 (D. Conn. 2007) (Squatrito, J.). Finally, as explained in detail below, Plaintiffs' Connecticut Probate Court remedies are futile, and, as a practical matter, this Court is Virginia D'Addario's last hope to remedy David D'Addario's deliberate, systematic, and long-term looting of her deceased father's Estate.

## 1.   Parties

### A.   Plaintiffs.

(1)   Plaintiff Virginia A. D'Addario is a citizen of California, a 12.5% beneficiary of the Will of F. Francis D'Addario, Deceased, and the sole beneficiary of the Virginia D'Addario Spray Trust #1, the Virginia D'Addario Spray Trust #2, and the Virginia D'Addario Accumulation Trust, which were set up by her father for her benefit.

(2)   Plaintiff Brent A. Platt, Trustee, is a citizen of California and the sole trustee for the Virginia D'Addario Spray Trust #1, the Virginia D'Addario Spray Trust #2, and the Virginia D'Addario Accumulation Trust (collectively, the "Virginia D'Addario Spray Trusts"). Virginia D'Addario is the sole beneficiary of the Virginia D'Addario Spray Trusts.

### B.   Defendants.

All of the Defendants listed below were active participants in, and provided knowing and substantial assistance for, the implementation and successful execution of the fraudulent schemes and the conspiracy involved in this suit.

(1)     Defendant David D'Addario is a citizen of Florida. Plaintiffs' claims herein are brought against David individually, and not in his capacity as an Executor of the Estate.

(2)     Defendant Mary Lou D'Addario Kennedy (a/k/a Mary Lou D'Addario) (David's sister) is a citizen of Connecticut.

(3)     Defendant Gregory S. Garvey ("Garvey") is a citizen of Florida.

(4)     Defendant Red Knot Acquisitions, LLC ("Red Knot") is a Connecticut limited liability company with its principal place of business in Westport, Connecticut. Although Red Knot purportedly is owned by Garvey, Red Knot is, in fact, the alter-ego of David D'Addario.

(5)     Defendant Silver Knot, LLC ("Silver Knot") is a Delaware limited liability company with its principal place of business in Westport, Connecticut. Silver Knot was formed by David D'Addario and Garvey for the purpose of acquiring a controlling interest in Wise Metals, which is an aluminum company based out of Muscle Shoals, Alabama.

(6)     Defendant Nicholas Vitti ("Vitti") is a citizen of Connecticut who was hand-picked by David D'Addario some 29 years ago to assist David D'Addario with the management and operation of the financial affairs of the Estate, and was and is David D'Addario's personal financial advisor and confidant for matters pertaining to the Estate.

### 2.     Alleged Wrongful Conduct

The alleged wrongful conduct in violation of 18 U.S.C. §1962 and the basis of liability for each Defendant is as follows:

### A.     Background.

Virginia D'Addario's father, F. Francis "Hi Ho" D'Addario ("Mr. D'Addario"), was a very successful, and very wealthy, businessman.  In a signed financial statement dated October 31,

1985 (Px 1)[1], Mr. D'Addario listed total assets in the amount of $162,636,000, with a net worth of $111,368,000 (*id.* p. 1), which, in today's dollars, is the equivalent to a net worth of approximately $330,000,000.

D'Addario Industries (which was the tradename for Mr. D'Addario's business empire) had ventures in real estate, construction, building materials, hazardous waste management, professional sports, communications, and fuel oil. By the mid-1980s, Mr. D'Addario's businesses were prospering. Indeed, from 1981 until the time of Mr. D'Addario's death on March 5, 1986, his total assets increased by $59,000,000, with an increase in his net worth in the amount of $28,000,000.

Mr. D'Addario and his wife, Ann, lived in Trumbull, Connecticut, where they raised five children: Virginia, the oldest; Lawrence; Mary Lou; Lisa; and David, the youngest, who was born on February 12, 1962. David is 15 years younger than his oldest sister, Virginia.

In his Will dated June 28, 1983 (the "Will"), Mr. D'Addario left his assets to a revocable testamentary trust (the "Testamentary Trust"), which provided for approximately one-half of Mr. D'Addario's net assets to go into a marital trust for the benefit of his wife, Ann, and the other half to separate trusts for the benefit of his five children in equal shares.

While traveling as a passenger in one of his company planes, on March 5, 1986 Mr. D'Addario died in an airplane crash outside of Chicago, Illinois.  Shortly thereafter, Mr. D'Addario's Will was filed for probate in the Probate Court of Trumbull, Connecticut, the Honorable John P. Chiota, presiding. Pursuant to Mr. D'Addario's Will, the decedent appointed his two sons, David and Larry, as well as three non-family members, as Executors of the Estate. On March 11, 1986, David D'Addario accepted his appointment as an Executor of the Estate,

---

[1]     References to "Px __" are to Plaintiffs' Exhibits submitted with Plaintiffs' Complaint.

and, on that date, was charged with the duty of administering and settling the affairs of the Estate in a prompt and efficient manner.

At the time David D'Addario accepted his appointment as an Executor of the Estate, he was 24 years old, living in a room at his mother's house in Trumbull, Connecticut. Upon his father's death, David did not have any significant assets to his name, and did not have any source of income other than working as an employee for his father's business, D'Addario Industries.

As of today, and for the last 15 years, David D'Addario and Larry D'Addario are the sole remaining Executors of the Estate. While David and his brother are technically Co-Executors, David exercises dictatorial control over the management and operation of the Estate.

Over ten years prior to his death, in late 1976 Mr. D'Addario created fifteen trusts for the benefit of his five children (the "Spray Trusts"), including the Virginia D'Addario Spray Trusts. During each year from 1977 through 1986, Mr. D'Addario used and borrowed funds from the Spray Trusts, but, prior to his death, had not replenished the funds into the Spray Trusts. At the time of his death on March 5, 1986, Mr. D'Addario's indebtedness to the Spray Trusts totaled $3,964,152.

After Mr. D'Addario's death, counsel for the Spray Trusts submitted a claim against the Estate on August 26, 1986 for the amount due as of the time of death, plus interest thereon at prime plus 1%. (Px 2) The Spray Trust claim against the Estate (including the Virginia D'Addario Spray Trust claim) was acknowledged and accepted by David D'Addario and the other Executors of the Estate, and thereafter verified by the Executors in the U.S. Estate Tax Return Form 706 filed with the IRS.

After Virginia D'Addario fell on difficult financial times due to a failed women's clothing business, on November 30, 1987 Virginia obtained an advance toward her distributional interest

in the Estate (in the form of a $3,900,000 non-recourse promissory note) to allow Virginia to emerge from Chapter 11 bankruptcy. As the price for this advance, David D'Addario had his sister, Virginia, agree that she would no longer "participate in or take part in Estate deliberations or decisions as regards the Estate or its property", and waive "all rights . . . in her favor against the Executors as regards their administration of the Estate and the validity of their decisions, . . . except for willful fraud, malfeasance or dishonesty." Virginia, however, maintained the right to receive, through her counsel, "[m]aterial data involving the Estate . . .."

After Virginia D'Addario executed the November 30, 1987 agreement, David D'Addario vowed that Virginia (who is 15 years his senior) would never receive another penny from the Estate. Indeed, on a number of occasions, David told his sister, Virginia, that "I'm 15 years younger than you, I'll outlive you, and **I can keep the Estate open until after you die**."

One of Mr. D'Addario's other daughters, Lisa D'Addario, died on May 18, 1990. Mary Lou D'Addario and Virginia D'Addario were the executors of Lisa's probate estate. As acknowledged and agreed by Mary Lou and Virginia as Lisa's executors, as well as all of the remaining heirs of Lisa and Mr. D'Addario, Lisa's interest under her father's Will passed to her siblings in equal shares (thus making Virginia D'Addario a 12.5% beneficiary under her father's Will), and that the Spray Trusts set up for Lisa's benefit would likewise pour over into the remaining Spray Trusts in equal shares for the benefit of Mr. D'Addario's four remaining living children.

David D'Addario enjoyed the trappings of sitting at the helm of "D'Addario Industries", which is the tradename used by the D'Addario family to describe Mr. D'Addario's financial empire that had passed, by operation of law, to the Estate. David knew, however, that Connecticut probate law provided that the Estate's creditors had to be paid before any of the

Estate's assets could be distributed to the beneficiaries. He also knew that, under his father's Will, 50% of the net assets of the Estate (after payment of creditors) would pass to his mother, and that only 12.5% of the net assets would eventually pass to himself. Accordingly, David knew that if the Estate ever closed, he would lose control over the operations of an $162,000,000 Estate, and his position would be reduced to that of a beneficiary claiming, at most, 12.5% of the net assets of the Estate. As a 24-year old just out of college, David decided to go down a path that was not only in breach of his fiduciary duty to administer and settle the affairs of the Estate in a prompt and efficient manner, but also was a violation of his father's desires as set forth in his Will. In short, David D'Addario's greed overcame family honor.

From and after the November 20, 1987 agreement with Virginia D'Addario, David D'Addario ran the Estate as his personal piggy bank, and did everything within his power to transfer the significant assets of the Estate for his personal financial benefit. Although Virginia repeatedly attempted to obtain meaningful information about the operations of the Estate, David repeatedly and consistently, from 1988 to the present, refused to provide detailed information to Virginia about the actual financial operations of the Estate, and the progress (or lack thereof) of David's duty to administer and settle the affairs of the Estate in a prompt and efficient manner.

Although a few initial accountings (albeit, vague and non-specific) were filed with the Probate Court for the operations of the Estate until May 31, 1991, David D'Addario then had the Estate stop filing any further interim accountings. Over four years then passed without the filing of any additional accountings or any judicial intervention, until July 18, 1995 when the Probate Court finally took some action and ordered the Estate to resume filing interim accountings. David D'Addario, however, did not file any additional interim accountings for the Estate until some six years later, when, in 2001, some additional accountings finally were filed, but which

only covered the period up to November 30, 1996.  In 2006, after another unauthorized and extended hiatus, some post-1996 interim accountings were finally filed with the Probate Court, but David D'Addario had those additional accountings filed under seal so that neither Virginia D'Addario, nor any other interested party, could have access to the accountings covering the period from 1996 through 2006. Inexplicably, Judge Chiota never reviewed the interim accountings, and, equally as disturbing, Judge Chiota repeatedly refused Virginia D'Addario's repeated requests to review those accountings.

On October 3, 2011, the new Probate Court Judge presiding over the D'Addario Estate, Hon. Joseph A. Egan, Jr., finally unsealed the interim accountings.  (Px 3)  Accordingly, it was not until October of 2011 before Virginia D'Addario was accorded the opportunity to review the interim accountings and attempt to find out how David D'Addario was managing (and more importantly, mismanaging) the affairs of the Estate. Those interim accountings, however, were, at best, vague and confusing, and raised many more questions than they answered.

Further, David D'Addario had the Estate resist all discovery and appeal every order entered by Judge Egan which authorized any creditor to conduct any discovery as to the financial affairs of the Estate. Thus, there has been no meaningful judicial review of the Executors' conduct for almost 30 years. Moreover, the interim accountings that were filed mainly consist of line-item entries that are devoid of meaningful information to assess the propriety of the transactions reported. Indeed, the accountings submitted by the Executors do not disclose the numerous properties that were transferred to David D'Addario (directly or indirectly) or "lost" through the Executors' actions or inactions, or any of the numerous instances where David D'Addario had usurped Estate opportunities.

For almost 30 years, the Estate, under David D'Addario's control, has refused to produce any documents pertaining to David D'Addario's self-dealing and systematic looting of the Estate. And, unfortunately, the Probate Court has not been successful in compelling David D'Addario to do so. Simply, David D'Addario, as the chief Executor of the Estate, has thwarted discovery of the financial affairs of the Estate at every turn.

**B.      The Overall Fraudulent Scheme.**

David D'Addario and those who conspired with him designed and implemented a number of schemes which allowed David to acquire an interest in, and then maintain control over, the affairs of his deceased father's $162,000,000 probate estate.  Under Connecticut probate law, any pre-death unsecured creditors (such as the Virginia D'Addario's Spray Trusts) are paid last, and then only if there is any money left in the probate estate. Moreover, there is no statutory time limit within which a Connecticut probate estate must be "closed" or "settled", which allows an executor (who, under Connecticut law, is vested with "broad discretion" in the administration of the probate estate) to string out an unfavored unsecured creditor (such as Virginia D'Addario) for years, or even decades, before there is an obligation to pay that unsecured creditor, and then only if there is any money left in the estate.

With no real judicial supervision over David D'Addario's management of the affairs of the Estate, abuse was likely, and here, abuse was rampant. Indeed, with David at the helm of the Estate, he proceeded over the next 30 years to plunder, pillage and loot the assets of the Estate to the extent that the Estate is now insolvent, and thus unable to pay the claims of its unsecured creditors, including Virginia D'Addario's Spray Trust claim, and then distribute the net assets of the Estate to the beneficiaries, including Virginia D'Addario's 12.5% beneficial interest.  And at the end of this 30-year process, not only is the Estate hopelessly insolvent, but David is left with

a multi-million dollar personal net worth many times over, and with the personal satisfaction of knowing that he had lived up to his vow to make certain that his older sister, Virginia, would never receive another penny from the Estate.

### C.    The Honeyspot Road Scheme.

Mr. D'Addario owned approximately 16 acres of undeveloped real estate off of Honeyspot Road in Stratford, Connecticut (the "Honeyspot Road Property"). The Honeyspot Road Property was listed on Mr. D'Addario's October 31, 1985 financial statement (Px 1) as having a value of $2,200,000, with no mortgage indebtedness. (*Id*. p. 6)

Prior to Mr. D'Addario's death, the Honeyspot Road Property was leased to a trucking company, Pace Motor Lines, Inc. ("Pace"), which owned the neighboring tract of land. Pace was owned by the Pacelli brothers, who were friends of the D'Addario family.

After Mr. D'Addario's death, the Estate had an appraisal done on the Honeyspot Road Property, which reflected a fair market value of $3,800,000 as of December 24, 1986. David D'Addario knew that the Honeyspot Road Property was a valuable piece of real estate owned free and clear by the Estate, with the lessee of the property, Pace, as the most likely candidate to purchase the property.

On January 5, 1989 the Estate accepted an offer to purchase the Honeyspot Road Property for $3,200,000. That sale, however, did not close. The Estate then authorized David D'Addario to continue negotiations for the sale of the Honeyspot Road Property for an amount exceeding $3,000,000. While these negotiations did not result in the sale of the property in 1989 or 1990, Pace continued to rent the Honeyspot Road Property from the Estate, and continued to make the monthly rental payments to the Estate for its use of that property.

Sometime after 1990, however, David D'Addario decided to stop paying the real estate taxes on the Honeyspot Road Property. As a consequence, by April of 1996 the delinquent real estate taxes owed on the Honeyspot Road Property totaled just over $149,000. As a result of this tax delinquency, in April of 1996 the Town of Stratford, with due notice to David D'Addario, levied upon the Honeyspot Road Property for the $149,112.38 that was owed for delinquent real estate taxes, with a tax foreclosure sale scheduled for June 28, 1996. As shown by the recently unsealed accountings, at all relevant times there was plenty of cash (from the Pace rental payments and otherwise), as well as free and clear liquid assets, so that the Estate could have paid the real estate taxes that were assessed and owed on the Honeyspot Road Property, had David D'Addario wanted the Estate to do so.

David D'Addario and his sister, Mary Lou D'Addario, knew that the Honeyspot Road Property was worth well in excess of $3,000,000, and that their family friends, the Pacelli brothers, would be interested in purchasing the property. Rather than have the Estate offer the Honeyspot Road Property to Pace, David D'Addario decided that the Estate would not pay the $149,112.38 owed on the delinquent taxes, and simply let this multi-million dollar Estate asset be lost at the tax foreclosure sale. As a consequence, on June 28, 1996 the Honeyspot Road Property was sold at the tax foreclosure sale for $179,323.84 to Dennis and William Miko, who were friends of Mary Lou D'Addario.

Although Connecticut law allowed the Estate, as the owner of the property, a one-year period of time (until June 29, 1997) to redeem the property from the tax foreclosure sale by paying the amount owed plus 18% interest, in June of 1997 David D'Addario had his attorney, Paul Berg ("Berg") (who was also an attorney for the Estate), set up a Connecticut limited liability company, Honeyspot Ventures, LLC ("HSV"), which was owned by David D'Addario,

-12-

Larry D'Addario and Mary Lou D'Addario. David had Berg list the mailing address for HSV as 52 Koger Road, Trumbull, Connecticut, which was Mary Lou's residence.  Berg then signed the articles of organization for HSV, which was filed with the Connecticut Secretary of State's Office on June 4, 1997.

Rather than have the Estate redeem the Honeyspot Road Property from the tax foreclosure sale, on September 30, 1997 David D'Addario had the tax sale purchasers, the Miko brothers, quit-claim the Honeyspot Road Property to his new company, HSV, for $250,000. Then, on October 6, 1998 David had HSV sell the Honeyspot Road Property to Honeyspot Investors, LLP -- an entity owned by the Pacelli brothers -- for $1,100,000, which was a price far below the approximately $3,000,000 fair market value of that property.  Thereafter, the Pacelli brothers, through their company, Pace, made David D'Addario, through one of his entities, a partner with Pace in the very profitable Bridgeport Barge Service.

The quick $850,000 profit from the sale of the Honeyspot Road Property to the Pacelli brothers was then divided among David D'Addario, Larry D'Addario and Mary Lou D'Addario, with none of the profits distributed to the Estate.  Moreover, at no time was the Honeyspot Road land flip disclosed to Virginia D'Addario, the creditors of the Estate, or the Probate Court. Equally as disturbing, there is no mention in any Executors' status reports to the Probate Court, or in the interim accountings, to indicate that the Honeyspot Road Property was lost at a tax foreclosure sale, or that Co-Executors David D'Addario and Larry D'Addario and their sister, Mary Lou D'Addario, had made an $850,000 profit on the flip of the Honeyspot Road Property to the trucking company which had been leasing the property from the Estate.

As revealed by the recently unsealed interim accountings, for the time period leading up to the June 28, 1996 tax foreclosure sale, the Estate had plenty of cash, plenty of liquid assets,

and plenty of other free and clear assets to pay not only the $149,112.38 in real estate taxes, but also pay the $179,323.84 needed to prevent the loss of the Honeyspot Road Property at the foreclosure sale, and to redeem the property within one year of the tax foreclosure sale.

It was a breach of the fiduciary duties owed by David D'Addario to the Estate to not authorize and arrange for the payment of the real estate taxes owed on the Honeyspot Road Property, and to not authorize the Estate to take any and all steps necessary to not only prevent the tax foreclosure sale, but also redeem the Honeyspot Road Property in the one-year redemption period after the tax foreclosure sale.

The self-dealing by David D'Addario, and the wrongful diversion of the $850,000 in profits which should have gone into the Estate, contributed to the insolvency of the Estate, which has now left Virginia D'Addario unable to collect on her Spray Trust claim against the Estate, or to receive a 12.5% distribution from the net assets of the Estate.

> **D.** **The Frenchtown Road Scheme.**

The D'Addario family was well known in Trumbull, Connecticut.  At the time of Mr. D'Addario's death in March of 1986, Mr. D'Addario and his family had lived in Trumbull for many years, and Mr. D'Addario was one of the wealthiest individuals in the area.  Further, David D'Addario grew up in Trumbull, and, by the spring of 1998, he was well connected with numerous government officials in the Town of Trumbull.

At the time of his death, Mr. D'Addario had a 50% ownership interest in 34.4 acres of undeveloped real estate on Frenchtown Road in Trumbull, Connecticut (the "Frenchtown Road Property").  The remaining 50% interest was owned by the family of Joseph Rosenberg.  In Mr. D'Addario's October 31, 1985 financial statement (Px 1), Mr. D'Addario's 50% interest in the

Frenchtown Road Property was listed with a value of $1,250,000, with no mortgage indebtedness. (*Id*. p. 6)

In the spring of 1998, David D'Addario learned that the Town of Trumbull wanted to build a new elementary school on Frenchtown Road, and was interested in purchasing the Frenchtown Road Property. Rather than have the Estate approach the Rosenberg family about acquiring their 50% interest in the Frenchtown Road Property, in the summer of 1998 David D'Addario and his attorney, Berg (who was also an attorney for the Estate), developed a scheme whereby David, personally, and not the Estate, would acquire the Rosenberg family's 50% interest in the Frenchtown Road Property, and thus personally profit on the eventual sale of the Frenchtown Road Property to the Town of Trumbull.

On August 17, 1998 David D'Addario and his attorney, Berg, formed Sunny Spot Associates, LLC ("SSA"), with David as the owner and manager of that entity. Berg then had the articles of organization for SSA mailed from the Connecticut Secretary of State's office to 52 Koger Road, Trumbull, Connecticut, which was the residence of David's sister, Mary Lou D'Addario. Some 10 days later on August 27, 1998, the Rosenberg family transferred their 50% interest in the Frenchtown Road Property to David's new company, SSA, for $450,000.  In breach of his fiduciary duties, David did not take all reasonable steps necessary to accord the Estate the opportunity to acquire the Rosenberg family's 50% interest in the Frenchtown Road Property. In fact, David concealed that opportunity from Virginia D'Addario, the Estate's unsecured creditors, and the Probate Court.

On May 15, 1999 David D'Addario had his attorney, Berg, form Old Town Land Partners, which was a partnership between David's company, SSA, and the Estate. On June 18, 1999 David, through his attorney, Berg, had SSA and the Estate transfer their 50% interests in

the Frenchtown Road Property to Old Town Land Partners. And then on October 1, 1999, the Town of Trumbull purchased the Frenchtown Road Property for $6,000,000. Pursuant to the scheme arranged by David D'Addario and his attorney, Berg, (a) David's company, SSA, made a $2,550,000 profit on the sale, which should have gone to the Estate; and (b) the Estate "contributed" $750,000 to the Town of Trumbull for the right to name the new school on Frenchtown Road after David's mother, Ann D'Addario, which should not have flowed out of the Estate. Moreover, the entire Frenchtown Road transaction transpired without notice to Virginia D'Addario or the Estate's creditors, and without prior approval of the Probate Court.

Through the recently unsealed accountings, it is clear that in August of 1998 the Estate was in a financial position to acquire the Rosenberg family's 50% in the Frenchtown Road Property for $450,000. In breach of his fiduciary duties, however, that financial opportunity was diverted to David D'Addario's company, SSA.

David D'Addario breached the fiduciary duties that he owed to the Estate by acquiring the Rosenberg family's 50% interest in the Frenchtown Road Property in the name of his own company, SSA, rather than taking all reasonable steps necessary to accord that opportunity to the Estate. The self-dealing by David, and the wrongful diversion of the $2,550,000 in profits which should have gone into the Estate, contributed to the insolvency of the Estate, which ultimately resulted in the inability of Virginia D'Addario to collect on her Spray Trust claim against the Estate, or to receive a 12.5% distribution from the net assets of the Estate.

### E.     The Red Knot Forbearance Agreement Scheme.

In his October 31, 1985 financial statement (Px 1), Mr. D'Addario listed total assets in the amount of $162,636,000.  (*Id.* p. 1)  When the Estate was opened in March of 1986, the Executors reported that the Estate had total liabilities in the amount of $41,363,977.  Thus, when

David D'Addario first became an Executor and was charged with the duty of administering and settling the affairs of the Estate in a prompt and efficient manner, the Estate had a net worth of over $120,000,000, which, in today's dollars, is the equivalent to a net worth of approximately $360,000,000.

The bulk of the Estate's debt was owed to three banks: (1) Connecticut National Bank; (2) Connecticut Bank and Trust Company; and (3) People's Bank (collectively, the "Bank Group"). The Bank Group's claims were reported by the Executors as totaling $25,218,084, and were secured by some of Mr. D'Addario's assets.

In December of 1990, the Bank Group claimed that the Estate (under David D'Addario's stewardship) was in default of some of the obligations in connection with the previous loans made to Mr. D'Addario. As a consequence, on December 13, 1990 the Bank Group and the Estate entered into an omnibus agreement governing the continuing credit relationship between the parties (the "Definitive Agreement"). Under the Definitive Agreement, approximately $14,000,000 in additional funds were loaned by the Bank Group to the Estate, but certain limitations were imposed on the Executors' management and operation of the Estate. In addition to the imposition of a stringent budget and strict reporting requirements on the part of the Executors, the Bank Group required the Executors to agree to utilize diligent and good faith efforts to sell the assets of the Estate so as to effect periodic payments to creditors and thereby settle the Estate in a timely manner. By June 30, 1992, however, the Estate, with David D'Addario still at the helm, had failed to meet any of the benchmarks for asset disposition.

As a result of the Executors' failure to dispose of Estate assets in accordance with the Definitive Agreement, and failure to wind-up and settle the affairs of the Estate in a timely manner, on July 1, 1992 the Bank Group filed a Joint Application for Removal of Executors (Px

4) (the "Bank Group Motion to Remove").  In that Motion, the Bank Group alleged that the Executors had "failed to meet a single quarterly benchmark for asset dispositions" (*id*. p. 3 ¶6), and that the Bank Group was "extremely concerned" with the "negligent and improper manner in which the Executors have administered this Estate . . .."  (*Id*. p. 4 ¶9)

Further, the Bank Group alleged that the Executors had (a) "[f]ailed and refused to settle the Estate within a reasonable time"; (b) "[f]ailed and refused to distribute assets of the Estate to creditors within a reasonable time"; and (c) "[f]ailed to manage and administer the assets of the Estate in a prudent manner pending the time of disposition so as to cause a dissipation of the value thereof."  (*Id*. pp. 4-5 ¶11)  Further, the Bank Group alleged that Co-Executors David D'Addario and Larry D'Addario had "serious conflicts of interest which impede the settlement of the Estate to the detriment of its creditors." (*Id*.) In particular, the Bank Group alleged that David D'Addario and Larry D'Addario (a) "are beneficiaries of this Estate [where] there is a serious question whether the assets of the Estate are sufficient to pay both creditors and beneficiaries"; and (b) "are . . . beneficiaries under various trusts", which are

> i) actual or alleged joint owners of certain assets also owned by the Estate, ii) actual or alleged creditors of the Estate, and iii) beneficiaries of the Estate pursuant to which they have conflicting and/or disputed interests with those of the majority of Estate creditors in relation both to certain specific assets of the Estate and the goals of estate administration generally . . ..

(*Id*. p. 5 ¶12)

Because of those very serious issues, the Bank Group requested that Probate Judge Chiota remove the existing Executors, and then appoint "an independent fiduciary" to "administer and settle this Estate in a prompt and efficient manner", and also "examine and explore all avenues of potential recourse and liability against all previous Executors of the Estate." (*Id*. pp. 5-6 ¶14) David D'Addario, however, through skilled counsel, was able to

-18-

forestall any ruling by Judge Chiota on the Bank Group's Motion to Remove for over five years. During that unconscionable delay, the banks within the Bank Group fell on difficult financial times, and the member banks simply wanted to rid themselves of the delay and frustration of dealing with the D'Addario Estate pending in the Trumbull Probate Court before Judge Chiota.

### (1)      The Bank Group Offers To Discount The Amount Owed.

By the end of December, 1997, the amount owed by the Estate to the Bank Group was in excess of $48,000,000, which was secured by liens on some of the Estate's assets.  In the fall of 1997, the Bank Group approached David D'Addario and stated that they "wanted out of the loans."  Because of the Bank Group's "inner turmoil" and the substantial financial difficulties that they were facing at the time (including federal receivership), the Bank Group "had already written-off or charged-off these loans", and (according to David) was "just looking to get something and get out of Dodge . . .."  Accordingly, in the fall of 1997 the Bank Group offered a number -- $4,750,000 -- as the amount it would take for the Estate to extinguish over $48,000,000 in loan obligations (which was a $43,250,000 discount) and thereby obtain a release of the Bank Group's liens on the Estate's assets.  According to David, the Bank Group offered a $4,750,000 buy-out price for over $48,000,000 in secured indebtedness, and, with no real negotiation, "we [*i.e.*, David D'Addario] said okay."

Despite the incredible offer made by the Bank Group and the myriad of multi-million dollar free and clear assets still owned by the Estate, David D'Addario claimed that the Estate couldn't come up with the funds to extinguish the $48,000,000 in secured bank debt for $4,750,000.  According to David, he had to turn to a wealthy and long-standing friend and business partner, Garvey, to buy out the Bank Group's position, and then enter into a so-called "Forbearance Agreement" for the debtor-creditor relationship between the Estate and the

purchasing entity -- Red Knot, which had just recently been set up by David D'Addario's attorney, Berg. While Red Knot supposedly was an entity owned and controlled by Garvey, it was, in actuality, the mere alter-ego of David D'Addario, and was used by David as a vehicle to maintain control over the affairs of the Estate as he continued to plunder, pillage and loot the assets of the Estate, and attempt to beat down the claims of Virginia D'Addario as an unsecured creditor of the Estate, and a 12.5% beneficiary of the net assets of the Estate.

As shown by the recently unsealed interim accountings, David D'Addario's claim that the Estate couldn't raise the $4,750,000 buy-out figure by the end of 1997 was false. Those accountings reveal that in the fall of 1997, the Estate had plenty of cash, liquid assets and other free and clear assets to come up with the $4,750,000 necessary to extinguish the $48,000,000 in secured loan obligations. Indeed, at that time, David was selectively managing the assets of the Estate to make the Estate appear incapable of repaying the claims of its unsecured creditors.

### (2)    The Red Knot Forbearance Agreement Was A Sham.

David D'Addario and Garvey had a long-standing social and business relationship, and had been friends since David became an Executor of the Estate in March of 1986.  Indeed, David's attorney, Berg, had previously established a number of entities which were jointly owned by David and Garvey, including Silver Knot, the entity which eventually acquired a controlling interest in Wise Metals.

David D'Addario then turned to his long-standing attorney, Berg, to prepare the papers for Red Knot's acquisition of the Bank Group's loan position. Berg previously had represented David in connection with his efforts to purchase various Estate assets related to the fuel oil and concrete block business for $6,000,000. In addition, in June of 1997, Berg was the attorney for

David in connection with the formation of HSV, and otherwise assisted David with the self-dealing involved in the Honeyspot Road Scheme. Further, Berg's firm, Berkowitz, Trager & Trager ("BT&T"), had represented David D'Addario, Larry D'Addario and Mary Lou D'Addario in connection with the Estate's ownership of real estate in Vermont, which closed on July 15, 1997.

Rather than have the Estate raise the $4,750,000 necessary to extinguish the $48,000,000 loan obligation owed to the Bank Group, David D'Addario had Berg prepare the papers for the formation of Red Knot, which was organized and placed in the name of Garvey on November 13, 1997. According to Garvey, it was Berg who selected the name "Red Knot", but Garvey did not know why the name was chosen. David then had his attorney, Berg, finalize Red Knot's acquisition of the Bank Group's loan position for $4,875,000, with the additional $100,000 paid to the FDIC to obtain an additional release on the "Hi-Ho Radio Tower" property.  Then David had Berg prepare the so-called Forbearance Agreement (Px 5) (the "Forbearance Agreement") which would insure that David D'Addario could remain in absolute control of the Estate for as long as he desired.

The Forbearance Agreement was signed on December 30, 1997.  Under that Agreement, the Estate granted Red Knot a lien on virtually all of the Estate's assets, and also provided that, should David D'Addario ever be removed as an Executor of the Estate, Red Knot had the immediate right to engage in collection efforts on the over $48,000,000 allegedly owed to Red Knot, including the right to foreclose on all of the Estate's assets.  (Px 5 pp. 9-10 §4(v))  This "Executor for life" clause was inserted in the Forbearance Agreement despite the fact that the Bank Group (through reputable counsel) had previously filed a Motion to Remove David D'Addario as an executor of the Estate, which listed the negligence, mismanagement,

-21-

malfeasance and serious conflicts of interest that had existed while David D'Addario was in control of the Estate.  (Px 4 pp. 4-5)  At the time of the execution of the Forbearance Agreement on December 30, 1997, the Bank Group's July 1, 1992 Motion to Remove was still pending before Probate Judge Chiota but, for reasons that are now obvious, was not thereafter pursued by David D'Addario's alter-ego, Red Knot.

Further, the Forbearance Agreement provided the Estate with a "purchase option" that, on paper, allowed the Estate the option to purchase the Bank Group's loan position (now held by Red Knot) at a steep discount, with the option price increasing at a rate of over 20% per year until January 7, 2003, at which time the purchase option was set to expire (Px 5 pp. 6-7 §§2.3-4 & attached Schedule (the "Estate Purchase Option")).  In operation, however, the Estate Purchase Option was simply another device that was inserted in the sham Forbearance Agreement to allow David D'Addario to remain in absolute control of the Estate for as long as he desired.

Despite the pledge of additional Estate collateral to Red Knot, and the David D'Addario "Executor for life" clause, David D'Addario entered into the Forbearance Agreement without prior notice to Virginia D'Addario or any of the other creditors, and without prior Probate Court approval.

### (3)   The Red Knot Forbearance Agreement Was A Fraud On The Court.

After execution of the Forbearance Agreement on December 30, 1997, David D'Addario, with Berg as his counsel, the Estate, with Berg as its counsel, and Red Knot, with Berg as its counsel, proceeded to manage and operate the Estate as David D'Addario saw fit. With all of the self-dealing by David D'Addario and the waste of Estate assets, it is inexplicable that Red Knot, as a supposed legitimate secured creditor, did not institute collection and foreclosure proceedings against the Estate -- unless, of course, Red Knot was the mere puppet of David D'Addario, acting

for and on behalf of David D'Addario. In short, it is inconceivable that a legitimate secured creditor in the position of Red Knot would not have taken any action to collect on the ever-increasing amount of indebtedness owed by the Estate in the face of the self-dealing and wasting of Estate assets by David D'Addario.

The Red Knot Forbearance Agreement was and is a sham.  Rather than operate as a mechanism for a legitimate secured creditor (purportedly, Red Knot) and a debtor (the Estate) to extend and work out a debtor's defaulted loan obligations, here the Red Knot Forbearance Agreement was used by David D'Addario and Garvey as a mechanism for David to stay in control of the Estate.  Red Knot was and is the alter-ego of David D'Addario, so that should any creditor or any beneficiary under Mr. D'Addario's Will (such as David's sister, Virginia) attempt to have David removed as an Executor, Red Knot (say David D'Addario) could wield the club of a threatened foreclosure under the Forbearance Agreement to convince the Probate Court (and Superior Court upon *de novo* appeal) that David should remain in control of the Estate. With the Estate thus staying open for an extended period of time, David could, under Connecticut probate law, delay paying the claims of the unsecured creditors, including Virginia D'Addario's Spray Trust claim, for as long as he desired. And all the while as the Estate remained open, David D'Addario could continue to plunder, pillage, and loot the assets of the Estate, and personally enrich himself at the expense of the Estate and at the expense of his sister, Virginia, as both an unsecured creditor of the Estate and a 12.5% beneficiary of the net assets of the Estate.

The recently unsealed accountings show that by August 31, 2000 Red Knot had been paid a total of $6,650,000, thus leaving a balance of $828,383 for the Estate to exercise the Estate Purchase Option at that time. (*See* Px 5 pp. 6-7 §§2.3-4 & attached Schedule) Those same recently unsealed accountings show that the Estate had plenty of cash in August of 2000 to

finalize the Estate Purchase Option for $828,383, had David D'Addario wanted to do so. Indeed, in October of 1999, David D'Addario, with the assistance of his attorney, Berg (who was also Red Knot's attorney and an attorney for the Estate), had the Estate "donate" $750,000 to the Town of Trumbull for the right to name the new school on Frenchtown Road after David's mother, Ann D'Addario.

But rather than authorize the expenditure of $828,383 in available cash on August 31, 2000 to exercise the Estate Purchase Option, and thereby rid the Estate of an additional $55,000,000 of alleged debt, David let the Estate Purchase Option at the $828,383 buy-out price expire, with the amount thereafter allegedly owed by the Estate to Red Knot exceeding $100,000,000, and with a purported lien by Red Knot on all of the Estate's assets. No honest, ethical and good faith Executor of the Estate would permit any such financial suicide to occur. David D'Addario's all-too-convenient failure to rid the Estate of over $55,000,000 in first lien indebtedness supposedly owed to Red Knot at a steeply discounted price, when the Estate had over $8,437,000 in cash on hand to do so (Px 9 p. [6]), lays bare David D'Addario's true motive.

On February 11, 2010 the Executors represented to the Probate Court that the amount owed to Red Knot (as a supposed first-lien secured creditor) was "in excess of $55 million dollars." (Px 6 p. 1)  By February 27, 2012, the amount of the Red Knot indebtedness supposedly had increased to over "$100 million dollars." (Px 7 p. 1) This supposed $45,000,000 in increased first-lien secured indebtedness is troublesome on a number of fronts, not the least of which is the Executors' prior representation to the Probate Court that "[s]ince January of 1998 the Estate has concentrated its efforts on selling its assets in a prudent and expeditious manner in order to satisfy the Red Knot debt on a discounted basis . . .." (Px 8 p. 1)

Moreover, David D'Addario has used the Red Knot Forbearance Agreement as a fraud on the court. After another unsecured creditor, The Cadle Company ("Cadle"), filed a Motion to Remove the Executors (Px 10), on September 15, 1999 David D'Addario had his attorney, Berg, send a letter to the Probate Court, on behalf of Red Knot, opposing Cadle's Motion to Remove. (Px 11)  In that letter, Berg, purportedly on behalf of Red Knot, stated that Red Knot, "[a]s the Estate's largest secured creditor, . . . has a significant degree of familiarity with the assets and liabilities of the Estate." (*Id.* p. 1)  Further, Berg represented to the Probate Court that:

> As of June 30, 1999, Red Knot has the right to commence legal proceedings to collect its entire debt which is in excess of $55,000,000.  Red Knot has indicated to the Estate that it does not intend to commence collection proceedings so long as the Executors of the Estate are not removed and the Estate continues to preserve its assets and moves toward an orderly disposition of those assets . . . .

(*Id.* p. 3)

The carefully crafted strategic representations by Berg to the Probate Court were, at best, misleading.  As counsel for David D'Addario, Red Knot and the Estate, Berg knew full well that (a) David D'Addario had not, in fact, "continue[d] to preserve [Estate] assets", but rather had systematically wasted Estate assets; and (b) David D'Addario had not, in fact, moved the Estate toward "an orderly disposition of [Estate] assets."  Indeed, because of Berg's personal involvement in the Honeyspot Road Scheme and the Frenchtown Road Scheme, including the $750,000 "donated" by the Estate to the Town of Trumbull, Berg was fully aware that David D'Addario had engaged in multiple episodes of self-dealing, as well as serial dissipation of Estate assets in the many millions of dollars.

Rather than serve as a legitimate debtor-creditor document, the only real use of the Forbearance Agreement was as a threat to (a) the unsecured creditors (such as Virginia

D'Addario's Spray Trusts), (b) the beneficiaries under Mr. D'Addario's Will (such as David D'Addario's sister, Virginia), and (c) the Probate Court (including the Superior Court upon *de novo* appeal) that if David was pushed too hard or was ever removed as an Executor, Red Knot (as the alter-ego of David D'Addario) would exercise its "rights" under the Forbearance Agreement to commence collection proceedings on its alleged $55,000,000 in secured indebtedness, and thus annihilate the Estate. That club, however, would be lost should the Estate ever pay off the supposed Red Knot indebtedness at the steeply discounted price in accordance with the Estate Purchase Option.

Further, on August 1, 2002 Vitti (who was David D'Addario's hand-picked comptroller, but, in actuality, David's alter-ego) made the misleading representation to the Superior Court that if David was removed as Executor, Red Knot would foreclose, and thus destroy the Estate. The Red Knot Forbearance Agreement, however, was and is a fraud on the court, which was simply used by David D'Addario, Garvey and those who conspired with them as a means for David to stay in control of the Estate, and thus allow David the opportunity to continue to plunder, pillage and loot the Estate to the detriment of Virginia D'Addario as both an unsecured creditor, and as a 12.5% beneficiary of the net assets of the Estate.

Counsel for the Estate has characterized Red Knot as the "800 pound gorilla", which is "a party friendly to the Estate." (Px 11 p. 2)  This "800 pound gorilla" which was "friendly to the Estate" was at the beck and call of David D'Addario, who has used the threat of that "800 pound gorilla" as a means to stay in control of the Estate.  That virtually unchecked control has led to the systemic and long-term plundering, pillaging and looting of the Estate, which continues to this date. And David D'Addario's wrongful conduct, including the Red Knot Forbearance Agreement Scheme, has now resulted in the insolvency of the Estate, to the harm and detriment

of Virginia D'Addario as both an unsecured creditor of the Estate and a 12.5% beneficiary of the
net assets of the Estate.

### F.   The Wrongful Use And Transfer Of The Estate's Residential Properties For The Benefit Of David D'Addario, Lawrence D'Addario And Mary Lou D'Addario.

At the time of Mr. D'Addario's death on March 5, 1986, he owned a number of residential
properties located throughout the United States: (a) a fully-furnished condominium in the Knob
Hill section of San Francisco, California (the "San Francisco Condo"), valued at $300,000, with
$246,000 in equity (Px 1 p. 7); (b) a fully-furnished condominium in Quechee Lake, Vermont
(the "Vermont Condo") valued at $83,000, and a two-acre residential lot located nearby (the
"Vermont Lot"), valued at $25,000, with no mortgage indebtedness on either property
(collectively, the "Vermont Properties") (*id.*); (c) a fully-furnished condominium in New York,
New York (the "New York Condo"), valued at $275,000 (*id.* p. 9); and (d) a three bedroom fully
furnished condominium on the oceanfront in Fort Lauderdale, Florida (the "Florida Condo"),
valued at $175,000. (*Id.* pp. 6 & 7)

As David D'Addario was engaging in self-dealing and otherwise exercising dictatorial
control over the financial affairs of the Estate, he rewarded his brother, Larry D'Addario, and his
sister, Mary Lou D'Addario, for their willingness to not question David's management and
operation of the Estate:

(a)      For over 13 years, David D'Addario had free and unfettered use of
the San Francisco Condo, and allowed Larry D'Addario and Mary
Lou D'Addario likewise free use of that condominium, with all
costs and expenses associated with the use and maintenance of that
condominium charged to and paid by the Estate. While on March
30, 1999 the San Francisco Condo was sold by the Lawrence
D'Addario Spray Trust #1 to an unrelated third party for $280,000,
there were no apparent funds paid to the Estate for the transfer of
that property.

(b)     For over 11 years, David D'Addario had free and unfettered use of the Vermont Properties, and allowed Larry D'Addario and Mary Lou D'Addario free and unfettered use of those properties as well, with all costs and expenses associated with the use and maintenance of those properties paid by the Estate. While on July 15, 1997 the Vermont Condo was transferred to David and the Vermont Lot was transferred to Mary Lou, there were no apparent funds paid to the Estate for those conveyances.

(c)     Further, for over 11 years, David D'Addario had free and unfettered use of the New York Condo, with all costs and expenses associated with the use and maintenance of that condominium paid by the Estate. While Larry D'Addario, as co-executor of the Estate, apparently deeded the New York Condo to David on June 30, 1997, the deed for that purported transfer was not filed of public record until June 30, 2011. (Px 12) Moreover, the recently unsealed accountings do not reveal any funds received by the Estate in connection with that transfer.

(d)     In addition, for over 10 years David D'Addario had free and unfettered use of the Florida Condo, and allowed Larry D'Addario and Mary Lou D'Addario to likewise have free and unfettered use of that condominium, with all costs and expenses associated with the use and maintenance of that condominium paid by the Estate.

The additional expenses incurred by the Estate in connection with the above properties, and the loss of the sale proceeds that should have been paid to the Estate, contributed to the insolvency of the Estate, and eventually left Virginia D'Addario unable to collect on her Spray Trust claim against the Estate, as well as realize on her 12.5% beneficial interest in the net assets of the Estate.

**G.     The Silver Knot/Wise Metals Scheme.**

Silver Knot is a corporation that was set up by David D'Addario and Garvey in early 1999 to acquire a controlling interest in Wise Metals, which was a producer of aluminum can stock for the beverage industry. In 2001, David, through his ownership interest in Silver Knot, acquired a majority interest in Wise Metals.

Based on information and belief, David D'Addario used assets, proceeds and business opportunities of the Estate to acquire a controlling interest in Wise Metals through Silver Knot, which interest equitably belonged to the Estate. Indeed, in an April 10, 2014 newsletter for D'Addario Industries (which is the tradename used by David D'Addario for his father's business empire that passed to the Estate upon his death), D'Addario Industries (and thus, the Estate) now included "an aluminum company (the 3rd largest U.S. producer of aluminum can stock for the food and beverage industry) . . .." (Px 13) In October of 2014, a Dutch aluminum company, Constellium N.V., acquired Wise Metals, through its purchase of Silver Knot, for $1.4 billion, comprised of a cash payment to David D'Addario's company, Silver Knot, of $455,000,000, and assumption of $945,000,000 in debt. (Px 14)

Through conversion and misappropriation of Estate assets, funds and business opportunities, David D'Addario acquired an ownership interest in Silver Knot, which in turn, acquired a controlling interest in Wise Metals. David D'Addario breached fiduciary duties owed to the Estate by using Estate assets, funds and business opportunities to acquire a controlling interest, through Silver Knot, in Wise Metals.

Accordingly, David D'Addario's ownership interest in Silver Knot, and the proceeds resulting from the sale of Wise Metals to Constellium, equitably belonged to the Estate, which David D'Addario has now converted for his own personal financial benefit. The self-dealing by David, and the wrongful diversion of the profits upon the sale of Wise Metals which should have gone into the Estate, contributed to the insolvency of the Estate, which ultimately resulted in the inability of Virginia D'Addario to collect on her Spray Trust claim against the Estate, or to receive a 12.5% distribution from the net assets of the Estate.

H.   **Red Knot/David D'Addario Settlement Scheme.**

Finally, in late 2014 and early 2015, David D'Addario used his alter-ego, Red Knot, to bail himself out of trouble in connection with a RICO suit that was brought against him by another defrauded creditor, The Cadle Company.

Prior to his death, Mr. D'Addario executed a $1,000,000 promissory note dated May 31, 1985 in favor of the Bank of New Haven ("BNH") (the "$1,000,000 Note"). On March 25, 1987 the Estate listed BNH's claim on its return of claims filed with the Probate Court, reflecting that the aggregate unpaid amount on the $1,000,000 Note was approximately $800,000. Indeed, in his October 31, 1985 financial statement (Px 1), Mr. D'Addario listed $830,000 as the amount then owed to BNH.  (*Id*. p. 1)  Further, on June 6, 1987 the Estate filed its Form 706 Federal Estate Tax Return and listed BNH as having two claims, with one in the amount of $811,749, and the other in the amount of $67,578.  In addition, on April 11, 1988 the Estate filed an interim accounting with the Probate Court listing BNH's claim in the amount of $877,822.13.

On September 23, 1994 Cadle purchased the $1,000,000 Note from BNH and received an assignment of all of BNH's claims against the Estate under that loan obligation. Thereafter, Cadle was allowed to proceed with its Probate Court claim against the Estate. After reviewing the Probate Court file, including the prior Motion to Remove David D'Addario and Larry D'Addario as Executors filed by the Bank Group (Px 4), on October 9, 1997 Cadle filed a Motion which sought the removal of David D'Addario and Larry D'Addario as Executors for breach of fiduciary duties because of their failure and refusal to settle the Estate in a timely manner (Px 10) (the "Cadle Motion to Remove").  On April 29, 1998 Judge Chiota heard Cadle's Motion to Remove and, without taking any evidence, denied Cadle's Motion on that date.  Cadle then took an appeal of that denial to the Superior Court.

Thereafter, on June 7, 1999 David D'Addario called a representative of Cadle in Milford, Massachusetts, and threatened Cadle that if Cadle did not "back off" on its Motion to Remove and settle the Estate's loan obligation under the $1,000,000 Note for $80-$100,000, David would personally insure that Cadle would never receive anything on its claim. As stated by David D'Addario on that date, "Cadle either takes $80-$100,000 to settle and get out of Dodge, or **Cadle will get nothing**." Further, David falsely represented to Cadle during that telephone conversation that "Cadle's actions are causing Red Knot [as an alleged secured creditor of the Estate, but in actuality the alter-ego of David D'Addario] to foreclose and take the assets of the Estate . . .."  Cadle, however, refused to cower to David D'Addario's threats, and continued with the prosecution of its Motion to Remove.

On August 1, 2002 the Superior Court denied the appeal of Cadle's Motion to Remove, in part based on the representation by David D'Addario that the Estate could, and would, settle and close in one to two years (*i.e.*, by August of 2004).

Thereafter, on September 3, 2002 Cadle filed suit against David D'Addario and Larry D'Addario, as Executors of the Estate, in Connecticut Superior Court for the balance owed on the $1,000,000 Note. Even though there was overwhelming evidence that the Estate still owed over $810,000 on the $1,000,000 Note, David D'Addario contested the validity of the $1,000,000 Note and the balance owed on the Note, with the case proceeding to trial in May of 2009.  On June 3, 2009 the jury ruled that the principal balance owed to Cadle on the $1,000,000 Note was $810,245.59. Thereafter, on March 1, 2010 the Superior Court entered final judgment for Cadle, awarding Cadle $810,245.59 as the principal amount due under the $1,000,000 Note, along with interest and costs, for a total judgment against the Estate in the amount of $2,580,470.23. Upon appeal, on September 6, 2011 the Connecticut Court of Appeals affirmed, with an order of

remand allowing Cadle to recover additional interest under a default rate. *See Cadle Company v. D'Addario*, 131 Conn. App. 223 (2011).  After remand, on November 15, 2011 the Superior Court entered an Amended Judgment in favor of Cadle against the Estate in the total amount of $3,178,418.17, plus post-judgment interest (Px 15) (the "Amended Judgment").

Rather than make any effort to pay off the over $3,100,000 that was due by the Estate to Cadle under the Amended Judgment, David D'Addario continued with his plan to loot the assets of the Estate, and thereby live up to his June 7, 1999 vow that "Cadle will get nothing [from the Estate]." After Cadle unearthed evidence showing David D'Addario's systematic and long-term looting of the Estate, on May 31, 2012 Cadle filed suit against David D'Addario, Garvey, Red Knot and others for engaging in a RICO conspiracy to denude the assets of the Estate. *See The Cadle Company v. David D'Addario, et al.*, United States District Court, District of Connecticut, No. 3:12-cv-00816-WGY (Hon. William G. Young, J., Dist. of Mass., sitting by designation) (the "Cadle RICO Suit").

After considerable briefing on the Defendants' Motions to Dismiss, on June 17, 2013 the Court (Young, J.) administratively closed the Cadle RICO Suit for nine months (6/17/13 Tr. (Px 16) p. 11), ruling that this case "may be reopened on the motion of any party at the end of that time . . .." (*Id.*) The Court administratively closed the Cadle RICO Suit to allow David D'Addario, as the controlling Executor of the Estate, the opportunity (after what Cadle believed to be a 27-year pattern by David D'Addario of plundering, pillaging and looting the Estate for his personal financial benefit) to bring the Estate to a close, and pay Cadle  the amount that was owed on the $3,178,418.17 judgment against the Estate. (*Id.* p. 6) If David D'Addario did not do so within that nine month period, on June 17, 2013 Judge Young ruled that

> given the length of time that has already passed [*i.e.,* 27 plus
> years], [the Cadle RICO Suit] may be reopened on the motion of

> any party and . . . a strong argument can be made that [the Probate
> Court proceeding] is a futile remedy. It's just futile. It's *Jarndyce v.*
> *Jarndyce*. * * * And it does seem to me that staying my hand for a
> respectable period of time and then . . . all parties will know that at
> the end of that time an argument that the state remedy is futile will
> be a very powerful argument with this Court.

(*Id*. pp. 6-7 & 8-9) Accordingly, on June 17, 2013 the Court in the Cadle RICO Suit ruled that

"this case is ordered administratively closed for nine months from today's date . . .. It may be

reopened on the motion of any party at the end of that time . . .." (*Id*. p. 11)

The threat that the Court would allow the Cadle RICO Suit to proceed, and thereby allow

Cadle to conduct discovery as to the sham Red Knot Forbearance Agreement, as well as David

D'Addario's self-dealing and systematic looting of the Estate, caused David D'Addario and

Garvey to come up with a plan to get rid of that suit before any discovery could be conducted.

And, once again, David D'Addario turned to his alter-ego, Red Knot, to accomplish his goal.

Pursuant to the Court's June 17, 2013 Order, the nine month period of abatement for the

Cadle RICO Suit was set to expire on March 17, 2014. In late 2013 and early 2014, David

D'Addario and Garvey came up with a plan whereby (a) an asset of the Estate -- the Hi Ho Motel

located on the Black Rock Turnpike in Fairfield, Connecticut (the "Motel") -- would be

transferred by the Estate to Red Knot for a $4,500,000 credit on the amount supposedly owed to

Red Knot; (b) Red Knot would sell the Motel for approximately $4,500,000 which, after

payment of delinquent real estate taxes and closing expenses, would net approximately

$4,000,000; and (c) Red Knot (as David D'Addario's alter-ego) would then use the $4,000,000 in

net sale proceeds to buy Cadle's $3,178,418.17 judgment against the Estate, and thereby settle

Cadle's RICO Suit claims against David D'Addario, Garvey and Red Knot without a single

document ever being produced, or a single deposition ever taken. Cadle's silence, however, could

not be so easily bought.

On February 17, 2015 Cadle, Red Knot and Garvey entered into a settlement agreement (Px 17) for the payment of $5,160,944.34 by Red Knot to Cadle in exchange for Cadle's assignment of the $3,178,418.17 judgment against the Estate (Px 15) to Red Knot, and the dismissal of all claims asserted in the Cadle RICO Suit. Pursuant to the settlement agreement, the Cadle RICO Suit was thereafter dismissed.

The sale of the Motel, however, did not realize the amount of funds that David D'Addario and Garvey had hoped. After payment of the delinquent real estate taxes, attorney's fees and closing costs, Red Knot was only able to net approximately $3,700,000 from the sale of the Motel. The balance of the approximately $1.5 million for settlement of the Cadle RICO Suit was, on information and belief, paid by David D'Addario. Indeed, after the Cadle settlement, David D'Addario approached his brother, Larry D'Addario (who was also a named defendant in the Cadle RICO Suit), about contributing additional funds into the Estate to keep the Estate operating. At that time, David D'Addario told his brother, Larry, "I paid $1.5 million to save your ass from Cadle; the least you can do is contribute additional money into the Estate to keep it operating."

The Red Knot Forbearance Agreement, and the Red Knot/David D'Addario settlement of the Cadle RICO Suit, was, and is, a fraud upon the Estate. The transfer of the Motel from the Estate to Red Knot for the purpose of funding the settlement of a multi-million dollar claim against David D'Addario contributed to the insolvency of the Estate, and eventually left Virginia D'Addario unable to collect on her Spray Trust claim against the Estate, as well as realize on her 12.5% beneficial interest in the net assets of the Estate.

I.     <u>For Virginia D'Addario, Any Remedy In The Probate Court Is Futile</u>.

Unlike proceedings in Bankruptcy Court, under Connecticut Probate Court procedures, interested parties -- like David D'Addario -- are allowed to preside over the supposed liquidation and winding-up of the affairs of an $162,000,000 probate estate, with virtually no supervision over their conduct, and no accountability for their wrongful conduct. Indeed, the Estate has sold or otherwise disposed of approximately 75 assets or businesses since March of 1986, all without any realistic form of judicial supervision or creditor scrutiny.  While the former Probate Court Judge, Judge Chiota, required the Executors to file interim accountings, those interim accountings were filed under seal so that Virginia D'Addario was not accorded the opportunity to discover how David D'Addario was managing (or mismanaging) the financial affairs of the Estate.  As acknowledged by former Judge Chiota on September 8, 2010, even he had not reviewed the prior interim accountings which were filed under seal.  And that is not appropriate judicial supervision; rather, it is a situation ripe for abuse.

There is also a serious question as to when the Estate will close. Although on April 29, 1998 Judge Chiota ordered the Executors to file by July 1, 1998 a timeline for resolution of the Estate, it was not until some two and a half years later on January 15, 2001 that the Executors represented to the Probate Court that they could close the Estate within six months (*i.e*., by July 15, 2001). After that deadline passed, in the summer of 2002 David D'Addario represented to the Superior Court that he could close the Estate in one to two years. Some 13 plus years later, the Estate still hasn't closed, and, if David D'Addario has his way, the Estate will never close.

David D'Addario and his skilled counsel are masters at manipulating the Connecticut Probate Court system.  When there is any ruling by the Probate Court against the Executors, they simply take an immediate *de novo* appeal to the Superior Court in which, under Connecticut

probate law, the appealed issue is heard all over again, in its entirety, with all attendant delay. And as the Probate Court appeal proceeds, the Executors ignore the ruling of the Probate Court.

After it was discovered that David D'Addario had been making substantial (but undisclosed) campaign contributions to Judge Chiota's reelection campaigns, on October 25, 2010 Judge Chiota recused himself from serving as the Probate Judge presiding over the D'Addario probate proceedings. Thereafter, Judge Egan took over those Probate Court proceedings, with his initial observation that "I think this case should have been settled a long time ago." As noted by Judge Egan on October 7, 2011, with the way things were going with the D'Addario probate matters, he foresaw the Estate "plod[ding] along" for another 10 years, with Virginia D'Addario forced to wait to get paid on her unsecured claim or any distribution as a 12.5% beneficiary of the Estate.

And as far as expediting the closing of the Estate by removing David D'Addario as an Executor and appointing a new, independent Executor, on October 7, 2011 Judge Egan commented that "I couldn't wish this one on my worst enemy", and that "no attorney in their right mind would take [over as an Executor of this Estate]." Even as of today -- some 30 years after the Estate was opened and David D'Addario accepted his appointment as an Executor and thereby vowed to administer and settle the affairs of the Estate in a prompt and efficient manner -- David D'Addario has no real intention of closing the Estate.

In an effort to encourage the Executors to engage in some good faith effort to close the Estate, on September 25, 2012 Judge Egan ruled that "commencing January 1, 2013 and quarterly thereafter the Executors shall report to the Court, in writing, as to what steps have or are being taken to finalize the administration of this Estate." (Px 18 p. 2) Despite this Order by Judge Egan, the Executors (David D'Addario and Lawrence D'Addario) never provided to the

Probate Court a detailed report "as to what steps . . . are being taken to finalize the administration of this Estate." Further, on July 16, 2013 the Probate Court again ordered the Executors to submit a report which "state[d] in detail what steps the fiduciaries have taken or are going to take to satisfy all outstanding creditors and when they anticipate the Estate will be closed." (Px 19 p. 1) Once again, however, to date the Executors have failed to provide the Probate Court with the required detailed report or the required statement as to "when they anticipate the estate will be closed." With past as prologue, the word "futility" would be an understatement as to the effectiveness of any remedy Virginia D'Addario may have in connection with the D'Addario Probate Court proceedings.

On February 8, 2013, Virginia D'Addario filed an Application for Appointment of an Auditor (Px 20), which requested that the Probate Court appoint "[a]n independent auditor . . . so that the financial status of the estate can be determined and a plan for closing the estate devised." (*Id.* p. 4) While Virginia's Motion was summarily denied on July 2, 2013, the Probate Court entered an Order granting Cadle's Motion to Appoint an Auditor (Px 21) (the "Auditor Order") which, of course, was immediately appealed by the Executors to the Superior Court. On January 9, 2014 the auditor, Mr. Owen Bregman, sent the Executors a letter requesting that the Executors provide certain documents to the auditor so that he could commence his audit of the Estate. The Executors, however, refused to provide any documents to the auditor, claiming that, although the Probate Court denied their Motion to Stay the Audit Order pending appeal, their mere appeal of that Order served as an automatic stay.

With the Executors' refusal to provide the back-up documentation supporting their accountings, Cadle, on February 18, 2014, filed a Motion to Compel and for Sanctions against the Executors, which was heard by the Probate Court on June 4, 2014. At that hearing, David

Rubin, Esq., counsel for the Executors (David D'Addario and Lawrence D'Addario), informed

the Probate Court (Egan, J.) that:

> If this Court grants [Cadle's Motion to Compel] . . ., we [the
> Executors] then have to appeal that and file a motion to stay. To the
> extent that the Court denies that motion to stay, we have to appeal --
> **and it goes on forever**.

(Px 22 p. 43 (emphasis added))

When Judge Egan took over the handling of the D'Addario Probate Court proceedings

from Judge Chiota, Judge Egan commented: "I just keep thinking how could this possibly feel

after 26 years, to me it's mind boggling no matter how confusing it is.  * * *  **[T]his is just going

to keep going forever**."  (Px 23 pp. 7-8 (emphasis added))  At that same hearing on October 7,

2011, Judge Egan stated:

> How can we basically get rid of this, because what I'm thinking of
> is that I hear all these motions, what difference does it make how I
> rule. Someone is going to appeal it, and it's going to prolong the
> agony.  **This thing is never coming to a head**.

(*Id*. p. 23 (emphasis added))

Some two years later on November 7, 2013, Judge Egan had an idea on how best to get

the D'Addario Probate Estate closed:

> I agree with you [Cadle] that it's [the Probate Estate's] moving too
> slowly.  Despite everything that's going on, as I said before, Cadle
> should be paid, because I know in my mind that when Cadle gets
> paid, my job is going to get a lot easier.  My work is going to
> eventually get back to handling a normal estate, routine estate . . ..

(Px 24 pp. 54-5)  On June 11, 2014, however, the Probate Court, in apparent recognition of the

futility of its efforts, denied Cadle's Motion to Compel the Executors to produce the support

documentation for the accountings (Px 25) so that an independent auditor could, as Virginia

D'Addario requested, audit "the financial status of the Estate . . . and a plan for closing the Estate

[could be] devised."  (Px 20 p. 4)

Finally, on March 10, 2014, Virginia D'Addario filed a Petition for Removal of Executors

(Px 26) wherein she asserted:

> It has been over 28 years since Frank D'Addario died.  This Court
> is well aware of the history of proceedings in this estate and
> particularly of the proceedings over the last three years since being
> cited in to replace the Honorable John P. Chiota who recused
> himself with respect to this estate on October 25, 2010.  Aside
> from an abundance of evidence that the executors are incapable of
> executing a fiduciary's trust, that they have neglected to perform
> the duties of such trust to wind up this estate, and that they have
> wasted the estate in their charge to perpetuate their control over all
> D'Addario properties, it has become clear in the past month that
> the executors do not recognize the authority of this Court and will
> not comply with any orders that would lead to the disclosure of
> their malfeasance over the past decades.

(*Id*. p. 1)  Further, Virginia D'Addario asserted:

> It has been over eight months since the Court granted Cadle
> Company's motion to appoint an auditor.  True to form, the
> executors took an appeal of the Court's order and moved for a stay
> pending the appeal.  The Court denied the motion for stay,
> however, and the executors appealed that decision as well.  Rather
> than comply with the order of the Court to allow a court-appointed
> auditor to examine the books and records of the estate, the
> executors have made it clear through Attorney Rubin's letter to the
> Court of February 14, 2014, that they have no intention of
> complying with the Court's order.  There is no remedy for such
> contempt of the Court's authority other than to remove the
> executors and appoint a suitable person to fill the resultant
> vacancy.  The executors have placed their legal "rights" above their
> obligations to the creditors and beneficiaries of this estate for far
> too long.  It should now be apparent to the Court the executors
> have no intention of complying with any order of the Court with
> which they disagree, even if they are under a positive duty to do
> so.  Unless this Court removes the executors, the Court's authority
> to supervise the administration of this estate is meaningless, and
> the rights of the creditors and beneficiaries are lost.

(*Id*. p. 2) Without according Virginia D'Addario an evidentiary hearing, on June 11, 2014 the Probate Court denied Virginia D'Addario's Petition for Removal of Executors.  (Px 27)

This recent ruling by the Probate Court is simply another chapter in the Connecticut Probate Court version of *Bleak House* (*see* Px 16 pp. 6-7) being written by chief Executor David D'Addario and his skilled counsel as they take advantage of the procedural infirmities inherent in the Connecticut probate system to further David D'Addario's goal of keeping the Estate open forever. Indeed, to date neither the Testamentary Trust, nor any of the trusts to be set up thereunder, have been funded, with these sham trusts simply used by David D'Addario as part of a scheme to perpetuate his control over the financial affairs of the Estate. Under the unique facts and circumstances of this case, the D'Addario Probate Court proceeding is a futile remedy for Virginia D'Addario. This Court, however, is not powerless to act in the face of the manifest miscarriage of justice that has been allowed to fester in the Probate Court for almost 30 years.

## J. The Probate Estate Is Now Hopelessly Insolvent.

On numerous occasions from January 13, 1998 to the present (including January 13, 1998; July 31, 2002; July 10, 2007; September 28, 2008; and September 3, 2015), David D'Addario has represented to the Probate Court, and the Superior Courts of Connecticut upon *de novo* appeal, that the Estate is solvent. In fact, on September 3, 2015 David D'Addario represented to the Honorable T.R. Rowe, the Probate Judge presiding over the probate estate of Mr. D'Addario's deceased wife, Ann T. D'Addario, that Mr. D'Addario's Probate Estate was solvent to the tune of $11,857,816:

> The estimated net assets available for distribution [from the Estate of F. Francis D'Addario] as of today is $11,857,816. The Internal Revenue agreement and the Motor Inn transaction are recorded in this current balance. The Estate of Ann T. D'Addario is entitled to 50% of this amount.

-40-

> The probate accounting reflects assets valued at the Internal
> Revenue Service audited values as of F. Francis D'Addario's date
> of death. The future actual realized sales proceeds may exceed
> those 706 values. Based on the majority of the Estate asset sales to
> date, the sales proceeds have exceeded the listed 706 values.

(Px 28) David D'Addario's representations to Judge Rowe were, at best, misleading.

In the November 25, 2014 Verified Status Update of the Decedent's Estate that David D'Addario filed in his father's Probate Court proceedings (Px 29), David D'Addario listed, under oath, numerous real estate holdings of the Estate with a purported net value of $13,958,140.58. This representation was knowingly false. Indeed, the numerous properties listed as valuable assets of the Estate have significant environmental problems which significantly impact their values. Moreover, David D'Addario failed to disclose that there are unpaid real estate taxes owed on these properties for an amount far in excess of $1,000,000, which continue to incur interest at the rate of 18% per year.

Further, David D'Addario listed the "amounts due to Spray & Accumulation Trusts for unpaid loans and interest accrued" as of October 31, 2014 at $4,086,314.00. (Px 29) David D'Addario knew this representation was false as well. Indeed, by letter dated January 15, 2001 by David D'Addario's counsel to the Probate Court, the amount listed as due on the Spray Trust claim as of December 31, 2000 was $14,616,498. (Px 8 pp. 8 & 9)

In February of 2015 David D'Addario called a "family meeting" at the Florida Condo among Mary Lou D'Addario, Larry D'Addario and David D'Addario's personal attorney, Robert W. Ericson. At that meeting, David put pressure on his brother, Larry, to put additional sums into the Probate Estate to keep it going. Larry responded that he would not do anything further until there was a real family meeting, and that the family included their sister, Virginia D'Addario.

David responded by telling Larry to stop talking to Virginia: "I demand you stop talking to her; there will be no family meeting with Virginia."

And then in late 2015, Larry had another meeting with David's personal attorney, Bob Ericson, where Mr. Ericson (on behalf of David) again asked Larry to contribute additional funds into the Estate to keep it operating. Larry responded by requesting that Mr. Ericson please stop bothering him, stating that "I'm not going to put any more money into the Estate until there's a real family meeting with Virginia and a plan developed to move toward closure. Tell my brother to resign and I'll close the Estate within 18 months."

As of the date of the filing of this suit, the Estate of F. Francis D'Addario, Deceased, which at one time had a net worth of over $120,000,000, is now hopelessly insolvent.

### K.    The Defendants Are Jointly And Severally Liable For The Conduct Of David D'Addario And The Other Co-Conspirators.

The Defendants knowingly and intentionally participated in the wrongful and fraudulent schemes of David D'Addario to acquire an interest in, and then maintain control over, his deceased father's $162,000,000 probate estate, which then allowed David D'Addario to plunder, pillage and loot the Estate for over 29 years.   On information and belief, Vitti, as the comptroller/chief financial officer for D'Addario Industries and David D'Addario's financial consultant and administrative assistant, advised and counseled David D'Addario about the financial aspects of each of the above schemes, and knew, must have known, or should have known that the implementation and execution of each of the above schemes was a violation of David D'Addario's fiduciary duties owed to Virginia D'Adarrio as both a creditor of the Estate and a 12.5% beneficiary of the net assets of the Estate.

As a result of the Defendants' wrongful conduct, the Estate is now hopelessly insolvent, thus leaving Virginia D'Addario unable to collect on her Spray Trust claim against the Estate,

-42-

and to realize any benefit from her 12.5% beneficial interest in the net assets of the Estate. The acts of each Defendant as described herein played an integral role in the implementation and successful execution of David D'Addario's wrongful schemes, and, at all times relevant to this suit, all Defendants acted with awareness that their role was part of an overall improper activity.

All of the Defendants are jointly and severally liable for the full amount of damages caused to Plaintiffs because they each engaged in the affirmative conduct described herein in furtherance of the goals of the conspiracy. Upon joining the conspiracy, each Defendant became liable for the prior conduct of the earlier co-conspirators, and remains liable for the subsequent conduct of David D'Addario and the other co-conspirators until such time as there is a clear and unequivocal renouncement of any further participation in the conspiracy. To date, none of the co-conspirators named as Defendants herein has renounced his or her further participation in the fraudulent conspiracy.

### 3.  Other Wrongdoers

The other wrongdoers, other than the Defendants named herein, are Paul Berg, Esq., as well as the other persons and entities who assisted David D'Addario and the other Defendants in the implementation and execution of the wrongful and fraudulent schemes set forth above, who will be discovered and then identified in connection with the discovery to be conducted in this case.

### 4.  Victims/Injury

While some of the Defendants' RICO violations may have occurred a number of years ago, the Defendants' wrongful conduct did not give rise to a claim for relief under 18 U.S.C. §1964(c) until those violations resulted in an injury to Plaintiffs' business or property, and then the RICO claim did not accrue until Plaintiffs learned that the Estate was insolvent, and thus

Plaintiffs suffered damages because they were not able to collect on Virginia D'Addario's Spray Trust claim, and not able to realize any benefit from Virginia D'Addario's 12.5% beneficial interest in the net assets of the Estate. Further, although the fraudulent conspiracy described herein was directed primarily at Plaintiffs and Cadle, the victims of the Defendants' fraudulent schemes and conspiracy are (1) Plaintiffs; (2) Cadle (until it was paid off in February of 2015); and (3) Ann D'Addario (and now her probate estate), as a legitimate and non-collusive beneficiary of the Estate under her deceased husband's Will. Plaintiffs have been injured in their business or property by reason of a violation of 18 U.S.C. §1962. Pursuant to 18 U.S.C. §1964(c), Plaintiffs are entitled to recover from the Defendants treble their actual damages, costs of suit, and reasonable attorneys' fees.

### 5.   Pattern Of Racketeering Activity

Pursuant to 18 U.S.C. §1962(b), it is unlawful "for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise . . .."  Further, pursuant to 18 U.S.C. §1962(c), it is unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . .."  In addition, pursuant to 18 U.S.C. §1962(d), it is unlawful "for any person to conspire to violate any of the provisions of subsections . . . (b), or (c) of [§1962]."

The course of conduct described above constitutes violations by Defendants of §§1962(b), (c) and (d) of RICO.  The Defendants engaged in a pattern of wrongful conduct involving mail fraud, wire fraud, money laundering, monetary transactions with unlawful proceeds, interstate racketeering, and interstate transport of misappropriated funds (the "Predicate Acts") to allow David D'Addario to acquire an interest in, and then maintain control

over, the affairs of the Estate.  Further, the Defendants combined together to engage in a pattern of wrongful conduct involving the Predicate Acts to conduct or participate, directly or indirectly, in the conduct of the conspiracy to allow David D'Addario to remain in control of the Estate, and thus allow David D'Addario to plunder, pillage and loot the assets of the Estate over the last 29 years, with the result that the Estate is now hopelessly insolvent such that Virginia D'Addario cannot collect on her Spray Trust claim against the Estate, and is not able to realize any benefit from her 12.5% beneficial interest in the net assets of the Estate.

As described herein, the Defendants engaged in numerous acts of racketeering activity within ten years of each other.  The Predicate Acts and other wrongful conduct of the Defendants described herein were related in the sense that they involved the same or similar purposes, results, participants, victims and methods of commission, and did not involve isolated or sporadic events.  Further, there was continuity of conduct in that the Predicate Acts and other wrongful activities of the Defendants described herein extended over a considerable period of time and involved conduct with the threat of continuing wrongful activities.

A.     The alleged predicate acts are:

(1)     <u>Mail Fraud</u>.  The conduct of the Defendants described herein constitutes mail fraud in violation of 18 U.S.C. §1341 in that:

     (a)     the Defendants participated in a scheme or artifice to defraud or attempt to defraud Plaintiffs as a creditor of the Estate and a 12.5% beneficiary of the net assets of the Estate;

     (b)     the Defendants, or someone associated with the scheme, used the mails or caused the mails to be used, by placing or causing to be placed in an authorized depository for mail a letter intended to be sent or delivered by the United States Postal Service; and

     (c)     the use of the mails was for the purpose of executing the scheme.

In that regard, the United States mails were used on a regular, continuous and systematic basis in connection with the implementation and execution of the various wrongful schemes set forth above.

      (i)    In connection with the <u>Honeyspot Road Scheme</u>, David D'Addario, Berg, Vitti, and Mary Lou D'Addario knew, must have known, or should have known, that the United States mails would be used in connection with some aspect of the furtherance of this scheme.  In particular:

    (1)    On or about June 28, 1996, a tax foreclosure deed was mailed by the Town of Stratford to Dennis and William Miko.

    (2)    In early June of 1997, the Articles of Organization for HSV was mailed by Berg to the Connecticut Secretary of State's Office for filing, with a file-marked copy then mailed by the Connecticut Secretary State's Office on June 4, 1997 to Mary Lou D'Addario's residence at 52 Koger Road, Trumbull, Connecticut.

    (3)    On or about September 30, 1997, a quit-claim deed reflecting the conveyance of the Honeyspot Road Property from the Mikos to HSV was mailed by the Town of Stratford Clerk's Office to Mary Lou D'Addario's residence at 52 Koger Road, Trumbull, Connecticut.

    (4)    On October 6, 1998, a warranty deed reflecting the conveyance of the Honeyspot Road Property from HSV to Honeyspot Investors, LLP was mailed by the Town of Stratford Clerk's Office to Mary Lou D'Addario's residence at 52 Koger Road, Trumbull, Connecticut.

    (5)    On or about October 6, 1998, $850,000 in proceeds from the sale of the Honeyspot Road Property were divided and, upon information and belief, mailed to David D'Addario, Larry D'Addario and/or Mary Lou D'Addario.

      (ii)    In connection with the <u>Frenchtown Road Scheme</u>, David D'Addario, Berg, Vitti, and Mary Lou D'Addario knew, must have known, or should have known, that the United

States mails would be used in connection with some aspect of the furtherance of this scheme.  In particular:

(1)     In mid-August of 1998, Berg mailed the Articles of Organization for SSA to the Connecticut Secretary of State's Office, with a file-marked copy then mailed by the Connecticut Secretary of State's Office to SSA at BT&T's office in Fairfield, Connecticut on August 17, 1998.

(2)     On August 27, 1998, quit-claim deeds for the conveyance of the Rosenberg family's 50% interest in the Frenchtown Road Property were mailed by the Town of Trumbull Clerk's Office to SSA at BT&T's office in Fairfield, Connecticut.

(3)     On June 18, 1999, a quit-claim deed reflecting the conveyance of the Estate's interest in the Frenchtown Road Property to Old Town Land Partners was mailed by the Town of Trumbull Clerk's Office to SSA at BT&T's office in Fairfield, Connecticut.

(4)     On June 18, 1999, a quit-claim deed reflecting the conveyance of SSA's 50% interest in the Frenchtown Road Property to Old Town Land Partners was mailed by the Town of Trumbull Clerk's Office to SSA at BT&T's office in Fairfield, Connecticut.

(5)     On September 30, 1999, a warranty deed reflecting the conveyance of the Frenchtown Road Property from Old Town Land Partners to the Town of Trumbull was mailed by the Town of Trumbull Clerk's Office to SSA at BT&T's office in Fairfield, Connecticut.

(6)     On or about October 1, 1999, $4,500,000 in proceeds from the sale of the Frenchtown Road Property were divided and, on information and belief, mailed to SSA and the Estate.

(7)     In early October of 1999, David D'Addario caused the annual report for SSA to be mailed to the Connecticut Secretary of State's Office.

(8)     In the fall of 2000, David D'Addario caused the annual report for SSA to be mailed to the Connecticut Secretary of State's Office.

(9)     On September 21, 2001, David D'Addario caused the annual report for SSA to be mailed to the Connecticut Secretary of State's Office.

(10)     On June 17, 2002, David D'Addario caused the annual report for
         SSA to be mailed to the Connecticut Secretary of State's Office.

(iii)     In connection with the <u>Residential Real Estate Schemes</u>, David D'Addario,
Berg, Vitti, and Mary Lou D'Addario knew, must have known, or should have known, that the
United States mails would be used in connection with some aspect of the furtherance of these
schemes.  In particular:

(1)     On or about January 27, 1999, a copy of the deed reflecting the
        conveyance of the San Francisco Condo from the Testamentary
        Trust to Vitti, as Trustee for the Lawrence D'Addario Spray Trust
        #1, was mailed by the San Francisco County Clerk's Office to
        Vitti.

(2)     On or about March 30, 1999, a copy of the deed reflecting the
        conveyance of the San Francisco Condo from Vitti to a third party
        purchaser was mailed by the San Francisco County Clerk's Office
        to Vitti.

(3)     On information and belief, on or about March 30, 1999, a check
        pertaining to the $280,000 in proceeds from the sale of the San
        Francisco Condo was mailed to Larry D'Addario.

(4)     On information and belief, on a periodic basis from August 11,
        1989 to March 30, 1999, Estate checks reflecting payment of
        expenses associated with the San Francisco Condo were mailed by
        the Estate to various persons and entities for payment of bills
        and/or invoices associated with the San Francisco Condo.

(5)     On or about January 8, 1998, a quit-claim deed reflecting the
        conveyance of the Vermont Condo from the Testamentary Trust to
        David D'Addario was mailed from the Hartford Town Clerk's
        Office to David D'Addario at BT&T's office in Fairfield,
        Connecticut.

(6)     On or about January 8, 1998, a quit-claim deed reflecting the
        conveyance of the Vermont Lot from the Testamentary Trust to
        Mary Lou D'Addario was mailed from the Hartford Town Clerk's
        Office to Mary Lou D'Addario at BT&T's office in Fairfield,
        Connecticut.

(7)     On information and belief, on a periodic basis from January 8,
        1998 through November 30, 1998, Estate checks reflecting

-48-

payment of expenses associated with the Vermont Condo and the Vermont Lot were mailed by the Estate to various persons and entities for payment of bills and/or invoices associated with the Vermont Properties.

(8)   On or about June 30, 2011, a copy of the deed reflecting the conveyance of the New York Condo from Larry D'Addario, as co-Executor of the Estate, was mailed by the New York City Department of Finance Office of the City Register to David D'Addario.

(9)   On information and belief, on a periodic basis from March 30, 1986 and for over 11 years thereafter, Estate checks reflecting payment of expenses associated with the New York Condo were mailed by the Estate to various persons and entities for the payment of bills and/or invoices associated with the New York Condo.

(10)   On information and belief, on a periodic basis from March of 1986 and for over 10 years thereafter, Estate checks reflecting payments of expenses associated with the Florida Condo were mailed by the Estate to various persons and entities for payment of bills and/or invoices associated with the Florida Condo.

(iv)   In connection with the Red Knot Forbearance Agreement Scheme, David D'Addario, Berg, Vitti, Garvey and Red Knot knew, must have known, or should have known, that the United States mails would be used in connection with some aspect of the furtherance of this scheme.  In particular:

(1)   On or about November 13, 1997, Berg mailed the Articles of Organization for Red Knot to the Connecticut Secretary of State's Office, with a file-stamped copy then mailed by the Connecticut Secretary of State's Office to Red Knot at BT&T's office in Fairfield, Connecticut on November 13, 1997.

(2)   On information and belief, on or about December 30, 1997, a signed copy of the Forbearance Agreement (Px 5) was mailed by Berg to David D'Addario and Greg Garvey.

(3)   On or about September 15, 1999, a copy of Berg's September 15, 1999 letter (Px 11) was mailed to Bonnie Amendola, David Atkins, David Rubin and Bruce Gelston.

-49-

(4)     On information and belief, on or about January 20, 2000, an Estate check in the amount of $1,650,000 was mailed to Red Knot.

(5)     On information and belief, on or about August 31, 2000, an Estate check in the amount of $6,500,000 was mailed to Red Knot.

(6)     For each year from 1998 to the present, federal income tax returns for Red Knot were mailed to the IRS.

(v)     In connection with the Silver Knot/Wise Metals Scheme, David D'Addario and Garvey knew, must have known, or should have known, that the United States Mails would be used in connection with some aspect of the furtherance of this scheme. In particular:

(1)     On or about January 5, 1999, the corporate papers relating to the formation of Silver Knot were mailed by the Delaware Secretary of State's office to David D'Addario and/or Garvey.

(2)     In December of 2001, the corporate papers relating to David D'Addario's purchase, through Silver Knot, of a majority interest in Wise Metals were mailed to David D'Addario.

(3)     In October of 2014, the papers and documentation reflecting the acquisition by Constellium N.V. of Wise Metals, through its purchase of Silver Knot, and documents pertaining to the payment of the sale proceeds to David D'Addario, were mailed to David D'Addario and Garvey.

(4)     For each year from 1999 to 2015, the federal income tax returns for Silver Knot and Wise Metals were mailed to the IRS.

(vi)     In connection with the Red Knot/David D'Addario Settlement Scheme, David D'Addario, Vitti, Garvey and Red Knot knew, must have known, or should have known, that the United States mails would be used in connection with some aspect of the furtherance of this scheme. In particular:

(1)     On November 7, 2014, the deed conveying the transfer of the Hi Ho Motel from the Estate to Mild Voyager, LLC (another Garvey related entity) was mailed by the Town of Fairfield Clerk's Office to Garvey, Berg, Red Knot and/or Mild Voyager, LLC.

-50-

(2)     On information and belief, in 2015 the federal income tax return for the Estate reflecting the conveyance of the Motel was mailed to the IRS.

(3)     On information and belief, in 2014 and/or 2015, the federal income tax returns for Red Knot and/or Mild Voyager, LLC reflecting the sale of the Motel were mailed to the IRS.

(2)     Wire Fraud. The conduct of the Defendants described herein constitutes wire fraud in violation of 18 U.S.C. §1343 in that:

(a)     the Defendants participated in a scheme or artifice to defraud or attempt to defraud Plaintiffs as a creditor of the Estate and a 12.5% beneficiary of the net assets of the Estate;

(b)     the Defendants, or someone associated with the scheme or artifice, transmitted communications by means of a telephone, computer or fax machine connected to interstate wires for the purpose of executing such scheme or artifice; and

(c)     the Defendants, or someone associated with the scheme or artifice, used a telephone, computer or fax machine connected to interstate wires willfully and with the specific intent to carry out some essential step in attempting to carry out the scheme or artifice to defraud or attempt to defraud Plaintiffs.

In that regard, the interstate telephone wires were used on a regular, continuous and systematic basis in connection with the implementation and execution of the various schemes set forth above.  In particular:

(1)     The funds reflecting the Estate's portion of the $455,000,000 cash payment to Silver Knot upon the sale of Wise Metals to Constellium were, on information and belief, wire transferred by Constellium and/or Silver Knot to or for the benefit of an account in the name of David D'Addario or a David D'Addario related entity in October of 2014; and

(2)     On February 17, 2015, $5,160,944.34 in proceeds for settlement of the Cadle RICO Suit were wire transferred from Connecticut to Cadle's bank account in Ohio.

(3)     Money Laundering.  The course of conduct set forth above constitutes violations by David D'Addario of 18 U.S.C. §1956(a) in that David D'Addario:

-51-

(a)      unlawfully obtained proceeds from, or that rightfully belonged to, the Estate (the "Funds");

(b)      was involved in (i) a transaction which in any way or degree affected interstate commerce (1) involving the movement of Funds by wire or other means, or (2) involving one or more monetary instruments, or (3) involving the transfer of title to any real property; or (ii) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate commerce in any way or degree (a "Financial Transaction"); and

(c)      knowing that the Funds involved in a Financial Transaction represented the proceeds of some form of unlawful activity, conducted or attempted to conduct a Financial Transaction which in fact involved the proceeds of a violation of 18 U.S.C. §§1341, 1343, 1951, 1952 and/or 2314 (the "Specified Unlawful Activity"), (i) with the intent to promote the carrying on of Specified Unlawful Activity; or (ii) knowing that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of Specified Unlawful Activity.

Since (1) David D'Addario conducted or attempted to conduct a Financial Transaction; (2) which he knew involved the proceeds of some form of unlawful activity; and (3) the unlawful activity in fact constituted a Specified Unlawful Activity, David D'Addario's conduct as set forth above (including, without limitation, the Honeyspot Road scheme, the Frenchtown Road scheme, and the Silver Knot/Wise Metal scheme) constitutes money laundering in violation of 18 U.S.C. §1956(a).

(4)      <u>Monetary Transactions With Unlawful Proceeds</u>. The course of conduct set forth above constitutes violations by David D'Addario of 18 U.S.C. §1957 in that David D'Addario:

(a)      unlawfully obtained proceeds from, or that rightfully belonged to, the Estate (the "Funds");

(b)      knowingly engaged in or attempted to engage in a monetary transaction (the deposit, withdrawal, transfer, or exchange, in or affecting interstate commerce, of funds or a monetary instrument by, through, or to a financial institution which is engaged in, or the

activities of which affect, interstate commerce in any way or degree) in connection with the acquisition of property of a value greater than $10,000; and

(c)    the Funds involved in the acquisition were proceeds of a violation of Specified Unlawful Activity (as defined under 18 U.S.C. §1956).

Since David D'Addario used proceeds derived from a Specified Unlawful Activity to acquire an ownership interest in and control of Silver Knot, and thereby a controlling interest in Wise Metals, as well as acquire numerous exotic, antique and classic automobiles (and numerous other assets) of a value in excess of $10,000, and, in connection therewith, used a financial institution which was engaged in, or the activities of which affect, interstate commerce, David D'Addario's conduct constitutes monetary transactions with unlawful proceeds in violation of 18 U.S.C. §1957.

(5)    <u>Interstate Racketeering</u>.

(i)    David D'Addario engaged in unlawful activity under 18 U.S.C. §1952 because he engaged in (1) money laundering in violation of 18 U.S.C. §1956; and (2) monetary transactions with unlawful proceeds in violation of 18 U.S.C. §1957 (the "Unlawful Activity").

(ii)    David D'Addario used the United States mail and other facilities of interstate commerce with intent to (1) distribute the proceeds of any Unlawful Activity; or (2) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any Unlawful Activity.

(iii)    The course of conduct set forth above (including, without limitation, the Honeyspot Road scheme, the Frenchtown Road scheme, and the Silver Knot/Wise Metals scheme) constitutes interstate racketeering by David D'Addario in violation of 18 U.S.C. §1952.

(6)     <u>Interstate Transport Of Misappropriated Funds</u>.

(i)     David D'Addario transported, transmitted or transferred in interstate commerce funds of the value of $5,000 or more knowing the same to have been misappropriated, converted or taken by fraud from the Estate.

(ii)     Further, David D'Addario devised a scheme or artifice to defraud money from the Estate, and in connection therewith, transported or caused to be transported in interstate commerce funds having a value of $5,000 or more.

(iii)     The course of conduct set forth above (including, without limitation, the Honeyspot Road scheme, the Frenchtown Road scheme, and the Silver Knot/Wise Metals scheme) constitutes interstate transport of misappropriated funds by David D'Addario in violation of 18 U.S.C. §2314.

B.     The dates of the Predicate Acts, the participants in the Predicate Acts, and a description of the facts surrounding the Predicate Acts are set forth in detail and discussed in §§2 and 5(A) above.

C.     The circumstances constituting mail fraud and wire fraud are set forth in detail and discussed in §§2 and 5(A)(1) & (2) above.

D.     To date, there has not been a criminal conviction for the Predicate Acts.

E.     Civil litigation has not resulted in a judgment in regard to the Predicate Acts.

F.     As described herein, the Defendants engaged in numerous acts of racketeering activity within ten years of each other.  The Predicate Acts and other wrongful conduct of the Defendants described herein were related in the sense that they involved the same or similar purposes, results, participants, victims and methods of commission, and did not involve isolated or sporadic events.  Further, there was continuity of conduct in that the predicate acts and other

-54-

wrongful activities of the Defendants described herein extended over a considerable period of time and involved conduct with the threat of continuing wrongful activities.

G.     As discussed in §5(F), the predicate acts relate to each other as part of a common plan and scheme by the Defendants to allow David D'Addario to acquire an interest in, and then maintain control over, the affairs of the Estate. Further, the Defendants combined together to engage in a pattern of wrongful conduct involving the Predicate Acts to conduct or participate, directly or indirectly, in the conduct of the conspiracy to allow David D'Addario to remain in control of the Estate, and thus allow David D'Addario to plunder, pillage and loot the assets of the Estate over the last 29 years, with the result that the Estate is now hopelessly insolvent such that Virginia D'Addario cannot collect on her Spray Trust claim against the Estate, and is not able to realize any benefit from her 12.5% beneficial interest in the net assets of the Estate.

### 6.     Enterprise

A.     Pursuant to 18 U.S.C. §1962(b), the Defendants have engaged in the pattern of racketeering activity described herein to allow David D'Addario to acquire an interest in, and then maintain control over, the affairs of the Estate, an "enterprise" affecting interstate commerce within the meaning of 18 U.S.C. §1961(4).  *See Handeen v. Lemaire*, 112 F.3d 1339 (8th Cir. 1997); *Gunther v. Dinger*, 547 F.Supp. 25 (S.D.N.Y. 1982).

Further, pursuant to 18 U.S.C. §1962(c), David D'Addario, the other Defendants, and other persons and entities not named as Defendants herein, have participated in an associational enterprise-in-fact affecting interstate commerce. The associational enterprise was devoted to the wrongful and fraudulent purpose of allowing David D'Addario to acquire an interest in, and then maintain control over, the affairs of the Estate, which allowed David D'Addario to plunder, pillage and loot the assets of the Estate for over 29 years, thus resulting in the insolvency of the

Estate and the inability of Virginia D'Addario to collect on her Spray Trust claim against the Estate or to realize any benefit from her 12.5% beneficial interest in the net assets of the Estate. The enterprise has an ongoing organization and functions as a continuing unit. David D'Addario, the other Defendants, and other persons and entities not named as Defendants herein, have conducted the affairs of this enterprise through the pattern of racketeering activity described herein. Accordingly, the joining together by David D'Addario, the other Defendants, and other persons and entities not named as Defendants herein for the purpose of allowing David D'Addario to (a) divert assets and income out of the Estate outside of probate and in fraud of creditors and beneficiaries of the Estate, and (b) acquire and then maintain control over the affairs of the Estate, constitutes an associated-in-fact "enterprise" within the meaning of 18 U.S.C. §1961(4).

In addition, the Defendants participated in varying capacities in the wrongful and fraudulent schemes to allow David D'Addario to (a) divert assets and income out of the Estate outside of probate and in fraud of creditors and beneficiaries of the Estate, and (b) acquire an interest in, and then maintain control over, the affairs of the Estate. The Defendants willfully associated themselves with the schemes set forth herein and willfully participated in such schemes. As set forth above, David D'Addario, and those under his direction, committed numerous fraudulent and wrongful acts which constitute the predicate acts of mail fraud, wire fraud, money laundering, monetary transactions with unlawful proceeds, interstate racketeering, and interstate transport of misappropriated funds. The Defendants named herein knew about and agreed to facilitate David D'Addario's wrongful schemes, and provided knowing and substantial assistance toward the accomplishment of David D'Addario's wrongful goals. In addition, the Defendants aided or abetted the Predicate Acts described herein. Accordingly, pursuant to 18

U.S.C. §1962(d) and 18 U.S.C. §2, the Defendants, as co-conspirators with David D'Addario, are liable as principals and co-conspirators.

B.      For Plaintiffs' §1962(b) claims, the RICO enterprise is the Estate; the structure of the Estate is that of a Connecticut probate estate; the purpose of the Estate was supposed to be as a vehicle to marshal, administer, preserve and protect the assets of the Estate, to pay the legitimate creditors of the Estate, and then distribute the net assets of the Estate to the Will beneficiaries. The function and course of conduct of the Estate, however, was to enrich David D'Addario at the expense of (a) certain unfavored unsecured creditors of the Estate (including Virginia D'Addario) and (b) Virginia D'Addario as a 12.5% beneficiary of the net assets of the Estate.

For Plaintiffs' §1962(c) claims, the structure of the enterprise was associational-in-fact; the associational enterprise was devoted to the wrongful and fraudulent purpose of allowing David D'Addario to acquire an interest in, and then maintain control over, the affairs of the Estate, which allowed David D'Addario to plunder, pillage and loot the assets of the Estate for over 29 years, thus resulting in the insolvency of the Estate and the inability of Virginia D'Addario to collect on her Spray Trust claim against the Estate or to realize any benefit from her 12.5% beneficial interest in the net assets of the Estate; and the function and course of conduct of the enterprise was to engage in the wrongful and fraudulent conduct described in §§2 and 5(A) above.

C.      David D'Addario was and is an Executor of the Estate.

D.      All of the Defendants, and other wrongdoers not named as defendants herein, are associated with the §1962(c) associational enterprise-in-fact.

E.      For Plaintiffs' §1962(b) claim, the Defendants have engaged in a the pattern of racketeering activity described in §§2 and 5(A) above to acquire an interest in, and then maintain control over, the affairs of the Estate, an "enterprise" affecting interstate commerce within the meaning of 18 U.S.C. §1961(4).  *See Handeen v. Lemaire*, 112 F.3d 1339 (8th Cir. 1997); *Gunther v. Dinger*, 547 F.Supp. 25 (S.D.N.Y. 1982).  For Plaintiffs' §1962(c) claims, the Defendants are individuals and entities who are some, but not all, of the members of the associational enterprise-in-fact.

F.      For Plaintiffs' §1962(b) claims, the Estate is both a perpetrator and victim of the pattern of racketeering activity. For Plaintiffs' §1962(c) claims, the Defendants and other wrongdoers not named as defendants herein are perpetrators of the pattern of racketeering activity.

7.      As discussed above, the pattern of racketeering activity and the enterprise are separate.

8.      For Plaintiffs' §1962(b) claims, the Defendants engaged in the pattern of racketeering activities to allow David D'Addario to acquire an interest in, and then maintain control over, the affairs of the Estate -- the enterprise involved in those claims.  For Plaintiffs' §1962(c) claims, the Defendants conducted the affairs of the enterprise through the pattern of racketeering activity described in §§2 and 5(A) above.

9.      For Plaintiffs' §1962(b) claims, the enterprise has not benefited from the pattern of racketeering activity. For Plaintiffs' §1962(c) claims, the enterprise has benefited in that David D'Addario has maintained control over the affairs of the Estate and has been personally enriched at the expense of (a) certain unfavored unsecured creditors of the Estate (including Virginia D'Addario) and (b) Virginia D'Addario as a 12.5% beneficiary as the net assets of Estate, and the

Estate is now insolvent such that Plaintiffs are unable to collect on their claims against the Estate.

10.     The Defendants' commission of and conspiracy to commit the predicate acts described above constitute a sufficient nexus with interstate commerce under the RICO statute. In addition, the Estate owned and transferred properties in numerous states, and the affairs of the Estate affect interstate commerce.

11.     N/A.

12.     As described in §§2 and 5(A) above, the Defendants engaged in a pattern of racketeering activity to allow David D'Addario to acquire an interest in, and then maintain control over, the affairs of the Estate.

13.     In connection with Plaintiffs' claims under §1962(c), the Defendants, and the other wrongdoers not named as defendants herein, are associated with the enterprise.  The liable "person" and the "enterprise" are not one and the same entity.

14.     As described in §§2 and 5(A) above, the Defendants participated in varying capacities in the wrongful and fraudulent schemes to allow David D'Addario to (a) divert assets and income out of the Estate outside of probate and in fraud of creditors, and (b) acquire an interest in, and then maintain control over, the affairs of the Estate.  The Defendants willfully associated themselves with the schemes and willfully participated in such schemes.  As set forth above, David D'Addario, and those under his direction, committed numerous fraudulent and wrongful acts which constitute the predicate acts of mail fraud, wire fraud, money laundering, monetary transactions with unlawful proceeds, interstate racketeering, and interstate transport of misappropriated funds.  The Defendants named herein knew about and agreed to facilitate David D'Addario's wrongful schemes, and provided knowing and substantial assistance toward the

-59-

accomplishment of David D'Addario's wrongful goals.  In addition, the Defendants aided or abetted the Predicate Acts described herein.  Accordingly, pursuant to 18 U.S.C. §1962(d) and 18 U.S.C. §2, the Defendants, as co-conspirators with David D'Addario, are liable as principals and co-conspirators.

15.     Plaintiffs have been injured in their business or property by reason of the RICO violations described above in that the Defendants have defrauded Plaintiffs out of the benefit of their claims against the Estate and have otherwise caused Plaintiffs to incur additional and unnecessary legal fees and other expenses in their prior unsuccessful efforts to recover the amounts owed by the Estate.

16.     But for the Defendants' violations of the RICO statute, Plaintiffs would have been able to collect on their claims against the Estate for the amounts owed by the Estate to Plaintiffs. The reasonably foreseeable consequences of the Defendants' wrongful conduct as set forth above were not only the systematic diversion of assets, income and opportunities that should have gone into the Estate, but also the prospect that the Estate would be rendered insolvent, so that the unsecured creditors and non-collusive Will beneficiaries, such as Plaintiffs, would not be able to collect on their claims against the Estate. Had the Defendants not engaged in the wrongful conduct set forth above, the Estate could have and would have been able to pay the full amount owed to Virginia D'Adarrio as both a creditor of the Estate and a 12.5% beneficiary of the net assets of the Estate.  As a direct, proximate and consequential result of the Defendants' wrongful conduct as set forth above, the Estate is now hopelessly insolvent, with no likelihood of recovery by Plaintiffs' on their claims against the Estate.

17.     Plaintiffs have been injured in their business or property, and have suffered direct, proximate and consequential damages as a result of the acts described above in an amount not

less than (a) $5,800,000 for the Virginia D'Addario Spray Trust claim, and (b) $15,000,000 plus

interest thereon from March 5, 1986 to date of judgment for Virginia D'Addario's 12.5%

beneficial interest in the net assets of the Estate. These damages include:

> (a)  lost debt damages for (i) the amount that Plaintiff Brent A. Platt,
> Trustee of the Virginia D'Addario Spray Trusts would have been
> able to collect from the Estate for the Virginia D'Addario Spray
> Trust claim, but was prevented from doing so because of the
> Defendants' wrongful conduct as set forth above; and (ii) the
> amount that Virginia D'Addario would have been able to receive as
> a 12.5% beneficiary of the net assets of the Estate, but was
> prevented from doing so because of the Defendants' wrongful
> conduct as set forth above; and
>
> (b)  separate and independent damages in the nature of collection
> expense damages for the attorneys' fees and other expenses
> incurred by Plaintiffs in connection with their unsuccessful efforts
> to enforce their claims against the Estate. Within the last four
> years, Plaintiffs' collection expense damages are in excess of
> $200,000.

All of the Defendants are jointly and severally liable for the full amount of damages caused to

Plaintiffs because the Defendants each engaged in affirmative conduct in furtherance of the goals

of the conspiracy.  *See Chemetron Corporation v. Business Funds, Inc.*, 682 F.2d 1149, 1180

(5th Cir. 1982).

18.     No other federal cause of action is alleged in the Complaint.

19.     Because of complete diversity of citizenship, this Court also has diversity

jurisdiction under 28 U.S.C. §1332 over Plaintiffs' state law claims for  (a) breach of fiduciary

duties by David D'Addario; (b) aiding and abetting breach fiduciary duties by all Defendants;

and (c) conspiracy to breach fiduciary duties by all Defendants. *See Beal Bank v. Galef*, 2010

WL 1332461 at *1 & 4-5 (D.Conn. Mar. 31, 2010) (Hall, J.); and *Chapman Lumber, Inc. v.

Tager*, 288 Conn. 69, 87-88 & 89 (2008). Further, under this Court's federal question

jurisdiction, the Court has supplemental jurisdiction over these state law claims.

20.     While we realize and appreciate that a number of District Court Judges have a negative view of most civil RICO suits[2], there are certain patterns of related wrongful conduct which can and should be prosecuted under RICO.  *See Bingham v. Zolt*, 66 F.3d 553 (2d Cir. 1995); *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158 (2d Cir. 1993); *Handeen v. Lemaire*, 112 F.3d 1339 (8th Cir. 1997); *Bankers Trust Company v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988); *The Cadle Company v. Flanagan*, 2006 WL 860063 (D. Conn. Mar. 31, 2006) (Covello, J.); and *Gunther v. Dinger*, 547 F.Supp. 25 (S.D.N.Y. 1982).  This is just such a case. Plaintiffs respectfully request the opportunity to prove their claims to a jury.

Respectfully submitted,

ARMSTRONG LAW FIRM, P.C.

DATED: February 9, 2016.          By_____/s/_____
                                    F. Dean Armstrong
                                   Ct. Fed. Bar #ct22447
                                   1324 Dartmouth Road
                                   Flossmoor, IL  60422
                                   708/798-1599
                                   Fax: 708/798-1599
                                   armstronglaw@sbcglobal.net

---

[2]      As a result of the hostility by many District Court Judges to civil RICO suits, the Second Circuit and the Supreme Court have, on numerous occasions, directed the District Courts back to the exact wording of the statute, as well as the express admonition by Congress that RICO is to "be liberally construed to effectuate its remedial purposes.*"  See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985).  Indeed, as noted by the Second Circuit in *Baisch v. Gallina*, 346 F.3d 366, 375 (2d Cir. 2003), "RICO was designed, in part, to protect . . . lenders from losing money to elaborate mail fraud schemes." *See, also, Bridge v. Phoenix Bond and Indem. Co.*, 553 U.S. 639, 660 (2008) ("we are not at liberty to rewrite RICO to reflect . . . our . . . views of good policy.  We have repeatedly refused to adopt narrowing constructions of RICO in order to make it conform to a preconceived notion of what Congress intended to proscribe"); *Sedima*, 473 U.S. at 481 & 497-98 ("RICO is to be read broadly.  This is the lesson not only of Congress' self-consciously expansive language and overall approach, . . . but also of its express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes,'. . . . The statute's 'remedial purposes' are nowhere more evident than in the provision of a private action for those injured by racketeering activity").  Indeed, "although RICO cases might be pesky, courts should not erect artificial barriers -- metaphysical or otherwise -- as a means of keeping RICO cases off the federal dockets." *Sun Savings & Loan Association v. Dierdorff*, 825 F.2d 187, 194 (9th Cir. 1987).

SABIA TAIMAN, LLC

By_____/s/_____
    Edward C. Taiman, Jr.
Ct. Fed. Bar #ct01319
450 Church Street
Hartford, CT 06103
860/541-2077
Fax: 860/713-8944
etaiman@sabialaw.com

Attorneys for Plaintiffs
Virginia A. D'Addario and Brent Platt, Trustee

## Certificate of Service

I hereby certify that on February 9, 2016, a copy of the foregoing RICO Case Statement was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System. In addition, the undersigned will provide by e-mail a copy of the above RICO Case Statement to all counsel and/or pro se Defendants who file a notice of appearance after this date. Further, a courtesy copy of the foregoing pleading was forwarded by overnight delivery service to: Hon. Janet Bond Arterton, United States District Judge, Richard C. Lee United States Court House, 141 Church Street, Courtroom 2, New Haven, CT 06510.

_____/s/_____
    Edward C. Taiman, Jr.

-63-