UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| VIRGINIA A. D'ADDARIO, Individually, and on behalf of the F. Francis D'Addario Testamentary Trust and the Virginia A. D'Addario Trust; and VIRGINIA A. D'ADDARIO, EXECUTRIX, as Executrix of the Probate Estate of Ann T. D'Addario, Deceased, and on behalf of the F. Francis D'Addario Testamentary Trust and the Ann T. D'Addario Marital Trust, <br><br>     *Plaintiffs*, <br><br>     *v.* <br><br> DAVID D'ADDARIO; MARY LOU D'ADDARIO KENNEDY; GREGORY S. GARVEY; RED KNOT ACQUISITIONS, LLC; SILVER KNOT, LLC; and NICHOLAS VITTI, <br><br>     *Defendants.* | Civil No. 3:16cv99 (JBA) <br><br> March 22, 2017 |

**RULING GRANTING DEFENDANTS' MOTION TO DISMISS**

Virginia D'Addario ("Virginia") individually, on behalf of two testamentary trusts and in her capacity as Executrix of the probate estate of her deceased mother, Ann T. D'Addario (collectively, "Plaintiffs"), filed this suit against Defendants David D'Addario ("David"), Mary Lou D'Addario Kennedy ("Mary Lou"), Gregory S. Garvey ("Garvey"), Red Knot Acquisitions, LLC ("Red Knot"), Silver Knot LLC ("Silver Knot") and Nicholas Vitti ("Vitti") (collectively, "Defendants") alleging: RICO violations by all Defendants (Count One); breach of fiduciary duties by David D'Addario as Executor of the Estate (Count Two); breach of fiduciary duties by David D'Addario as Trustee of the Testamentary Trust, the Marital Trust and the Virginia Trust (Count Three); aiding and abetting breach of fiduciary duties by all Defendants (Count Four); conspiracy to breach fiduciary duties by all Defendants (Count Five); and unjust enrichment by David

D'Addario (Count Six). Defendants move [Doc. # 37] to dismiss Plaintiffs' First Amended Complaint ("Am. Compl.") [Doc. #25] in its entirety. Oral argument was held on November 15, 2016.

In summary, and for the reasons discussed in the Ruling that follows, the Court grants Defendants' Motion to Dismiss because Plaintiffs fail to adequately plead substantive RICO violations, there is no diversity of parties, and the Court will not exercise supplemental jurisdiction over the state law claims. In granting this Motion, the Court finds that Plaintiffs' interest in the Estate is sufficient to confer RICO standing upon them, but that their lost debt injury remains uncertain and speculative and is therefore not ripe. Nonetheless, Plaintiffs' independent claim for collection expenses associated with their lost debt injury is ripe and therefore the Court addresses the sufficiency of Plaintiffs' substantive RICO allegations. Although Plaintiffs pled a pattern or practice of racketeering behavior, and with respect to their Section 1962(b) claim, adequately linked Defendants' racketeering to the maintenance of the enterprise, Plaintiffs failed to allege the necessary separate acquisition and maintenance injury, resulting in dismissal of their Section 1962(b) claim. Plaintiffs' Section 1962(c) claim fails due to the hub-and-spoke nature of the alleged association-in-fact enterprise and Plaintiffs' RICO conspiracy claim under Section 1962(d) must also be dismissed, as Plaintiffs have not sufficiently alleged any substantive RICO violation. Given the dismissal of Plaintiffs' only federal claim, and in the absence of diversity jurisdiction, the Court will not exercise supplemental jurisdiction over Plaintiffs' state law claims and the Complaint will be dismissed in its entirety.

## I.    Facts Alleged

### A.  Background

On March 5, 1986 F. Francis D'Addario ("Mr. D'Addario") died in an airplane crash, leaving behind a will directing the manner in which his estate, worth over $120,000,000,[1] was to be divided. (Am. Compl. ¶¶ 12, 13, 26.) Mr. D'Addario left behind his wife, Ann T. D'Addario, as well as five children: Virginia, the oldest; Lawrence; Mary Lou; Lisa; and David, the youngest, who is 15 years younger than his oldest sister, Virginia. (*Id.* ¶ 11.) The will created "a revocable testamentary trust (the "Testamentary Trust"), which provided for approximately one-half of Mr. D'Addario's net assets to go into a marital trust (the "Marital Trust") for the benefit of his wife, Ann, and the other half into separate trusts for the benefit of his five children in equal shares, including a trust for the benefit of his oldest daughter, Virginia (the "Virginia Trust")." (*Id.* ¶ 12.) Mr. D'Addario appointed his two sons, David and Larry, as well as three non-family members, Executors of the Estate. (*Id.* ¶ 13.)

Shortly after Mr. D'Addario's death the will was filed for probate in the Probate Court of Trumbull, Connecticut, with the Honorable John P. Chiota presiding. (*Id.*) "On March 11, 1986, David D'Addario accepted his appointment as an Executor of the Estate, and, on that date, was charged with the duty of administering and settling the affairs of the Estate in a prompt and efficient manner." (*Id.*) At that time, David D'Addario was 24 years old and living at his mother's house in Trumbull, Connecticut. (*Id.* ¶ 14.) He did not have any significant assets to his name, and his only source of income was from working as an employee for his father's business, D'Addario

---

[1] Plaintiffs contend that in today's dollars, this is the equivalent to a net worth of approximately $360,000,000 (*Id.* ¶ 47.)

Industries. (*Id.*) "As of today, and for the last 15 years, David D'Addario and Larry D'Addario are the sole remaining Executors of the Estate. While David and his brother are technically Co-Executors, David exercises dictatorial control over the management and operation of the Estate." (*Id.* ¶ 15.)

Virginia fell on difficult financial times and on November 30, 1987 she obtained an advance on her distributional interest in the Estate (in the form of a $3,900,000 non-recourse promissory note) to allow her to emerge from Chapter 11 bankruptcy. (*Id.* ¶ 17.) In return for this advance, David "required that his sister, Virginia, no longer participate in or take part in Estate deliberations or decisions as regards the Estate or its property, and waive all rights . . . in her favor against the Executors as regards their administration of the Estate and the validity of their decisions . . . except for willful fraud, malfeasance or dishonesty." (*Id.* (internal quotation marks omitted.)) After executing this agreement, David,  cognizant of the fact that should his mother and his older sister, Virginia, predecease him before the Estate closed, their interests in his father's Estate would be distributed on a pro rata basis to himself and his remaining siblings, vowed that Virginia would never receive another penny from the Estate. (*Id.* ¶ 18.) "In fact, on a number of occasions, David told his sister, Virginia, that 'I'm 15 years younger than you, I'll outlive you, and I can keep the Estate open until after you die.'" (*Id.*)

On May 18, 1990 Lisa D'Addario, one of the five siblings, passed away. (*Id.* ¶ 19.) Her interest in her father's will passed to her siblings in equal shares, making Virginia a 12.5% beneficiary of Mr. D'Addario's will. (*Id.*)

According to Plaintiffs, "[f]rom and after the November 20, 1987 agreement with Virginia D'Addario, David D'Addario ran the Estate as his personal piggy bank, and did everything within his power to transfer the significant assets of the Estate for his personal financial benefit." (*Id.* ¶

4

21.) David has consistently refused to provide detailed information to Virginia about the operations of the Estate, despite repeated attempts by Virginia to obtain this information. (*Id.*) Moreover, after filing a few initial accountings with the Probate Court, after May 31, 1991 David had the Estate stop filing interim accountings and for over four years none were filed without judicial intervention, until July 18, 1995 when the Probate Court ordered the Estate to resume filing these interim accountings. (*Id.* ¶ 22.) Still, despite this order, David "did not file any additional interim accountings for the Estate until some six years later, when, in 2001, some additional accountings finally were filed, but which only covered the period up to November 30, 1996." (*Id.*) "In 2006, after another unauthorized and extended hiatus, some post-1996 interim accountings were finally filed with the Probate Court, but David D'Addario had those additional accountings filed under seal so that neither Virginia D'Addario, nor any other interested party, could have access to the accountings covering the period from 1996 through 2006." (*Id.*) Probate Court Judge Chiota never reviewed the interim accountings and refused Virginia D'Addario's repeated requests to review those accountings. (*Id.*)

On October 3, 2011 a new Probate Court Judge, Honorable Joseph A. Egan, Jr., unsealed the interim accountings, giving Virginia the ability to review them. (*Id.* ¶ 23.) However, the vague and confusing nature of the interim accountings raised more questions regarding the management of the Estate than they answered, as they "consisted mainly of line-item entries that were devoid of meaningful information to assess the propriety of the transactions reported." (*Id.* ¶¶ 23, 24.) Over the past 30 years David, through the Estate, has resisted all discovery and appealed every order entered by the Probate Judge. (*Id.* ¶ 24.) David has refused to produce any documents pertaining to his "self-dealing and systematic looting of the Estate." (*Id.* ¶ 25.)

### B.  The Alleged Fraudulent Schemes[2]

Plaintiffs allege Defendant David D'Addario, with the assistance of the other Defendants and several others not named in the Complaint, engaged in several fraudulent schemes involving property owned by the Estate and debts it owed.

#### i.  The Honeyspot Road Scheme

The first of these schemes is known in the Complaint as "The Honeyspot Road Scheme." (*Id.* § C.)  The Honeyspot Road Property, owned free and clear by the Estate, was appraised in December of 1986 as having a fair market value of $3,800,000. (*Id.* ¶ 30.) The most likely candidate to purchase was the lessee of the property, Pace Motor Lines, Inc., which was owned by the Pacelli brothers, friends of the D'Addario family. (*Id.* ¶¶ 29, 30.) In fact, on January 5, 1989 the Estate accepted an offer to purchase the Honeyspot Road Property for $3,200,000. That sale, however, did not close." (*Id.* ¶ 31.)

Instead, at the direction of David, the Estate consciously chose not to pay real estate taxes on the Property, nor did it pay the $149,112.38 owed in delinquent taxes, despite having ample notice and assets to do so. (*Id.* ¶ 32.) Thus, David decided to "let this multi-million dollar Estate asset be lost at the tax foreclosure sale. As a consequence, on June 28, 1996 the Honeyspot Road Property was sold at the tax foreclosure sale for $179,323.84 to Dennis and William Miko, who were friends of Mary Lou D'Addario." (*Id.* ¶ 33.) Meanwhile, David directed his attorney, Paul Berg ("Berg"), who was also an attorney for the Estate, to set up a Connecticut limited liability

---

[2] None of the transactions related to these schemes were disclosed to Virginia, the creditors of the Estate, or the Probate Court before being undertaken. (*Id.* ¶¶ 36, 44, 60).

company, Honeyspot Ventures, LLC ("HSV"), which was owned by David, Larry, and Mary Lou. (*Id.* ¶ 34.)

On September 30, 1997, rather than having the Estate redeem the Honeyspot Road Property,[3] David had the tax sale purchasers, the Miko brothers, quit-claim the Property to his new company, HSV, for $250,000. (*Id.* ¶ 35.) Subsequently, "on October 6, 1998 David had HSV sell the Honeyspot Road Property to Honeyspot Investors, LLP – an entity owned by the Pacelli brothers – for $1,100,000, which was a price far below the approximately $3,000,000 fair market value of that property." (*Id.*) This resulted in a profit of $850,000, none of which went to the Estate, but which was instead divided among David, Larry, and Mary Lou D'Addario. (*Id.* ¶ 36.)[4]

### ii. *The Frenchtown Road Scheme*

The Estate also owned a 50% ownership interest in 34.4 acres of undeveloped real estate on Frenchtown Road in Trumbull, Connecticut (the "Frenchtown Road Property"). (*Id.* ¶ 41.) The remaining 50% interest was owned by the family of Joseph Rosenberg. Mr. D'Addario's interest in the Property, according to Mr. D'Addario's 1985 financial statement, was worth $1,250,000, with no mortgage indebtedness. (*Id.*) Upon learning in the spring of 1989 that the Town of Trumbell wanted to purchase the Property for a new school, David and Attorney Berg formed Sunny Spot Associates, LLC ("SSA"), with David as owner and manager, and acquired the Rosenberg 50% interest in the Property for $450,000. (*Id.* ¶¶ 42, 43.) This was done without affording the Estate

---

[3] Under Connecticut law, the Estate had a period of one year–until June 29, 1997–to redeem the property from the tax foreclosure sale by paying the amount owed plus 18% interest. (*Id.* ¶ 34.)

[4] Neither the interim accounts nor the Executors' status reports contain any mention of having lost the Honeyspot Property in a foreclosure sale, let alone that Co-Executors David and Larry, along with their sister Mary Lou, had made a $850,000 profit by flipping the Property. (Am. Compl. ¶ 36.)

the opportunity to acquire the Rosenberg interest in the Property, which the accountings make clear it could have afforded, and in fact the opportunity was concealed from Virginia, the Estate's unsecured creditors, and the Probate Court. (*Id.* ¶ 43, 45.)

Then, on May 15, 1999 David directed Attorney Berg to form Old Town Land Partners, a partnership between David's company, SSA, and the Estate. (*Id.* ¶ 44.) David, through Berg, subsequently had SSA and the Estate transfer their 50% interests in the Frenchtown Road Property to Old Town Land Partners, which proceeded to sell to the Town of Trumbell the Property for $6,000,000. (*Id.*) Pursuant to this scheme, David's company SSA, made a $2,550,000 profit on the sale, which should have gone to the Estate. (*Id.*) Moreover, the Estate contributed $750,000 to the Town of Trumbull for the right to name the new school on Frenchtown Road after David's mother, Ann D'Addario. (*Id.*)

### iii.   The Red Knot Forbearance Agreement Scheme

When the Estate was opened in March 1986, the Executors reported that it had total liabilities in the amount of $41,363,977, secured by some of Mr. D'Addario's assets. (*Id.* ¶ 47, 48.) The majority of this debt ($25,218,084) was owed to three different banks (the "Bank Group"). (*Id.* ¶ 48.) As a result of the Estate defaulting on some of the obligations in connection with the previous loans made to Mr. D'Addario, on December 13, 1990 "the Bank Group and the Estate entered into an omnibus agreement governing the continuing credit relationship between the parties (the 'Definitive Agreement'). Under the Definitive Agreement, approximately $14,000,000 in additional funds were loaned by the Bank Group to the Estate, but certain limitations were imposed on the Executors' management and operation of the Estate." (*Id.* ¶ 49.) By the end of December, 1997, the debt owed to the Bank Group had grown to over $48,000,000. (*Id.* ¶ 53.)

However, because of "inner turmoil," the Bank Group offered to extinguish this debt if the Estate paid them only $4,750,000 (a $43,250,000 discount). (*Id.*)

David claimed the Estate could not come up with the $4,750,000, while the recently unsealed interim accountings reveal that the Estate did in fact have "plenty of cash, liquid assets and other free and clear assets to come up with the $4,750,000 necessary to extinguish the $48,000,000 in secured loan obligations." (*Id.* ¶¶ 54, 55.) Instead of paying the Bank Group, David had Attorney Berg establish Red Knot, an entity that was supposedly owned and controlled by long-time friend and business partner, Garvey, but in reality was the mere alter-ego of David D'Addario. (*Id.* ¶ 54.) Red Knot, in turn, acquired the Bank Group's loan position and then entered into a so-called "Forbearance Agreement" for the debtor-creditor relationship between the Estate and the purchasing entity–Red Knot." (*Id.* ¶ 54.)

> Under the Forbearance Agreement, signed December 30, 1997,
>
> the Estate granted Red Knot a lien on virtually all of the Estate's assets, and also provided that, should David D'Addario ever be removed as an Executor of the Estate, Red Knot [which Plaintiffs allege is simply David's alter-ego] had the immediate right to engage in collection efforts on the over $48,000,000 allegedly owed to Red Knot, including the right to foreclose on all of the Estate's assets.

(*Id.* ¶ 59.) This "Executor for life" clause was inserted in the Forbearance Agreement despite the fact that the Bank Group had previously filed a Motion to Remove David D'Addario as an Executor of the Estate, which listed as grounds for removal: negligence, mismanagement, malfeasance and serious conflicts of interest. (*Id.*) Additionally, the Forbearance Agreement provided the Estate with a "purchase option" that, on paper, allowed the Estate an option to purchase the Bank Group's loan position (now held by Red Knot) at a steep discount, with the option price increasing at a rate

of over 20% per year until January 7, 2003, at which time the purchase option was set to expire (the "Estate Purchase Option"). (*Id.* ¶ 60.)

The recently unsealed accountings reveal that the Estate had paid Red Knot $6,650,000 leaving a balance of $828,383, which the Estate could have purchased (and had the funds to do so) at a discount pursuant to the Estate Purchase Option. (*Id.* ¶ 64.) However, rather than exercise the Estate Purchase Option, thus ridding the Estate of an additional $55,000,000 of debt, "David let the Estate Purchase Option at the $828,383 buy-out price expire, with the amount thereafter allegedly owed by the Estate to Red Knot exceeding $100,000,000, and with a purported lien by Red Knot on all of the Estate's assets." (*Id.* ¶ 65.) In Plaintiffs' view:

> [T]he only real use of the Forbearance Agreement was as a threat to (a) the unsecured creditors, (b) the beneficiaries under Mr. D'Addario's Will (such as David D'Addario's older sister, Virginia), and (c) the Probate Court (including the Superior Court upon de novo appeal) that if David was pushed too hard or was ever removed as an Executor, Red Knot (as the alter-ego of David D'Addario) would exercise its 'rights' under the Forbearance Agreement to commence collection proceedings on its alleged $55,000,000 in secured indebtedness, and thus annihilate the Estate. That club, however, would be lost should the Estate ever pay off the supposed Red Knot indebtedness at the steeply discounted price in accordance with the Estate Purchase Option.

(*Id.* ¶ 69.) Therefore, Plaintiffs conclude that the Red Knot Forbearance Agreement was, and continues to be, a fraud on the court used by David as a means of staying in control of the Estate. (*Id.* ¶ 70.)

### iv. *The Wrongful Use and Transfer of Estate Owned Residential Properties for the Benefit of David, Larry, and Mary Lou D'Addario*

Plaintiffs allege that David rewarded his brother and sister, Larry and Mary Lou, for their willingness not to question his management and operation of the Estate. (*Id.* ¶ 73.) He did this by giving them "free and unfettered use of" several different properties owned by the Estate, with the

Estate continuing to pay all costs and expenses associated with the use and maintenance of these properties. (*Id.*) David also enjoyed this benefit. (*Id.*) Moreover, several of these properties (the San Francisco condo, Vermont condo, Vermont lot, and New York condo) were either sold to a third party or transferred to David or his siblings, without any indication that funds were ever paid to the Estate for these transactions. (*Id.*)

### v.   The Silver Knot/Wise Metal Scheme

"Silver Knot is a corporation that was set up by David D'Addario and Garvey in early 1999 to acquire a controlling interest in Wise Metals, which was a producer of aluminum can stock for the beverage industry." (*Id.* ¶ 74.) In 2001, David, through his ownership interest in Silver Knot, acquired a majority interest in Wise Metals. (*Id.*) Plaintiffs contend that David D'Addario used assets, proceeds and business opportunities of the Estate to acquire a controlling interest in Wise Metals through Silver Knot, which interest equitably belonged to the Estate. (*Id.* ¶ 75.) Then, in October of 2014 a Dutch company "acquired Wise Metals, through its purchase of Silver Knot, for $1.4 billion, comprised of a cash payment to David D'Addario's company, Silver Knot, of $455,000,000, and the assumption of $945,000,000 in debt. (*Id.*) David's ownership interest in Silver Knot and the proceeds resulting from the sale of Wise Metals belonged to the Estate, but David has converted it for his own personal benefit. (*Id.* ¶ 77.)

### vi.   Red Knot/David D'Addario Settlement Scheme

Finally, Plaintiffs detail a series of lawsuits, beginning with one brought against David and Larry as Executors of the Estate by The Cadle Company ("Cadle"), which was owed in excess of $810,000 on a promissory note Mr. D'Addario executed prior to his death. Final judgment was entered on March 1, 2010 by the Superior Court, awarding Cadle $810,245.59 as the principal amount due under the $1,000,000 Note, along with interest and costs, for a total judgment against

the Estate in the amount of $2,580,470.23. (*Id.* ¶ 83.) David made no effort to pay the amount due by the Estate to Cadle. (*Id.*) Consequently, "after unearthing evidence of David's systematic and long-term looting of the Estate," Cadle filed suit against David D'Addario, Garvey, Red Knot and others for engaging in a RICO conspiracy to denude the assets of the Estate. *See The Cadle Company v. David D'Addario, et al.*, United States District Court, District of Connecticut, No. 3:12-cv-00816-WGY (Hon. William G. Young, J., Dist. of Mass., sitting by designation) (the "Cadle RICO Suit"). (Am. Compl. ¶ 84.) Judge Young administratively closed the case for a period of nine months in order to allow David, as Executor, the opportunity to bring the Estate to a close and pay Cadle the amount owed, after which it could be reopened upon motion by either party. (*Id.* ¶ 85.)

David and Garvey devised a plan, using his alter-ego, Red Knot, to prevent the Cadle RICO Suit from reopening, which would allow Cadle to conduct discovery (thus revealing the sham Red Knot Forbearance Agreement and David's systemic looting of the Estate). (*Id.* ¶ 86.) Essentially, an Estate asset – the Hi Ho Motel – was transferred to Red Knot for a $4,500,000 credit on an amount supposedly owed to Red Knot, and Red Knot subsequently sold that Motel and used the proceeds to buy Cadle's judgment against the Estate, thereby settling Cadle's RICO Suit claims without any discovery ever occurring. (*Id.* ¶ 87.)

Plaintiffs contend that "[t]he transfer of the Motel from the Estate to Red Knot for the purpose of funding the settlement of a multi-million dollar claim against David D'Addario contributed to the insolvency of the Estate, and eventually left Plaintiffs unable to receive their promised inheritable beneficial interests from the net assets of the Estate." (*Id.* ¶ 90.)

### C.  Breach of Fiduciary Duty to Trusts

As an Executor of the Estate, David D'Addario never properly funded the Testamentary Trust, the Marital Trust, or the Virginia Trust, and as Trustee of those trusts, never diligently

pursued the full funding of those trusts with assets from the Estate. (*Id.* ¶ 92.) Instead, "David conspired with the other Defendants named herein to keep the assets of the Estate out of those trusts such that those assets would stay within the control of David as the chief Executor of the Estate, which would, in turn, allow David to deal with those assets as he chose for his personal financial benefit." (*Id.*) Plaintiffs claim that David systematically manipulated the Testamentary Trust, the Marital Trust and Virginia Trust from November 30, 1987 to the present, so that they became his alter-egos, and were simply used by him to perpetuate the fraudulent and other wrongful conduct set forth in their complaint. (*Id.* ¶ 93.)

### D.  Probate Court

According to Plaintiffs, the Connecticut Probate Court has permitted David D'Addario, an interested party, to preside over the "liquidation and winding-up of the affairs of an $162,000,000 probate estate, with virtually no supervision over [his] conduct, and no accountability for [his] wrongful conduct." (*Id.* ¶ 96.) Without any true judicial supervision, the Estate has sold or otherwise disposed of approximately 75 assets or businesses since March of 1986. (*Id.*) Even when accountings were finally filed, they were under seal and were not reviewed by the Probate Court Judge. (*Id.*) David D'Addario has no intention of closing the Estate. (*Id.* ¶ 100.)

On September 25, 2012 Judge Egan ordered the Executors to report to the Court as to what steps have or are being taken to finalize the administration of this Estate beginning January 1, 2013 and quarterly thereafter. (*Id.* ¶ 101.) The Executors never provided to the Probate Court such a report. (*Id.*) On July 16, 2013 the Probate Court again ordered the Executors to submit a report detailing what steps the fiduciaries have taken or are going to take to satisfy all outstanding creditors and asking when they anticipate the Estate will be closed. (*Id.*) To date the Executors have failed to provide the Probate Court with the required information. (*Id.*)

13

Although David has represented to the Probate Court on numerous occasions that the Estate is solvent, Plaintiffs aver that these misrepresentations were at best misleading, if not knowingly false.[5] (*Id.* ¶¶ 108-09.) Put simply, Plaintiffs allege that the Estate is currently insolvent. (*Id.* ¶ 113.)

## II.    Discussion[6]

Plaintiffs contend that Defendants' conduct constitutes violations of 18 U.S.C. §§1962(b), (c) and (d) of RICO.[7] Defendants move to dismiss the entire Complaint, focusing in substance on Plaintiffs' RICO claims (Count One), which they contend are the only valid basis for federal jurisdiction. Defendants' Motion offers the following grounds for dismissing Plaintiffs' RICO claims: 1) Plaintiffs do not have standing to pursue their RICO action; 2) Plaintiffs' claims are unripe; and 3) Plaintiffs have failed to plead the requisite elements of a RICO claim under either §§ 1962(b), (c), or (d). Defendants argue that because Plaintiffs' RICO claims must be dismissed,

---

[5] On September 3, 2015 David D'Addario represented that Mr. D'Addario's Probate Estate was valued at $11,857,816 and in the November 25, 2014 Verified Status Update of the Decedent's Estate he listed numerous real estate holdings of the Estate with a purported net value of $13,958,140.58. (*Id.* ¶¶108-09.)

[6] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although detailed allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Conclusory allegations are not sufficient. *Id.* at 678–79; *see also* Fed. R. Civ. P. 12(b)(6).

[7] As indicated in the introductory paragraph, the Complaint also contains various state law claims, the substance of which are not the focus of this Ruling.

14

the Court lacks subject matter jurisdiction over the remainder of the claims and thus that the entire case must be dismissed. The Court takes each argument in turn.

### A. Plaintiffs Have Standing to Bring Their RICO Claims

Defendants assert that Plaintiffs lack standing to pursue their RICO claims because the Estate, and not Plaintiffs, was the direct victim of the Defendants' alleged long-term pattern of wrongful conduct, and therefore the Estate is "the [only] party with standing to bring a civil RICO claim." (Def.'s Mot. to Dismiss at 7.) Plaintiffs respond that they have adequately alleged causation of injury to their business or property, especially given that Virginia D'Addario was the primary target of David's actions.[8]

In order to establish a civil RICO violation, Plaintiffs must meet the following standing requirements: "(1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 767 (2d Cir. 1994). Plaintiffs "must prove not only that the acts of [D]efendant constitute a RICO violation, but also that [P]laintiff suffered injury as a result of that violation. Until such injury occurs, there is no right to sue for damages . . ." *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1102 (2d Cir. 1988). Thus, a plaintiff alleging a civil RICO violation must "demonstrate a direct relation between the

---

[8] Plaintiffs correctly note that "the mere fact that the Defendants' wrongful conduct also caused harm to the Estate does not strip Plaintiffs of standing to pursue the Defendants for the injury that they caused to Plaintiffs' business or property." (Pl.'s Opp'n at 7.) For example, the plaintiffs in *Bankers Trust*, creditors of a bankrupt corporation, sought recovery for acts of bankruptcy fraud and bribery that concealed a corporate asset during reorganization. 859 F.2d at 1098. Because the creditors suffered injuries "directly," we allowed them to pursue their civil RICO claim notwithstanding the possibility that the bankrupt corporation "might also have suffered an identical injury for which it has a similar right of recovery." *Id.* at 1101; *see also GICC Capital Corp.*, 30 F.3d at 293 ("When a corporation fraudulently is caused to issue debt and stripped of its assets in a manner that obviously will leave the creditors unpaid, those creditors have standing.").

injury suffered [to his/her business or property] and the alleged injurious conduct." *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992).[9] In *Holmes*, the Supreme Court held that a court must examine the following three factors to determine whether an alleged RICO violation proximately caused injury to the plaintiff's business or property as required by the RICO statute: (1) the degree of directness of the injury; (2) the difficulty of apportioning damages among others affected by the alleged RICO violations; and (3) the possibility that other more directly injured victims could better vindicate the policies underlying RICO. 503 U.S. at 269-70.

Defendants' two primary authorities for claiming that "Plaintiffs, as beneficiaries to an estate . . . lack standing to bring a civil RICO suit based on any alleged injury to their expected inheritable interests" are two unpublished, out-of-circuit cases: *Schrager v. Aldana*, 542 F. App'x 101 (3d Cir. 2013) and *Firestone v. Galbreath*, 976 F.2d 279 (6th Cir. 1992). (Def.'s Mot. to Dismiss at 7.) However, neither of these cases require finding Plaintiffs lack standing under the facts of the instant case.

In *Schrager*, the plaintiff alleged that the aim of the defendants' conspiratorial conduct was to defraud the probate estate of the decedent and that as a beneficiary of that estate she suffered a direct injury proximately caused by the defendant.[10] 542 Fed. App'x. at 102-03. Applying the

---

[9] Here, Plaintiffs claim two distinct injuries–lost debt and collection expenses. Lost debt damages refer to Plaintiffs' vested interest in the assets of the Estate of which they have been deprived, while collection expenses include attorneys' fees and other expenses incurred in their prior unsuccessful efforts to recover the amounts due to them (*See* Am. Compl. ¶ 142.) The analysis regarding standing focuses on the lost debt injury, because if Plaintiffs do not have standing to pursue those damages, they would not have standing with regard to the related collection expenses.

[10] Here, however, Plaintiffs allege in their Complaint that Defendant David D'Addario's wrongful conduct was directed primarily at his sister, Plaintiff Virginia D'Addario, not simply at the Estate. (Am Compl. ¶¶ 18, 27, 107, 121.)

16

*Holmes* factors, the court concluded that the direct victim of the defendant's conduct was the estate, not the plaintiff and that the estate was in a better position to sue for the alleged injury. This was especially true because a Public Administrator, who had already taken action to recover the defrauded funds, had assumed control of the estate. *Id.* at 103-04. In so ruling, the Third Circuit noted that "plaintiff has alleged a financial loss due to the diminution of the estate of which he is a beneficiary. *This loss can serve as the basis for standing* so long as the additional criterion of proximate causation [set forth in *Holmes*] is met." *Id.* at 104 (emphasis added). Therefore, while the Third Circuit panel concluded that the plaintiff beneficiary lacked standing, it did not preclude the possibility that under different facts a beneficiary to an estate might have standing to bring a civil RICO claim. Plaintiffs here have alleged that the executors of the Estate are fraudulently maintaining control over the Estate and thus there is no better party to bring the RICO suit.

Moreover, the facts of *Firestone* are readily distinguished from those in this case. There, the plaintiffs alleged that by stealing from their legally incompetent grandmother during her lifetime, Defendants "decreased the size of [their grandmother's] estate, and consequently the size of their inheritance." 976 F.2d at 285. Accordingly, the plaintiffs, as potential beneficiaries under a will that the decedent could have changed prior to her death, had no vested interest in the decedent's assets prior to her death and suffered no tangible loss at the time the decedent's assets were misappropriated by the defendants. *Id.* at 284-85. In contrast, in this case Plaintiffs have vested, enforceable rights of inheritance. *See Gaynor v. Payne*, 261 Conn. 585, 592 (2002) ("[u]pon the decedent's death . . . the [will beneficiaries'] rights of inheritance are vested [, and] those vested rights are enforceable."). Thus, Plaintiffs' injury is significantly more direct than the plaintiffs' in *Firestone*, rendering that case inapposite.

Defendants attempt to substantiate their standing argument by contending that Plaintiffs have only "an intangible right to the property of the Estate," arguing that "any injury to the Estate has not caused them actual monetary loss, i.e., an out-of-pocket loss as required to create RICO standing for a lost debt claim." (Def.'s Reply at 2 (internal quotation marks omitted) (citing *In re Avandia Mktg.*, 804 F.3d 633, 638 (3d Cir. 2015); *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 151 (S.D.N.Y. 2014))). However, the Second Circuit has not required an out-of-pocket loss in order for a RICO plaintiff to have standing. As Plaintiffs highlight, the very case Defendants cite for this proposition, *In re Avinda Marketing*, states, "proof of a concrete financial loss, and not mere injury to a valuable intangible property interest . . . *can be satisfied by* allegations and proof of actual monetary loss, i.e., an out-of-pocket loss." *Id.* at 638 (emphasis added). This language does not mean that a plaintiff must *per se* demonstrate out-of-pocket loss, but rather that this is one way in which concrete financial loss may be established.

"The requirement that the injury be to the plaintiff's business or property means that the plaintiff must show a proprietary type of damage." *Bankers Trust*, 741 F.2d at 515. Moreover, "damages as compensation under RICO . . . for injury to property must, under the familiar rule of law, place [the injured parties] in the same position they would have been in but for the illegal conduct." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 122 (2d Cir. 2013) (internal quotation marks and citations omitted) (alterations in original). The *U.S Foodservice* court found that the plaintiffs, who had a protectable interest in a contract with the defendant at the time the fraud occurred, suffered an injury cognizable under RICO. *Id.* at 123. Similarly, Plaintiffs here had a protectable interest in the Estate at the time Defendants engaged in their alleged wrongful conduct and therefore suffered a proprietary type of damage. To the extent Defendants are found liable for diminishing the value of the Estate, they can be made to make it whole again, which in

turn would permit distribution to Plaintiffs of their rightful interest in the Estate had Defendants not perpetuated these frauds.[11]

### B.  Plaintiffs' RICO Lost Debt Injury is not Ripe

Although the Court concludes that Plaintiffs have standing to bring their RICO claims, there remains the question of whether their injuries are sufficiently ripe at this time. Defendants argue that Plaintiffs' lost debt claims are not yet ripe because the Estate is still open, making any injury to Plaintiffs' promised inheritable beneficial interests purely speculative. (Def.'s Mot. to Dismiss at 11.) In opposition, Plaintiffs respond that "[u]nder the facts as alleged in this case . . . any supposed future ability of Plaintiffs to collect from the Estate . . . is not a realistic possibility because the Estate, as alleged, is now hopelessly insolvent" and therefore their RICO claims are ripe because there is "no 'real possibility that the debt, and therefore the [lost debt] injury, may be eliminated or significantly reduced.'" (Pl.'s Opp'n at 16 (quoting *In re Merrill Lynch Ltd. P'ship Litig.*, 154 F.3d 56, 59 (2d Cir. 1998))). The question for this Court then is whether Plaintiffs' injury, i.e., the loss of their "promised inheritable beneficial interests in the net assets of the Estate," is ripe for review while the Estate remains open in Connecticut Probate Court.

### i.  *A Survey of Relevant Second Circuit Case Law*

Several Second Circuit cases provide the backdrop for determining whether Plaintiffs' civil RICO claims are ripe. First, in *Bankers Trust*, the defendant owners of a major corporation, in an effort to avoid liabilities to the creditor plaintiff, agreed to seek a reduction of the corporation's debts through a Chapter 11 bankruptcy proceeding. 859 F.2d at 1098. However, in

---

[11] Because Plaintiffs have standing to pursue lost debt, they also have standing to pursue the claimed accompanying collection expenses.

so doing, they fraudulently concealed from the plaintiff a major asset with net assets in excess of $3 million, thus inducing the plaintiff to consent to the reorganization plan. *Id.* Upon realizing the fraud, the plaintiff successfully moved in bankruptcy court to revoke the plan, resulting in the reinstatement of the bankruptcy proceedings. *Id.* at 1099. While the bankruptcy proceedings were still pending, the plaintiff brought a civil RICO action in the Southern District of New York, which the district court dismissed, finding in part that the plaintiff lacked standing. *Id.* at 1100. On appeal, the Second Circuit reversed, finding the plaintiff did have standing, but holding in relevant part that its lost debt damages "are unrecoverable, at least at this time, because their accrual is speculative and their amount and nature unprovable." *Id.* at 1106 (internal quotation marks and citations omitted).

*Bankers Trust* clarified that "civil RICO actions are subject to a rule of separate accrual"– "each time plaintiff discovers or should have discovered an injury caused by defendant's violation of § 1962, a new cause of action arises as to that injury, regardless of when the actual violation occurred." *Id.* at 1103. The court found that "a cause of action for a new and independent injury does not accrue until the plaintiff actually suffers that injury," reasoning that "[C]ongress intended the basic award under civil RICO to compensate the plaintiff for injury to his property or business," meaning the damages awarded must be "sufficient to place the plaintiff in the same financial position he would have occupied absent the illegal conduct." *Id.* at 1106. Under the facts of that case, the court held

> [I]t is impossible to determine the amount of damages that would be necessary to make plaintiff whole, because it is not known whether some or all of the fraudulently transferred funds will be recovered by the corporation. Should they be recovered, [the plaintiff] would benefit along with [the corporation's] other creditors and its injury would decrease. As a result, the damages in this area are

speculative and unprovable; any claim for relief based on the lost-debt injury must therefore be dismissed without prejudice.

*Id.*

The *Stochastic Decisions, Inc. v. DiDomenico* panel reaffirmed *Bankers Trust,* reasoning that "a RICO claim does not accrue until it is established that collection of the claim or judgment has been successfully frustrated." 995 F.2d 1158, 1166 (2nd Cir. 1993). The plaintiff judgment creditor in that case brought a civil RICO action charging the defendants with conspiracy to commit bankruptcy, wire, and mail fraud for the purpose of preventing the plaintiff from collecting outstanding state court judgments against the defendants for unpaid insurance premiums. *Id.* at 1162-63. The plaintiffs argued that because their lost debt was definitively determined by entry of the New Jersey judgments, that amount should have been considered part of its RICO injury. *Id.* at 1165. The Second Circuit though, citing *Bankers Trust*, held that the amount of the lost debt remained unprovable. It noted:

> [A]lthough [the plaintiff] . . . obtained judgments for specific amounts, the amount of its lost debt [could not] be determined at [that] time because of the ongoing efforts to collect those judgments. As *Bankers Trust* recognized, a debt is lost and thereby becomes a basis for RICO trebling only if the debt (1) cannot be collected (2) by reason of a RICO violation.

*Id.* (internal quotation marks omitted).

In *First Nationwide Bank v. Gelt Funding Corporation*, the Second Circuit specifically focused on whether the plaintiff's RICO claims were ripe for review. 27 F.3d 763 (1994). There, the court rejected the plaintiff's argument "that its claims with respect to all fraudulent loans were ripe for suit the moment the loans were made, regardless of whether the borrowers presently were in default or whether [the plaintiff] completed efforts to foreclose on the collateral properties." *Id.* at 767 (internal quotation marks omitted). As in *Bankers Trust*, the court

21

reasoned that "[b]ecause the fraud defendant is not liable for all losses that may occur, but only for those actually suffered, only after the lender has exhausted the bargained-for remedies available to it can the lender assert that it was damaged by the fraud, and then only to the extent of the deficiency." *Id.* at 768. Therefore, the court found that the plaintiff's claims are ripe for suit only when its loss becomes "clear and definite" but until that time plaintiff lacks standing to bring those claims. *Id.* at 769.

Ripeness was again at issue in *In re Merrill Lynch*, in which the plaintiff investors asserted that the defendant made fraudulent representations and omissions to induce investors to invest in several real estate limited partnerships. 154 F.3d at 57-59. The Second Circuit found that both *Bankers Trust* and *First Nationwide* were inapplicable, explaining that those cases

> [H]old that when a creditor has been defrauded[,] RICO injury is speculative when contractual or other legal remedies remain which hold out a real possibility that the debt, and therefore the injury, may be eliminated or significantly reduced. The RICO claim is, thus, not ripe until those remedies are exhausted and the damages are clear.

*Id.* at 59. The court differentiated the *In re Merrill Lynch* facts, finding the plaintiffs alleged "that the partnerships were fraudulent at the outset because they could never achieve the promised objectives" and therefore "the investors sustained recoverable out-of-pocket losses when they invested; namely, the difference between the value of the security they were promised and the one they received which could not meet those objectives." *Id.* Critical to the court's decision was that the investor plaintiffs had no other remedies which could mitigate or alleviate the injury, meaning that the amount of damages was "clear and definite[ ] and the injury was ripe[ ] at the time of investment." *Id.*

Finally, *Motorola Credit Corporation v. Uzan* involved plaintiff corporations that entered into several agreements whereby they loaned a corporation in Turkey hundreds of millions of dollars to set up cell-phone and communications networks, and as collateral were promised 51% of that corporation's outstanding shares. 322 F.3d 130, 133 (2nd Cir. 2003). "[F]ollowing a series of non-payments and serious concern that the loans would not be repaid [the plaintiffs] sued persons who are alleged to control the third party corporation . . . and to have impaired collateral by diluting the . . . corporation's stock and other maneuvers." *Id.* at 132. Arbitrations concerning the underlying financing transactions were initiated in Switzerland, but were subsequently stayed by the Southern District of New York. *Id.*

The Second Circuit, citing *First Nationwide*, held that the plaintiffs' claims were not ripe because the RICO damages sought might "be abated to the extent that: Plaintiffs realize value on the collateral; Plaintiffs recover in the Swiss arbitrations; or the size of the debt on the underlying contracts, or the obligation to pay it, is affected by any ruling . . . in the Swiss arbitration that is binding and enforceable." *Id.* at 136. Because these contingencies remained, the plaintiffs' loss suffered on unforeclosed past-due loans could not yet be determined and thus they lacked standing under RICO to assert claims as to those unripe loans. *Id.* The court went on to explain that although

> It may be that the arbitration is a forlorn hope for [the plaintiffs], and that, in any event, the collateral will yield little of value . . . the arbitration does not cease to be a possible influence . . . on the amount of loss simply because the district court has stayed it. Certainly, the district court cannot in that way force the RICO claim to ripen.

*Id.* at 137.[12]

These decisions make clear that an injury must be "clear and definite," *First Nationwide Bank*, 27 F.3d at 769; *In re Merrill Lynch*, 154 F.3d at 59, and that where damages are "speculative and their amount and nature unprovable" *Bankers Trust*, 859 F.2d at 1105, a RICO claim is not ripe.

> ### ii. Plaintiffs' Lost Debt Injury is not "Clear and Definite" as Required by Second Circuit Law

Even if the Court takes Plaintiffs' allegation in the Complaint that the Estate is insolvent as true, this does not render their lost debt injury ripe.[13] When an estate is insolvent its "assets are insufficient to cover its debts, taxes, and administrative expenses." Black's Law Dictionary (10th ed. 2014); *accord Zanoni v. Lynch*, No. CV95 0546174S, 1995 WL 645978, at *3 (Conn. Super. Ct. Oct. 26, 1995), *aff'd*, 79 Conn. App. 309 (2003) (Citing Black's Law Dictionary 5th ed. 1979 for definition of "insolvency" in probate context.). Therefore, the fact that Plaintiffs have alleged the Estate is insolvent is not the same as alleging that it has no assets at all.

---

[12] The *Motorola* court distinguished its case from *In re Merrill Lynch*, noting that there, the plaintiff "was unsecured, so there was no collateral on which to foreclose, or any other contractual remedy" available. *Id.* at 136.

[13] Defendants argue that because the question is whether the Court has subject matter jurisdiction, it is not required to accept as true Plaintiffs' allegations that the Estate is insolvent. *See e.g.*, *State Employees Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 77 n.4 (2d Cir. 2007) ("in adjudicating a motion to dismiss for lack of subject-matter jurisdiction, a district court may resolve disputed factual issues by reference to evidence outside the pleadings"). They therefore contend that because only the probate court has the authority to declare the Estate insolvent, and has not, this Court cannot treat it as insolvent for purposes of this Motion. The Court does not need to resolve this factual matter at this stage because even taking it as true that the Estate is not solvent, Plaintiffs' lost debt claims are not ripe.

Accordingly, while the Estate may not have sufficient assets to cover its expenses, the Probate Court can still afford priority to Plaintiffs' claims in distributing its assets. *See Appeal of Vail,* 37 Conn. 185, 195 (1870) ("If there are trusts connected with the property, or liens upon it, or priorities enforceable in equity,–if through fraud, accident or mistake, a class of creditors or beneficiaries are entitled of right to relief as against other creditors or beneficiaries, he may marshal or distribute the assets so as to enforce or satisfy the right."); *Gaynor*, 261 Conn. at 596 ("[Connecticut] General Statutes § 45a-175 (a) invests probate courts with jurisdiction over the interim and final accounts of certain fiduciaries, including testamentary trustees and executors. In exercising the jurisdiction afforded by this statute, probate courts shall determine the rights of the fiduciaries or the attorney-in-fact rendering the account and of the parties interested in the account.") (internal quotation marks and citations omitted). Plaintiffs therefore might still recover some portion of their lost debt should the probate court afford them priority over David or Mary Lou D'Addario and/or creditors of the Estate.

Moreover, the Probate Court has the ability to enforce the parties' rights by surcharging the fiduciary for breach of trust.[14] *Gaynor*, 261 Conn. at 596-97. Defendants therefore maintain

---

[14] The probate court also has the power to:

[1] Charge the fiduciary with property and income received but not accounted for;
[2] Charge the fiduciary with property and income which he or she neglected to get;
[3] Eliminate credit for claims allowed but not legally due;
[4] Eliminate credit for claims paid in the wrong order of priority;
[5] Eliminate credit for expenses improperly incurred, or chargeable to the fiduciary personally;
[6] Eliminate credit for legacies improperly paid or paid to the wrong person or in the wrong amount or by the wrong medium; and
[7] Establish provision for claims or legacies legally due but not provided for in the account

that the probate court has available to it effective legal remedies that might "eliminate[ ] or significantly reduce[ ]" Plaintiffs' injury, i.e., the alleged diminution in value of Plaintiffs' promised inheritable beneficial interests, rendering that injury speculative. *See In re Merrill Lynch*, 154 F.3d at 59. Plaintiffs respond that "Defendants' argument presupposes that there are, in fact, net proceeds left within the Estate to distribute. The hard work of Defendant D'Addario, however, has insured that there are none." (Pl.'s Opp'n at 18.) As discussed above, the fact that the Estate is alleged to be insolvent does not mean that it has no assets at all, leaving open the possibility that whatever assets it does have might be reprioritized and distributed to Plaintiffs in lieu of other creditors and beneficiaries. Between this and the potential for additional funds becoming available for distribution by way of the Probate Court imposing a surcharge on the Executors, Plaintiffs' lost debt injury is not "clear and definite," *First Nationwide Bank,* 27 F.3d at 763, and therefore, although any recovery in the probate court proceedings might be a "forlorn hope" through Plaintiffs' lens, *Motorola Credit Corp*, 322 F.3d at 137, their lost debt damages are not yet ripe.[15]

---

*Gaynor,* 261 Conn. at 597 n. 8.

[15] Plaintiffs attempt to avoid this ripeness problem by alleging any remedy in probate court is futile and that David D'Addario intends to keep the Estate open until after Virginia's death, making it impossible for Plaintiffs to recover.  First, the fact that the Probate Court has repeatedly rejected Virginia D'Addario's claims does not indicate that the Probate Court cannot, and has not, adequately protected her rights. *See Lefkowitz v. Bank of N.Y.*, 676 F. Supp. 2d 229, 275–76 (S.D.N.Y. 2009) ("[A]lthough plaintiff has repeatedly complained about her treatment in state court, the history of her extensive and extremely persistent involvement in the various probate proceedings . . . and the extraordinarily extensive court rulings and explanations for their decisions amply demonstrate that plaintiff has been given, and continues to be given, ample opportunity to be heard in state court. The fact that most, though not all, of plaintiff's complaints have been rejected does not itself reflect a failure by the state courts to protect her rights."). Second, while David D'Addario may have threatened to keep the Estate open past Virginia D'Addario's death, the conclusion that the Probate Court will permit the Estate to remain open indefinitely does not automatically follow. In fact, Plaintiffs' Complaint even acknowledges that this is not a certainty.

Plaintiffs attempt to distinguish their circumstances from *Bankers Trust* because there is no reasonable prospect they will obtain a substantial recovery on their lost debt claims, as the Estate is "hopelessly insolvent." Nowhere in *Bankers Trust*, however, does the Second Circuit require that there be a "high probability" that the plaintiff would obtain a "substantial recovery." (Pl.'s Opp'n at 17.) Rather, it stated, "[s]hould [some or all of the fraudulently transferred funds] be recovered, [the plaintiffs] would benefit . . . and its injury would decrease. As a result, the damages in this area are speculative and unprovable." *Bankers Trust*, 859 F.2d at 1106 (internal quotation marks and citations omitted). The Court is mindful of the language in *In re Merrill Lynch* that "when . . . legal remedies remain which hold out a *real possibility* that the debt, and therefore the injury, may be eliminated or *significantly reduced*," a lost debt injury remains speculative. 154 F.3d at 59 (emphasis added). *Motorola Credit Corp* clarifies that even where a legal remedy provides just a "forlorn hope" that will "yield little of value," the possibility of recovery through available legal remedy renders a RICO claim unripe. 322 F.3d at 137.

Consequently, Plaintiffs' RICO claims for lost debt based on their promised inheritable beneficial interests are not ripe and must be dismissed.

### C.  Plaintiffs' Collection Expenses are Ripe

Plaintiffs also claim separate and independent injury as a result of Defendants' RICO violations in the form of "attorneys' fees and other expenses incurred . . . in connection with their

---

(*See* Am. Compl. ¶ 97 ("There is also a serious question as to whether the Estate will close within the foreseeable future.")). This Court will not assume that any remedy through Connecticut's probate system is futile.

unsuccessful efforts to enforce their claims against the Estate." (Am. Compl. ¶ 142(b).)[16] It is well settled that legal fees may constitute RICO damages when they are the proximate consequence of a RICO violation. *See Stochastic*, 995 F.2d at 1167; *Bankers Trust*, 859 F.2d at 1105. "For collection expenses damages, the plaintiffs must show by a preponderance of the evidence the amount of legal fees and other expenses that they incurred in their unsuccessful attempts to collect [on their interests in the Estate] which were proximately caused by the defendant(s)' alleged RICO violations." *The Cadle Co. v. Flanagan*, No. CIV. 301CV531AVC, 2006 WL 860063, at *8 (D. Conn. Mar. 31, 2006); *see also Stochastic*, 995 F.2d at 1166–67 (citing *Holmes v. Securities Investor Protection Corp.*, 503 U.S. at 269-70).

For instance, the defendants in *Bankers Trust* had initiated fraudulent lawsuits against the plaintiffs and allegedly bribed one of the judges, all in an effort to frustrate collection of the debt owed the plaintiff. 859 F.2d at 1099. The Second Circuit held that the plaintiff could recover as RICO damages (1) legal fees and other expenses incurred in fighting the frivolous lawsuits in New York, (2) legal fees and other expenses spent in overcoming bribe-induced decisions in the South Carolina action, and (3) legal fees and other expenses incurred in obtaining a revocation of the initial reorganization plan. *Id.* at 1105. Similarly, the *Stochastic* court held that the plaintiff could recover legal fees and other expenses incurred in its attempt to collect on state court judgments against the defendants for unpaid insurance premiums where the alleged RICO violation involved the defendants' efforts to prevent the plaintiff from collecting on those judgments. 995 F.2d at

---

[16] Plaintiffs pursue only those expenses within the four-year statute of limitations, which they allege constitute expenses exceeding that which would have been necessary absent Defendants' deliberate wrongful conduct (i.e., the Estate should have closed many years before Plaintiffs made these expenditures). Plaintiffs claim this amount to be in excess of $200,000. (Am. Compl. ¶ 142(b).)

1167; *see also Flanagan*, 2006 WL 860063, at *7 (Finding that plaintiffs were "entitled to pursue RICO claims for damages incurred in collecting outstanding debts where the defendants had frustrated collection through fraud."). On the other hand, the court in *Stochastic* rejected the plaintiff's argument that it was also entitled to recover fees and expenses incurred in originally obtaining the state court judgments. *Id.* at 1166-67 ("[I]t cannot plausibly be contended that efforts to impede the collection of the . . . judgments proximately caused [the plaintiff's] prior expenditure of legal fees in obtaining the judgments.").

Clinging to this latter aspect of *Stochastic's* holding, Defendants contend that "Plaintiffs' expenses are not recoverable because they represent prejudgment litigation costs that Plaintiffs voluntarily elected to incur, as opposed to expenses that Plaintiffs were forced to incur by virtue of a RICO violation aimed at frustrating the collection of a judgment or other sum." (Def.'s Reply at 7.) Furthermore, they argue the very cases Plaintiffs cite demonstrate why Plaintiffs' collection expenses are not recoverable, singling out *Angermeir v. Cohen*, 14 F. Supp. 3d 134 (S.D.N.Y. 2014) and *Cadle v. Flanagan*, 2006 WL 860063, as illustrative of this point. Attempting to distinguish these cases, Defendants maintain that in *Angermeir* "the legal fees that the court concluded were recoverable were expended in response to allegedly fraudulent lawsuits that were instituted by *the defendants* to harass plaintiffs as part of the defendants' alleged racketeering activity" and in *Flanagan* "the plaintiffs had previously obtained a judgment against one of the defendants . . . [and the] plaintiffs' collection efforts were precisely what were frustrated by the defendant's alleged RICO violations in that case." (Def.'s Reply at 7 (emphasis in original) (internal citations omitted).)

Contrary to Defendants' position, the Court finds that Plaintiffs' claimed collection expenses are indeed analogous to those whose recovery was permitted in *Stochastic*, *Angermeir* and *Flanagan*. First, the fact that there is no judgment against Defendants does not distinguish this

case–the only difference where there is a judgment is that consequently there is also a sum certain, whereas Plaintiffs' interests will not be apportioned definitively until the Estate closes. That they have an interest though, is certain. Furthermore, characterizing Plaintiffs' expenses as "voluntary" ignores the fact that at this stage the Court accepts as true the allegations in the Complaint–that Defendants are intentionally keeping the Estate open through fraudulent means, while simultaneously looting it, to prevent Plaintiffs from ever recovering their interest in the Estate.

The Court finds it plausible that Defendants' alleged RICO violations (maintaining control of the Estate in order "to plunder, pillage and loot" its assets) proximately caused Plaintiffs to incur expenses in Probate Court in an effort to collect on their interest. (Am. Compl. ¶ 121.) Construing Plaintiffs' interest in the Estate as an outstanding debt, albeit for an unknown amount at this time, and Defendants' conduct as efforts to frustrate collection of that debt, Plaintiffs may pursue RICO claims for damages incurred attempting to close the Estate and collect their promised inheritable beneficial interest. *See Flanagan*, 2006 WL 860063 at *7 ("although [the defendant's] bankruptcy case [was] . . . still pending at the time of trial . . . the plaintiffs were nevertheless entitled to pursue RICO claims for damages incurred in collecting outstanding debts where the defendants had frustrated collection through fraud.").

### D.  Plaintiffs Have Failed to Plead the Required Elements of a RICO Claim

To state a claim that a defendant has violated the substantive RICO statute, 18 U.S.C. § 1962, Plaintiffs must allege the existence of seven elements: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (quoting 18 U.S.C. § 1962 (a)-(c)). Courts have warned that "each subpart [of

Section 1962] requires distinct elements and fact patterns and rarely can a defendant simultaneously violate all four." *Lesavoy v. Lane*, 304 F. Supp. 2d 520, 532 (S.D.N.Y. 2004), *aff'd* in relevant part and *rev'd* in part on other grounds, *Lesavoy v. Gattullo-Wilson*, 170 F. App'x 721 (2d Cir. 2006). Plaintiffs must also allege they were "injured in [their] business or property *by reason of* a violation of section 1962." *Moss*, 719 at 17 (internal quotation marks and citations omitted) (emphasis in original).

### i. Plaintiffs Have Alleged a Pattern of Racketeering Activity

In order to establish a claim under either Section 1962(b) or (c), the plaintiff must demonstrate that the defendants engaged in a "pattern of racketeering activity." 18 U.S.C. §§ 1962(b) and (c); *see also GICC Capital Corp.*, 67 F.3d at 465 ("Under any prong of § 1962, a plaintiff in a civil RICO suit must establish a pattern of racketeering activity."). Defendants' first substantive attack of Plaintiffs' RICO claims focuses on this requirement. To establish a "pattern of racketeering activity a plaintiff . . . must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). Essentially, a plaintiff "must provide some basis for a court to conclude that defendants' activities were neither isolated nor sporadic." *GICC Capital Corp.*, 67 F.3d at 467 (internal quotation marks and citations omitted).

Continuity is "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. Defendants maintain that Plaintiffs have not properly pled the continuity requirement for a RICO pattern of racketeering activity because the alleged conduct was undertaken by a "discrete set of actors" and was directed at "a small group of victims" for a "limited

purpose." (Def.'s Mot. to Dismiss at 17.)[17] In opposition, Plaintiffs contend they have adequately alleged both open-ended and closed-ended continuity.[18] "At the pleading stage, the hurdle [for showing continuity] is relatively low." *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 497 (S.D.N.Y. 2007), *aff'd*, 328 F. App'x 695 (2d Cir. 2009).

To satisfy closed-ended continuity Plaintiff must allege "a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months . . . do not satisfy this requirement." *H.J. Inc.*, 492 U.S. at 242. The Second Circuit has "never found a closed-ended pattern where the predicate acts spanned fewer than two years." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004); *see also Fresh Meadow Food Servs., LLC v. RB 175 Corp.*, 282 F. App'x 94, 98–99 (2d Cir. 2008); *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir.1999); *GICC Capital Corp.*, 67 F.3d at 467. "Although closed-ended continuity is primarily a temporal concept, other factors such as the number and variety of

---

[17] Defendants cite a series of district court cases they argue so hold. (Def.'s Mot. to Dismiss at 17.) Notably, one of those cases, *Weizmann Inst. of Sci. v. Neschis*, 229 F. Supp. 2d 234, 255-56 (S.D.N.Y. 2002), upon which others also rely, was later held to properly allege continuity upon repleading. *See Weizmann Inst. of Sci. v. Neschis*, 421 F. Supp. 2d 654, 689 (S.D.N.Y. 2005) (Continuity found where scheme to obtain control over estate assets took place over seven years and involved 24 predicate acts and two participants.). To the extent the factual patterns of Defendants' cited cases are similar to this one, the Court agrees with Plaintiffs that they are not consistent with the Second Circuit law articulated above.

[18] Because the Court finds Plaintiffs' Complaint to allege closed-ended continuity, it need not decide whether it also meets the requirements for open-ended continuity. *See GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir. 1995) ("[A] plaintiff in a RICO action must allege either an open-ended pattern of racketeering activity (*i.e.,* past criminal conduct coupled with a threat of future criminal conduct) or a closed-ended pattern of racketeering activity (*i.e.,* past criminal conduct extending over a substantial period of time.") (internal quotation marks omitted).

predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists. *Cofacredit, S.A.*, 187 F.3d at 242; *accord GICC Capital Corp.*, 67 F.3d at 467.

Here, Plaintiffs have alleged over 47 predicate acts, including six different types of act[19] and six different schemes,[20] with over seven participants and 12 victims, extending over a period of at least 19 years, from 1996-2015. By comparison, in *Procter & Gamble Co. v. Big Apple Industrial Buildings., Inc.* involving the construction and lease of a commercial building, the court found that continuity was established despite there being only two victims and four participants in the RICO scheme, which lasted approximately three years.  The court held there was a pattern of racketeering behavior where the plaintiff alleged that the defendants' fraudulent schemes included:

> (1) inducing execution of the ten-year studio lease by fraudulently misstating their experience, expertise, and construction cost estimates; (2) inducing plaintiffs to continue with the project, and inducing P & G to guarantee construction financing by fraudulently misrepresenting and concealing costs; (3) fraudulently diverting construction funds and charging excessive professional and other fees; (4) improperly escrowing construction loan funds to build a "cushion" against discovery of the alleged fraud; and (5) fraudulently scheming to collect "interim rent" for delays primarily caused by defendants.

879 F.2d 10, 18–19 (2d Cir. 1989); *see also, Metromedia Co. v. Fugazy*, 983 F.2d 350, 368-69 (2d Cir. 1992) (affirming the jury finding of civil RICO violations where a single plaintiff alleged four varieties of predicate acts committed by just two participants over the span of two years); *Jacobson*

---

[19] These are: mail fraud, wire fraud, money laundering, monetary transactions with unlawful proceeds, interstate racketeering, and interstate transport of misappropriated funds. (Am. Compl. ¶122.)

[20] These are: the Honeyspot Road Scheme, the Frenchtown Road Scheme, the Red Knot Forbearance Agreement Scheme, the Estate Real Estate Schemes, the Silver Knot/Wise Metals Scheme, and the Red Knot/David D'Addario Settlement Scheme. (*Id.* ¶¶ 28-71.)

*v. Cooper*, 882 F.2d 717, 720 (2d Cir. 1989) (closed-ended continuity sufficiently pled despite a narrow scheme to steal from one person, where a single victim alleged six varieties of predicate acts committed by two participants over "a matter of years"). In fact, *H.J. Inc.* itself held that racketeering activities occurring with some frequency over a six year period may be sufficient to establish continuity. 492 U.S. at 250.

In accordance with these Second Circuit decisions the Court finds that dismissal based upon too few participants, victims, or schemes is unwarranted here.

### ii.   Section 1962(b)

Section 1962(b) prohibits "any person through a pattern of racketeering activity or through collection of an unlawful debt [from] acquir[ing] or maintain[ing], directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."18 U.S.C. § 1962(b). To state a claim under Section 1962(b), a plaintiff must allege that:

> (1) the purpose of the defendants racketeering activity was to acquire an interest or to maintain control of the enterprise; (2) that the defendants in fact acquired an interest or maintained control of the enterprise through their pattern of racketeering activity; and (3) that the plaintiff suffered injury as a result of the acquisition of the enterprise.

*DeFazio v. Wallis*, 500 F. Supp. 2d 197, 208 (E.D.N.Y. 2007). "The purpose of Section 1962(b) is to prohibit the takeover of a legitimate business through racketeering, typically extortion or loansharking." *United States Fire Ins. Co. v. United Limo. Serv. Inc.*, 303 F. Supp. 2d 432, 450 (S.D.N.Y. 2004) (internal quotations omitted). Defendants focus on the first and third of these requirements as grounds for dismissing Plaintiffs' 1962(b) claim.

34

a. *Plaintiffs Sufficiently Link Racketeering to the Acquisition/Maintenance of the Enterprise*

Defendants argue that because as Executor, David D'Addario's interest or control of the alleged enterprise predates the racketeering activity and would have continued despite the alleged racketeering activity, Plaintiffs have failed to plead the necessary link between the racketeering activity and the acquisition or maintenance of an interest or control of the enterprise. *See, e.g., Black Radio Network v. NYEX Corp.*, 44 F. Supp. 2d 565, 579 (S.D.N.Y. 1999) (dismissing Section 1962(b) claim because "the defendants did not need to engage in the alleged racketeering activity to maintain control of the alleged enterprise").[21] In response, Plaintiffs contend that David D'Addario's object was to engage in a pattern of racketeering activity in order to maintain control over the affairs of the Estate for much longer than he would have absent his misconduct, and therefore they have sufficiently pled the link between Defendants' racketeering activity and maintaining control over the enterprise.

Plaintiffs direct the Court to the Red Knot Forbearance Agreement, which they allege was used as a "club" to convince the probate and state courts that David should remain in control of the Estate. (Am. Compl. ¶ 63.) According to Plaintiffs' Complaint, David D'Addario essentially created a new entity, Red Knot, through his attorney, which was ostensibly owned and controlled by longtime friend of David D'Addario and co-defendant, Garvey, but in reality was "the mere alter-ego of David D'Addario and was used by David as a vehicle to maintain control over the

---

[21] Defendants concede that for purposes of Plaintiffs' §1962(b) claim the Estate constitutes a RICO enterprise. *See Gunther v. Dinger,* 547 F. Supp. 25, 27 (S.D.N.Y. 1982) (Were the definition of an enterprise to include any legal entity or group is purposely broad, the court found "no reason why this reasoning should not extend to include an estate within RICO's definition of an enterprise.").

affairs of the Estate as he continued to plunder, pillage and loot" it. (*Id.* ¶ 54.) This was made possible because in the Red Knot Agreement

> the Estate granted Red Knot a lien on virtually all of the Estate's assets, and also provided that, should David D'Addario ever be removed as an Executor of the Estate, Red Knot (say, "David") had the immediate right to engage in collection efforts on the over $48,000,000 allegedly owed to Red Knot, including the right to foreclose on all of the Estate's assets.

(*Id.* ¶ 59.)

Thus, although courts have dismissed Section 1962(b) claims where the defendant's control of the enterprise predated the racketeering activity, as is true here, those courts also determined that the defendant's control over the enterprise was not furthered by the defendant's conduct. *See Neiman Marcus Grp., Inc. v. Dispatch Transp. Corp.*, No. 09 CV 6861 NRB, 2011 WL 1142922, at *9 (S.D.N.Y. Mar. 17, 2011); *Black Radio Network*, 44 F. Supp. 2d at 579. Here, the facts plausibly allege that it was only through David D'Addario's fraudulent acts that the Estate remained open for such a long period of time (and continues to remain open today), and importantly, that the object of Defendants' racketeering activity, as evidenced by the Red Knot Forbearance Agreement, was to maintain control over the Estate. Consequently, the Court will not dismiss Plaintiffs' 1962(b) claim for failing to allege the link between the racketeering activities and maintaining control over the enterprise.

### b. *Plaintiffs Failed to Allege a Separate Acquisition and Maintenance Injury*

In order to state a cause of action under Section 1962(b), Plaintiff must allege "a distinct acquisition injury" other than "injuries resulting from the commission of predicate acts." *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1063 (2d Cir.1996), *vacated on other grounds*, 525 U.S. 128 (1998) (internal quotation marks and citations omitted); *see also United States Fire Ins. Co. v.*

*United Limousine Serv., Inc.,* 303 F. Supp. 2d 432, 450 (S.D.N.Y. 2004) ("the plaintiff must allege an acquisition or maintenance injury separate and apart from the injury suffered as a result of the predicate acts of racketeering." (internal quotations omitted). It is "not sufficient merely to allege an injury caused by the predicate acts themselves . . . ." *Dornberger v. Metro. Life Ins. Co.,* 961 F. Supp. 506, 525 (S.D.N.Y. 1997) (citing *Quaknine v. MacFarlane,* 897 F.2d 75, 82-83 (2d Cir. 1990)). "The rationale for this acquisition injury requirement is . . . [that] the essence of a § 1962(b) violation is not the commission of predicate acts, but rather the acquisition or maintenance of an interest in or control of an enterprise." *Id.* (internal quotation marks omitted). Accordingly, "a plaintiff cannot recover under § 1962(b) unless he alleges a distinct injury caused not by predicate acts but by the defendant's acquisition or maintenance of an interest in or control of an enterprise." *Id.*[22]

> Plaintiffs' Amended RICO case statement alleges that
>
> While the individual Predicate Acts drained assets and income out of the Estate, it was the other wrongful conduct of the Defendants, such as the sham Red Knot Forbearance Agreement, that allowed David D'Addario to maintain, directly or indirectly, control over the affairs of the Estate, and extended the term of his control over the affairs of the Estate, which, in turn, allowed David D'Addario to continue to plunder, pillage and loot the assets of the Estate, and which eventuall[y] led to the insolvency of the Estate.

---

[22] Plaintiffs argue that there is no such requirement, relying on *European Community v. RJR Nabisco, Inc.,* 764 F.3d 149 (2d Cir. 2014), *rev'd and remanded,* ___ U.S. __, 136 S.Ct. 2090 (2016). However, that case to the extent it remains good law, does not appear to make any mention of whether § 1962(b) requires a showing of an acquisition or maintenance injury. Moreover, Defendants cite a case decided after *European Community* where the court continued to hold that in order to establish a § 1962(b) claim, a plaintiff must establish an injury caused by the acquisition or maintenance of an interest or control in the enterprise. *See Wood v. Gen. Motors Corp.,* No. 08 CV 5224 PKC AKT, 2015 WL 1396437, at *9 (E.D.N.Y. Mar. 25, 2015).

(Am. RICO Stmt. ¶ 15.) However, they also assert:

> Defendants engaged in a pattern of wrongful conduct involving mail fraud, wire fraud, money laundering, monetary transactions with unlawful proceeds, interstate racketeering, and interstate transport of misappropriated funds (the "Predicate Acts") to allow David D'Addario to acquire an interest in, and then maintain control over, the affairs of the Estate . . . and thus allow David D'Addario to plunder, pillage and loot the assets of the Estate over the last 29 years.

(Am. RICO Stmt. ¶ 5.) These two statements each allege the same injury: Defendant D'Addario's continued control over the Estate and his draining of its assets.[23] Thus, Plaintiffs' own Complaint and RICO statement belie their claim of a separate and distinct maintenance injury.

### iii.   Section 1962(c)

Section 1962(c) makes it unlawful for "any person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ." 18 U.S.C. § 1962(c). "To establish a violation of 18 U.S.C. § 1962(c) . . . a plaintiff must show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001) (internal quotations omitted). "The requirements of section 1962(c) must be established as to each individual defendant." *Id*. Thus, to state a claim under Section 1962(c), a plaintiff must separately allege the existence and the conduct of an enterprise through which the defendants committed their racketeering activity. *See, e.g., Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 259 (1994).

A RICO "enterprise" includes "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact, although not a legal

---

[23] That Plaintiffs' RICO statement concludes "the pattern of racketeering activity and the enterprise are separate" does not save their failure to provide facts supporting this allegation. (Am. RICO stmt. ¶ 7.)

entity." 18 U.S.C. § 1961(4). To establish an association-in-fact enterprise, a plaintiff must allege that the enterprise exhibited "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). So, "[a]n association-in-fact enterprise is a group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* (internal quotation marks omitted).

To determine whether a complaint has adequately alleged an association-in-fact enterprise, the Second Circuit has directed that courts "look to the hierarchy, organization, and activities of the association to determine whether its members functioned as a unit." *First Capital*, 385 F.3d at 174-75 (internal quotation marks omitted) (court found no enterprise where plaintiff alleged it was comprised of the family members, associates, and attorneys for a single lead defendant and organized for the purpose of "conceal[ing] [the defendant's] assets from his creditors."). "While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The enterprise is not the pattern of racketeering activity; it is an entity separate and apart from the pattern of activity in which it engages." *United States v. Turkette*, 452 U.S. 576, 583 (1981) (cited with approval in *Boyle*, 556 U.S. at 947) (internal quotation marks omitted); *see also D. Penguin Bros. v. City Nat. Bank,* 587 F. App'x 663, 667–68 (2d Cir. 2014).[24]

---

[24] The Court rejects Plaintiffs' argument that "the Supreme Court in *Boyle* clarified that . . . there is no need that a plaintiff allege that the enterprise existed separate and apart from the alleged racketeering acts." (Pl.'s Opp'n at 38.) Rather, *Boyle* reaffirmed its holding in *Turkette*, 452 U.S. at 583, that "the existence of an enterprise is an element distinct from the pattern of racketeering activity and proof of one does not necessarily establish the other" but that "the evidence used to

Plaintiff points to the following facts in the Amended Complaint as alleging an association-in-fact enterprise: Mary Lou D'Addario's refusal to complain about David D'Addario's failure to close the Probate Estate; Greg Garvey/Red Knot's refusal to foreclose under the sham Forbearance Agreement when they were aware of David D'Addario's systematic depletion of Estate assets; and the fact that Greg Garvey worked with David D'Addario to divert the profits from the sale of Wise Metals out of the Estate to David D'Addario. (Pl.'s Reply at 37.)

Defendants maintain that although Plaintiffs describe allegations of conduct by various defendants, each of these examples involve discreet conduct between David D'Addario and a single defendant, not a relationship between the defendants as a whole. Thus, Defendants contend that Plaintiffs describe a "hub-and-spoke" structure that courts have deemed insufficient to support a claim under 18 U.S.C. § 1962(c). *See Cedar Swamp Holdings, Inc. v. Zaman,* 487 F. Supp. 2d 444, 450-51 (S.D.N.Y. 2007) ("courts have held that allegations of a hub-and-spokes structure—that is, allegations that a common defendant perpetrated various independent frauds, each with the aid of a different co-defendant—do not satisfy the enterprise element of a RICO claim" but rather "a plaintiff must allege that the defendants operated symbiotically and played necessary roles in the achievement of a common purpose."); *Conte v. Newsday, Inc.,* 703 F. Supp. 2d 126, 135 (E.D.N.Y. 2010) ("Plaintiff alleges that Newsday, its employees, and various independent contractors engaged in a series of independent frauds that somehow benefitted Newsday. These 'hub and spokes' allegations are insufficient to support a conclusion that the various defendants were associated with one another for a common purpose."); *see also McDonough v. First Am. Title Ins. Co.,* No. 10-

---

prove the pattern of racketeering activity and the evidence establishing an enterprise may in particular cases coalesce." 556 U.S. at 947.

CV-106-SM, 2011 WL 285685, at *5 (D.N.H. Jan. 28, 2011) (citing *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300, 370 (3rd Cir.2010)).

Significantly, the Second Circuit cases Plaintiffs claim support their having pled an association-in-fact enterprise involve facts that stand in stark contrast to the allegations in this Complaint. *See United States v. Pierce*, 785 F.3d 832, 838-39 (2d Cir. 2015); *United States v. Applins*, 637 F.3d 59, 73, 77-78 (2d Cir. 2011). In *Pierce*, the Second Circuit affirmed the jury's findings of an association-in-fact enterprise based on evidence that the organization had a base of operation, carried guns to protect them from "beefs with other crews," members had tattoos and signs that signified their membership in the organization, and committed various crimes to further the enterprises goals. 785 F.3d at 838-39. Similarly, in *Applins*, the Second Circuit affirmed a jury's finding that an association-in-fact enterprise existed, known as the "Elk Block Gang," based on evidence that the organization had a set territory of operation, members had tattoos and signs that signified membership in the organization, members pooled their money to purchase narcotics and firearms, members "graduated" into senior membership in the enterprise. 637 F.3d at 65-71. The Court fails to see how the facts in Plaintiffs' Complaint are analogous to *Pierce* and *Applins* and finds that there are not sufficient factual allegations supporting any mutual purpose, nor relationships among Defendants and others associated with the enterprise, to constitute an association-in-fact enterprise. *See Boyle*, 556 U.S. at 946.

Because Plaintiffs' Complaint cannot be plausibly read to allege the existence of an association-in-fact enterprise, their 1962(c) claim fails.[25]

---

[25] The Court therefore will not address Defendants' additional arguments for dismissing Plaintiffs' Section 1962(c) claim.

### iv.  Due to Deficiencies in Substantive claims, Section 1962(d) Must Also be Dismissed

"To establish the existence of a RICO conspiracy, a plaintiff must prove "the existence of an agreement to violate RICO's substantive provisions." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 244 (2d Cir. 1999). "'Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient.'" *Falise v. Am. Tobacco Co.*, 94 F. Supp. 2d 316, 353 (E.D.N.Y. 2000) (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993)); *see also, First Capital*, 385 F.3d at 182 (dismissing plaintiff's conspiracy claim under 1962(d) because they did not "adequately allege a substantive violation of RICO").

### E.  Dismissal of Plaintiffs' RICO Claim

Because Plaintiffs fail to allege a separate and distinct maintenance injury and fail to allege an association-in-fact enterprise, their RICO claim fails and Count One is dismissed.

### F.  Lacking Federal Question or Diversity Jurisdiction, Supplemental Jurisdiction is Declined

Dismissal of Plaintiffs' RICO cause of action (Count One), leaves no basis for federal question jurisdiction. Moreover, the Court lacks diversity jurisdiction over Plaintiffs' remaining state law claims notwithstanding Plaintiffs' contrary contention.[26] Virginia D'Addario has sued not

---

[26] Plaintiffs concede that diversity jurisdiction does not exist for the claims asserted against the Defendants by Virginia D'Addario, Executrix, but argue that because diversity jurisdiction under 28 U.S.C. §1332 exists for the claims against the Defendants asserted by Virginia D'Addario individually the Court retains jurisdiction over the case. This is an incorrect statement of the law. *See e.g.*, *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373–74 (1978) (Section 1332 "require[s] complete diversity of citizenship. That is, diversity jurisdiction does not exist unless each defendant is a citizen of a different State from each plaintiff.").

only on behalf of herself individually but also as Executrix of her mother's Estate and she therefore must establish the citizenship of herself both in her individual capacity and in her official capacity as Executrix. *See e.g., Coello v. Conagra Foods, Inc.*, No. 3:15-CV-83 (CSH), 2015 WL 507580, at *2 (D. Conn. Feb. 6, 2015). As Executrix, Virginia D'Addario is deemed a citizen of Connecticut. *See* 28 U.S.C. § 1332(c)(2) ("the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent."). Because Defendants Silver Knot, LLC and Nicholas Vitti are also citizens of Connecticut, complete diversity is destroyed and the Court has no diversity jurisdiction over the remaining state law claims.

The Court may decline to exercise supplemental jurisdiction where it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). When all bases for federal jurisdiction have been eliminated from a case so that only pendent state claims remain, the federal court should ordinarily dismiss the state claims. *Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966); *see also Baylis v. Marriott Corp.*, 843 F.2d 658, 665 (2d Cir. 1988) ("[W]hen all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."). Since no claims conferring original jurisdiction remains, the Court dismisses Plaintiffs' remaining state law claims.

## III.     Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED. The Clerk is requested to close this case.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 22nd day of March 2017.