UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| VIRGINIA A. D'ADDARIO, Individually, and on behalf of the F. Francis D'Addario Testamentary Trust and the Virginia A. D'Addario Trust; and VIRGINIA A. D'ADDARIO EXECUTRIX, as Executrix of the Probate Estate of Ann T. D'Addario, Deceased, and on behalf of the F. Francis D'Addario Testamentary Trust and the Ann. T. D'Addario Marital Trust,<br><br>*Plaintiff*,<br><br>v.<br><br>DAVID D'ADDARIO; MARY LOU D'ADDARIO KENNEDY; GREGORY S. GARVEY; RED KNOT ACQUISITIONS, LLC; SILVER KNOT, LLC; and NICHOLAS VITTI,<br><br>*Defendants*. | Civil No. 3:16cv99 (JBA)<br><br>August 4, 2021 |

**RULING GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

**I.   Background**

Plaintiff Virginia D'Addario (Virginia) brings this Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, claim against her brother, David D'Addario (David); her sister, Mary Lou D'Addario Kennedy; Gregory Garvey; Nicholas Vitti; Red Knot Acquisitions, LLC; and Silver Knot, LLC. (Second Am. Compl. [Doc. # 73] ¶ 8.) Specifically, Virginia claims, both as an individual and as the Executrix of her mother's estate, that David "plunder[ed], pillage[ed,] and loot[ed] the over $162,000,000 in assets of his deceased father's probate estate." (*Id.* ¶ 28.)

F. Francis D'Addario died in an airplane crash in 1986, with a net worth of approximately $111 million. (*Id.* ¶ 12.) Francis appointed his two sons, David and Larry, along with three non-family members, as Executors of the Estate through his will. (*Id.*) The will provided that one-half of Francis's assets would be placed in a marital trust for the

1

benefit of his wife, Ann D'Addario, and the other half would be equally divided among their five children in separate trusts. (*Id.* ¶ 11.) Although Francis died over three decades ago, his estate remains open in probate court, and therefore distributions have never been made pursuant to Connecticut probate law. (*See id.* ¶ 28.)

According to the terms of the will, if any of the five children predeceases the others while the Estate is open, the deceased child's interest returns to the Estate for *pro rata* distribution to the remaining siblings. (*See id.* ¶ 16-17.) After falling on hard times in 1987, Virginia obtained an advance from the Estate on her distributional interest. (*Id.* ¶ 14.) In exchange, she promised that she would no longer "participate in or take part in Estate deliberations or decisions as regards the Estate or its property," and that she would "waive all rights in her favor against the Executors as regards their administration of the Estate and the validity of their decisions, except for willful fraud, malfeasance or dishonesty." (*Id.* ¶ 14 (internal quotations and alterations omitted).) Virginia also alleges that David told her that she "would never receive another penny from the Estate," and that he would accomplish that by keeping the Estate open until she died. (*Id.* ¶ 16.)

According to Virginia, David has run the Estate "as his personal piggy bank," doing "everything within his power to transfer the significant assets of the Estate for his personal financial benefit." (*Id.* ¶ 20.) In effectuating his plan to pillage the Estate, David "designed and implemented a number of schemes which allowed [him] to acquire an interest in, and then maintain control over, the affairs of his deceased father's $162,000,000 probate estate." (*Id.* ¶ 27.) Now, the Estate has negative net worth while "David is left with a personal net worth in excess of $500,000,000." (*Id.* ¶ 28.) Among these schemes are the Silver Knot/Wise Metal Scheme and the Red Knot Forbearance Agreement Scheme that are at issue in this motion.

     *i.*    *Silver Knot/Wise Metal Scheme*

Shortly after his father's death, David acquired on behalf of the Estate, an equity interest in New England Redemption in exchange for free rent at the Estate's Bridgeport

Brass Building. (*Id.* ¶ 80.) New England Redemption became a highly successful business and sold for millions of dollars in profits, a quarter of which David acquired on the Estate's behalf. (*Id.* ¶ 81.) In 1999, David and his friend Gregory Garvey created Silver Knot, LLC "to acquire legal title for a controlling interest in Wise Metals, which is a producer of aluminum can stock for the beverage industry," using the proceeds from the New England Redemption sale. (*Id.* ¶ 82.) In 2014, Constellium N.V., a Dutch aluminum company, acquired Wise Metals by purchasing Silver Knot for $1.4 billion, $455,000,000 of which was in cash. (*Id.* ¶ 84.) Instead of paying the profits of the sale back into the Estate, Virginia alleges that David "converted those sale proceeds for his personal financial gain and for the benefit of his co-conspirator Defendants." (*Id.*)

### ii. Red Knot Forbearance Scheme

When the Estate opened in March of 1986, it had liabilities totaling $41,363,977 and assets of $162,636,000, giving the Estate a net worth of just over $120 million. (*Id.* ¶ 48.) Approximately half of the Estate's debt was owed to three banks: Connecticut National Bank, Connecticut Bank and Trust Company, and People's Bank (collectively, the "Bank Group"). (*Id.* ¶ 49.) As a condition of one of the Bank Group loans, the Executors agreed to "stringent limitations on . . . management and operation of the Estate" including "imposition of a strict budget and detailed reporting requirements" and "utiliz[ation of] diligent and good faith efforts to sell the assets of the Estate so as to effect periodic payments to creditors and thereby settle the Estate in a timely manner." (*Id.* ¶¶ 50-51.)

By June 30, 1992, the Executors failed to meet any of the Bank Group's requirements and, as a result, Bank Group filed a Joint Application for Removal of Executors in which it alleged, *inter alia*, that David had serious conflicts of interest. (*Id.* ¶¶ 52-53.) No judicial action was taken on this for over five years, at which point Bank Group sought to settle the debt to avoid the continued delay involved with probate court and ameliorate its financial difficulties, including FDIC receivership. (*Id.* ¶¶ 54-55.) Bank Group ultimately agreed to

3

extinguish the Estate's loan obligation of over $48 million in exchange for a one-time cash payment of $4.75 million. (*Id.* ¶ 55.) David declined this offer, instead urging co-Defendant Gregory Garvey to create an entity called Red Knot Acquisitions, LLC. (*Id.* ¶ 56.) Red Knot bought out Bank Group's position and entered into a forbearance agreement with the Estate. (*Id.*) This agreement gave Red Knot a lien on virtually all of the Estate's assets, including numerous securities, and provided that if David was ever removed as an executor that Red Knot would have "the immediate right to engage in collection efforts on the over $48,000,000 allegedly owed to Red Knot." (*Id.* ¶ 60; Forbearance Agreement, Ex. C to Second Am. Compl. [Doc. # 73-1] at 27.)

According to Virginia, the forbearance agreement was a sham and made it practically impossible to remove David as Executor. (*See id.* ¶ 63.) "Rather than operate as a mechanism for a legitimate secured creditor (purportedly, Red Knot) and a debtor (the Estate) to extend and work out a debtor's defaulted loan obligations, here the Red Knot Forbearance Agreement was used by David and Garvey as a mechanism for David to stay in control of the Estate for as long as he desired." (*Id.* ¶ 65.) Although the forbearance agreement had a provision that would allow the Estate to repurchase Bank Group's loan position from Red Knot at a steep discount, the Estate never exercised this option despite having funds available to do so. (*Id.* ¶ 68.)

### A. Procedural History

Virginia filed this suit in the U.S. District Court for the District of Connecticut in January 2016 "after fruitless efforts in Connecticut state courts." *D'Addario v. D'Addario*, 901 F.3d 80, 91 (2d Cir. 2018). She alleged RICO violations and state law claims. (*Id.*) Defendants filed a motion to dismiss which this Court granted in its entirety "because Plaintiffs fail[ed] to adequately plead substantive RICO violations, there is no diversity of parties, and the Court will not exercise supplemental jurisdiction over the state law claims." *D'Addario v. D'Addario*, No. 3:16cv99 (JBA), 2017 WL 1086772, at *1 (D. Conn. Mar. 22, 2017), *vacated*

4

*and remanded*, 901 F.3d 80, 91 (2d Cir. 2018). On appeal, the Second Circuit revived Virginia's RICO claim and directed this Court to reconsider on remand whether to exercise supplemental jurisdiction over her remaining state law claims. *D'Addario*, 901 F.3d at 104-105.

On remand, the Court granted in part Virginia's motion for leave to file a second amended complaint and elected to exercise supplemental jurisdiction over her remaining state law claims. (Order on Pl.'s Mot. to Stay or Decline Suppl. Jurisdiction [Doc. # 88] at 2-3.) However, Virginia subsequently moved to stay consideration of all state law claims or otherwise decline to exercise supplemental jurisdiction over those claims pending resolution of Connecticut state law claims in the existing state court suit. (*Id.* at 3.) The Court then granted Virginia's motion and declined to exercise supplemental jurisdiction, thereby dismissing counts Two, Three, Four, Five, and Eight of the Second Amended Complaint. (*Id.* at 10.)

Several months later, and after significant discovery disputes, Defendants filed this Motion for Judgment on the Pleadings [Doc. # 114] arguing that Virginia's federal claims are precluded in their entirety by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which states that "no person may rely upon conduct that would have been actionable as fraud in the purchase or sale of securities to establish a [RICO] violation." (Defs.' Mem. in Supp. of Mot. for J. on the Pleadings [Doc. # 114-1] at 5,8.)

## II.   Legal Standard

"When deciding Rule 12(c) motions for judgment on the pleadings, a court employs the standard that applies to motions to dismiss a complaint under Rule 12(b)(6)." *Walker v. Sankhi*, 494 Fed. App'x 140, 141-142 (2d Cir. 2012) (citing *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011)). The Court therefore must "accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the counter-claimant." *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010) (internal

quotation marks omitted). "To survive a Rule 12(c) motion, plaintiffs' complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (internal quotation marks and alterations omitted).

### III.     Discussion

RICO creates civil and criminal liability for entities engaged in "a pattern of racketeering activity." 18 U.S.C. §§ 1962(a)-(d), 1964. Section 107 of the Private Securities Litigation Reform Act ("PSLRA") amended the RICO statute by providing that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c). The purpose of this bar, often referred to as the RICO Amendment, is "to prevent litigants from using artful pleading to boot-strap securities fraud cases into RICO cases, with their threat of treble damages." *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 274 (2d Cir. 2011) (internal quotation marks omitted).

Defendants maintain that Virginia's RICO claim is barred in its entirety because "Defendants' alleged misconduct coincides with the purchase and sale of securities." (Defs.' Mem. at 14.) Defendants point especially to Virginia's allegations regarding the Red Knot Forbearance Agreement Scheme and the Silver Knot/Wise Metal Scheme, both of which "rely on – and allege fraud in connection with – the purchase and sale of securities." (*Id.* at 14-15.) Since Virginia alleged that these two schemes were part of Defendants' overall fraudulent scheme, they contend the entire claim is barred by the RICO Amendment to the PSLRA. (Id. at 15.) Virginia disagrees, emphasizing that "[t]his is not a case which, at its core, is a securities fraud case artfully pled as a RICO suit." (Pl.'s Mem. at 5.) Although she concedes that the Second Amended Complaint mentions securities, the RICO Amendment does not prohibit all claims involving securities, only those that allege "conduct that would have been actionable as fraud in the purchase or sale of securities." (*Id.* (quoting 18 U.S.C. § 1964(c)).)

To resolve this dispute, the Court must determine what the phrase "would have been actionable as fraud in the purchase and sale of securities" means and whether the conduct Virginia alleges fits that definition.

*MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268 (2d Cir. 2011), a case that arose out of the infamous Ponzi scheme perpetrated by Bernie Madoff, offers the most comprehensive picture of Second Circuit jurisprudence on the meaning of the RICO Amendment. MLSMK was an entity that had invested $12.8 million with Madoff's investment company, all of which was lost following his arrest and the seizure of his assets. *Id.* MLSMK filed suit against a bank in which Madoff deposited his fraudulently obtained proceeds. *Id.* at 271. The bank, MLSMK alleged, knew that proceeds were not legitimately Madoff's but continued doing business with him in violation of RICO. *Id.* at 272. Although the plaintiff alleged that MLSMK had aided and abetted securities fraud, a claim that cannot form the basis of a private right of action under section 10(b) of the Securities Exchange Act of 1934, the Second Circuit concluded that the RICO Amendment bar still applied. *Id.* at 277. In reaching its decision, the Second Circuit emphasized the plain language of the statute which states that "no *person* may rely upon *any conduct* that would have been actionable as fraud in the purchase or sale of securities."[1] *Id.* at 278 (emphasis in original). This language "does not require that the same plaintiff who sues under RICO must be the one who can sue under securities laws; its wording does not make such a connection." *Id.* (internal quotations and alterations omitted). Moreover, the PSLRA's legislative history makes clear that "Congress did not say that it was removing any *claim* that would have been actionable." *Id.* at 279. "Its focus was on the behavior alleged to satisfy RICO's predicate-act requirement." *Id.*

---

[1] "Put differently, if the alleged conduct could form the basis of a securities fraud claim against any party – be it against, or on behalf of, the plaintiff, defendants or a non-party – it may not be fashioned as a civil RICO claim." *Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, 286 F. Supp. 3d 634, 544 (S.D.N.Y. 2017) (emphasis in original).

The Second Circuit noted that its interpretation in *MLSMK* was consistent with the decisions of several of its sister circuits. *Id.* at 280 (citing *Affco Invs. 2001, LLC v. Proskauer Rose, LLP*, 625 F.3d 185, 189-191 n.5 (5th Cir. 2010); *Bixler v. Foster*, 596 F.3d 751 759-760 (10th Cir. 2010); *Howard v. Am. Online Inc.*, 208 F.3d 741, 749 (9th Cir. 2000); *Bald Eagle Area Sch. Dist. v. Keystone Financial, Inc.*, 189 F.3d 321, 330 (3d Cir. 1999)). In *Bixler v. Foster*, the Tenth Circuit looked to interpretations of section 10(b) of the Securities Exchange Act of 1934 to decide what predicate conduct the RICO Amendment barred, concluding that the plaintiff's allegations "that defendants defrauded them from receiving UKL stock as provided in the transaction, and the subsequent (allegedly fraudulent) merger of UKL and Monara" adequately described a purchase or sale securities sufficient to trigger the RICO Amendment, citing caselaw that such conduct violated section 10(b). *Bixler*, 596 F.3d at 759-760 (citing *SEC v. Nat'l Sec. Inc.*, 393 U.S. 453, 467 (1969); *Realmonte v. Reeves*, 169 F.3d 1280, 1285 (10th Cir. 1999); *Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 596-597 (2001)).

In *Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, 286 F. Supp. 3d 634 (S.D.N.Y. 2017), the district court explained that many "courts have consulted an obvious source in Section 10(b) of the Securities Exchange Act of 1934" in defining what constitutes conduct actionable as fraud for purposes of the RICO Amendment. 286 F. Supp. 3d at 644. It relied heavily on *SEC v. Zandford*, in which the Supreme Court took a broad view of the phrase "in connection with the purchase or sale of securities," in holding that a broad scheme to loot a company where the looting "included pillaging portfolio companies of their equity, re-directing Zohar's equity interests for Defendants' benefit, and diverting the equity distributions in Defendants' coffers" was barred by the PSLRA. *Id.* at 651.

*Zandford* directed courts to interpret the phrase "in connection with the purchase or sale" in the context of Section 10(b) "not technically and restrictively, but flexibly to effectuate its remedial purposes." *SEC v. Zandford*, 535 U.S. 813, 820 (2002). Applying this

8

approach, the Supreme Court concluded that a stockbroker's actions selling a client's securities held in his investment account and making personal use of the proceeds constituted a fraud under Section 10(b) because the "scheme to defraud and the sale of securities coincide[d]." *Id.* at 822. Even though the sales themselves were lawful, the stockbroker's misappropriation of the proceeds of that sale was deceptive because it was not authorized by or disclosed to the clients and was thus properly viewed as a course of business that used fraud and deceit. *Id.* But even a flexible view has its limits, and courts cannot construe the statute "so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)." *Id.* In focusing the scope of its rule, particularly as it related to breaches of fiduciary duty, the Supreme Court explained that this "analysis does not transform every breach of fiduciary duty into a federal securities violation." *Zandford*, 535 U.S. at 824 n.4. For example, where a broker embezzles cash from a client's account, . . . the fraud would not include the requisite connection to a purchase or sale of securities." *Id.*

With regard to the Silver Knot/Wise Metals Scheme, Virginia alleges that David, as executor, "offered free rent in the Estate's Bridgeport Brass Building [to New England Redemption] in exchange for a 25% ownership interest in the venture." (Am. Compl. ¶ 80.) In other words, David acquired an equity interest in New England Redemption on behalf of the Estate. After New England Redemption became very successful, David "converted the profits from the sale of New England Redemption for his personal financial benefit[] and refused to plow those profits back into the Estate," instead using those proceeds to acquire a majority interest in Wise Metals via Silver Knot, an entity created to allow David to acquire a controlling interest in Wise Metals. (*Id.* ¶¶ 82-83.) When Wise Metals sold in 2014 for $1.4 billion, David "converted those sale proceeds for his personal financial gain and for the benefit of his co-conspirator Defendants named herein, and, in breach of his fiduciary duties, has not plowed any of the profits from the sale of Wise Metals back into the Estate." (*Id.* ¶

84.) Since Virginia alleges that David had, since 1987, acted in accordance with a plan to "plunder, pillage and loot" the Estate for his personal benefit, the only plausible reading of the Second Amended Complaint is that David sold these securities for his personal financial gain in breach of his fiduciary duty as Executor.

And with the Red Knot Scheme, Virginia alleges that David granted a lien on virtually all of the Estate's assets, including securities, in exchange for a sham forbearance agreement that harmed the Estate and had the practical effect of making it impossible to remove him as Executor. (*See* Am. Compl. ¶¶ 59-65.) As in *Zandford* where the investor's theft of proceeds from a lawful sale of his client's securities was found to involve the purchase or sale of securities, the Second Amended Complaint alleges that this posting of Estate securities as collateral, which amounts to a purchase or sale of securities, was done in breach of David's fiduciary duty so as to remain Executor.

Although these alleged schemes satisfy the "coincide" standard set forth in *Zandford*, Virginia still contends that these allegations are not sufficiently related to securities fraud to trigger the RICO Amendment. She claims that the Supreme Court clarified in *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377 (2014), that the connection between the sale of securities and the fraud must be "a connection that matters" "where the misrepresentation makes a significant difference to someone's decision to purchase or to sell a covered security." (Pl.'s Mem. (quoting *Chadbourne & Parke*, 571. U.S. at 387-388).)

In *Chadbourne*, the plaintiffs, who purchased certificates of deposit (CD), brought class action lawsuits against defendants who they claimed assisted Allen Stanford and his bank in perpetrating a multibillion dollar Ponzi scheme. 571 U.S. at 384-385. The defendants moved to dismiss the complaints because the Securities Litigation Uniform Standards Act of 1998 (SLUSA) prohibited large securities class actions based on violations of state law in which the plaintiffs allege "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security" and the plaintiffs' expectation that their CDs

10

would be invested in covered securities was sufficient to trigger the SLUSA bar. The Supreme Court disagreed, finding the connection too tenuous. *Id.* at 385-386.

*Chadbourne* regards a different statute where the crucial words preceding "in connection with the purchase or sale of a covered security," are "a misrepresentation or omission of a material fact."[2] *Id.* There is no similar materiality requirement in the RICO Amendment. *Chadbourne* explicitly embraced the standard set forth in *Zandford*, explaining that where victims who maintain an ownership interest in a security are defrauded, the fraud has a material connection to the purchase or sale of a security. *Id.* at 388-389. The *Chadbourne* plaintiffs had invested in CDs with fixed interest rates that did not fluctuate directly with the value of the securities, whereas in *Zandford*, a securities broker claimed he would invest the client's funds, but instead made personal use of the money, leaving the clients with nothing.

Here, Virginia alleges that she had a vested interest in the assets of the Estate immediately upon her father's death as a 12.5 percent beneficiary under her father's will. (SAC ¶¶ 11, 17.) The value of the Estate, which includes securities, and thus Virginia's entitlement, rises and falls directly with the value of the securities allegedly involved in the overall fraudulent scheme. The Parties do not dispute that Virginia has an ownership interest in the securities within the meaning of *Chadbourne*, and her stake in the fluctuating value of the securities is precisely the type of interest contemplated by *Chadbourne*. *See also*, *Great Western Ins. Co. v. Graham*, 2020 WL 3415026 (S.D.N.Y. June 22, 2020) (holding that the plaintiff beneficiary of a trust maintained an ownership interest within the meaning of *Chadbourne* in the assets of a trust account, which were subsequently traded as part of an allegedly fraudulent scheme). Thus, even though *Chadbourne* relates to a different statute that, unlike the RICO Amendment, imposes a materiality requirement, the alleged fraud here

---

[2] "The phrase 'material fact in connection with the purchase or sale' suggests a connection that matters." *Id.* at 377-378.

still materially relates to Virginia's ownership interest in the securities of her father's estate and would be actionable under the RICO Amendment.

### IV. Conclusion

Because the factual allegations of the Second Amended Complaint describe David's fraudulent conduct as coinciding with the sale or purchase of securities, Plaintiff's claim is barred by the RICO Amendment. The Court therefore grants Defendants' Motion for Judgment on the Pleadings [Doc. # 114].

The Clerk is directed to close this case.

                                              IT IS SO ORDERED.

                                            /s/

                                          Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 4th day of August 2021.